IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J.L. FRENCH AUTOMOTIVE CASTINGS, | ) | Case No. 09-[_____] ( ) |
| INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY PRIMING BASIS; (II) AUTHORIZING DEBTORS' USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A FINAL HEARING

J.L. French Automotive Castings, Inc. and its affiliated chapter 11 debtors,

debtors and debtors in possession (collectively, the "Debtors") move the Court for entry of an

interim order (a copy of which is attached hereto as Exhibit A, the "Interim Order") and a final

order (the "Final Order"; together with the Interim Orders, the "DIP Orders") pursuant to

sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code") (i) authorizing the Debtors to obtain postpetition financing (the "DIP

Facilities") on a superpriority administrative claim and first priority priming lien basis, (ii)

authorizing the Debtors' use of cash collateral, (iii) granting adequate protection to the Debtors'

prepetition secured lenders for the priming of their existing liens and use of cash collateral, (iv)

---

[1]    The Debtors in these cases along with the last four digits of each of the Debtors' federal tax identification numbers are:  J.L. French Automotive Castings, Inc., (3670); French Holdings LLC, (0518); Nelson Metal Products LLC (4939); Allotech International LLC (5832); J.L. French LLC (8901); J.L. French Automotive, LLC (7075); Central Die, LLC (7793).  The Debtors' headquarters and mailing address is:  3101 South Taylor Drive, Sheboygan, WI 53082.

setting the time for a final hearing, and (iv) granting related relief (the "Motion"). Any capitalized term used but not defined herein shall have the meaning ascribed to it in the Interim Order or DIP Financing Documents (defined below), as applicable. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, and Rule 4001 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Rules").

## Background

3.      On July 13, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.

4.      The Debtors are leading global designers and producers of high-pressure aluminum die-castings, specializing in automotive powertrain components. The Debtors currently produce a broad range of aluminum die-cast components and assemblies, including engine blocks, oil pans, transmission cases, engine covers, bedplates, ladderframes, cam covers,

and front end accessory drive brackets. The Debtors principal manufacturing facilities are located in Wisconsin and Kentucky, and their corporate headquarters are in Sheboygan, Wisconsin. In 2008, approximately 95% of the Debtors' sales went to four customers— Ford Motor Company, General Motors Corporation, Chrysler LLC, and Magna International, Inc.

### The Need for Postpetition Financing

5.     As discussed in greater detail below, economic forces beyond the Debtors control have placed significant stress on the Company's liquidity. Significant declines in order volumes from the Debtors' principal customers, combined with the unwillingness of traditional lenders to lend against accounts receivables generated by General Motors and Chrysler, have placed substantial liquidity pressures on the Debtors. As of the Petition Date, the Debtors had cash on hand of approximately $11 million, which, along with cash flow from operations, will not be sufficient to pay for the Debtors' costs during a three or four month chapter 11 case. Depending on how aggressive the Debtors' principal vendors and tool suppliers are with respect to trade terms for post-petition deliveries, and given the substantial additional costs associated with administering a chapter 11 case, the Debtors will need access to some borrowing capacity. Therefore, in order to implement the substantial deleveraging that the Debtors plan to accomplish in these Chapter 11 Cases, the Debtors must have access to the $15 million of borrowing capacity being made available under the Senior Secured Super-Priority Debtor-in-Possession Credit and Guaranty Agreement (a copy of which is attached hereto as Exhibit B, the "DIP Credit Agreement") and the attendant mortgage, pledge, security, guaranty and other related documents, agreements and instruments (collectively with the DIP Credit Agreement, as amended, supplemented or otherwise modified from time to time, the "DIP Financing Documents").

## Events Leading to Filing

6.    Following their emergence from their 2006 bankruptcy cases, the Debtors have encountered significant operational and financial difficulties. In 2008, nearly all of the Debtors' revenue was directly or indirectly related to light vehicle production of its primary customers Ford, General Motors and Chrysler (collectively, the "Domestic Automakers"; and together with Magna International, Inc., the "OEMs"). The Domestic Automakers' North American light vehicle production fell from 9.5 million vehicles in 2007 to 7.5 million vehicles in 2008, and are projected to fall to 4.2 million vehicles in 2009, a more than 50% drop from just two years ago.

7.    The Domestic Automakers' production levels have been in decline for several years due to a number of factors including, among other things, global competition, significant legacy costs and high energy costs, but this current precipitous decline was triggered by the current global credit crisis and the resulting deterioration of consumer confidence and consumer spending which has devastated the automobile industry. The credit crisis, coupled with the significant recent deterioration in the Domestic Automakers' market share and vehicle production, has all but eliminated the availability of capital to support the operations of automotive suppliers, as credit providers have become increasingly concerned with the future viability of the Domestic Automakers. For instance, within the past six months the funding provider under the Debtors' accounts receivable factoring arrangement determined that it would no longer factor receivables owed to the Debtors by any of the Domestic Automakers, resulting in a significant reduction in the Debtors' liquidity.

8.    While most of the Debtors' product lines are profitable, the Debtors' financial results have been seriously impaired by the loss of sales volume under many of their

existing customer contracts. Over the past several years, the Debtors invested significant amounts of capital to expand their die-casting and machining capacity in support of specific customer production contracts that in many cases failed to generate the expected level of sales volume. The precipitous decline in volume under these contracts and related loss of revenue have rendered the Debtors unable to generate sufficient cash flow to service their debt obligations. The Debtors' financial woes have been exacerbated by the refusal of some of their customers to award certain new business because of the Debtors' over-leveraged balance sheet.

9.     The Debtors' liquidity has been severely constrained in recent months as a result of the volume declines described above, and also due to the loss of their ability to factor receivables from the Domestic Automakers. In April 2009, Wells Fargo Business Bank terminated their accounts receivable factoring program with the Debtors. As a result, the Debtors had no access to traditional working capital borrowing, they had insufficient cash to stay current on their payment obligations under their secured debt, and they were unable to make the capital improvements needed to pursue the growth and development initiatives necessary to remain competitive in their industry.

10.     During the past five months, the Debtors engaged Milbank, Tweed, Hadley & McCloy LLP as restructuring counsel, Houlihan, Lokey, Howard & Zukin Capital, Inc. as investment banker and financial advisor, and Conway, McKenzie & Dunleavy as financial and operational restructuring advisor. In conjunction with its advisors, the Debtors concluded that unless they substantially reduce their debt obligations, they could no longer fund the capital expenditures required to launch new products and reliably supply high-quality and well-engineered parts, and, accordingly, that the lenders under the Prepetition Credit Facilities

(defined below) would have to convert their debt investments in the Debtors into equity of the reorganized Debtors.

11.    By early February 2009, the Debtors were in default under several provisions of their Prepetition Credit Facilities, partly because of their failure to make the scheduled interest payments due under the Prepetition Credit Facilities. The Debtors began negotiating with the Prepetition First Lien Term Agent, Prepetition First Lien Revolver Agent and the Prepetition Second Lien Agent (each defined below).

12.    On February 13, 2009, the Requisite Lenders under, and as defined in, the Prepetition First Lien Credit Agreement entered into the Forbearance and Standstill Agreement (First Lien) ("First Lien Forbearance Agreement") with the Debtors, pursuant to which the Prepetition First Lien Lenders (defined below) agreed to temporarily forbear from the exercise of the remedies available to them under the Prepetition First Lien Credit Facilities until February 23, 2009. Pursuant to several letter agreements, the term of the First Lien Forbearance Agreement was extended to July 15, 2009.

13.    Also on February 13, 2009, the Debtors entered into the Forbearance and Standstill Agreement (Second Lien) (the "Second Lien Forbearance Agreement") with the Requisite Lenders under, and as defined in, the Prepetition Second Lien Credit Agreement, pursuant to which the Prepetition Second Lien Lenders (defined below) agreed to temporarily forbear until February 23, 2009, from the exercise of the remedies available to them under the Prepetition Second Lien Credit Facility. Pursuant to several letter agreements, the term of the Second Lien Forbearance Agreement was extended to July 15, 2009.

14.    During the time that the First and Second Lien Forbearance Agreements were in place, the Debtors, the term loan and revolving lenders under the Prepetition First Lien

Credit Facilities, the Prepetition Second Lien Lenders and certain of the OEMs began discussing the terms of a consensual chapter 11 restructuring pursuant to which such the term loan lenders would convert their debt to equity in the Reorganized Debtors, the revolving lender would receive a restructured note and the OEMs would make certain modifications to the OEM Agreements requested by the Debtors. The terms of the parties' agreement are contained in that certain Restructuring Lock-Up Agreement, dated as of July 12, 2009, a copy of which is attached to the Declaration of Thomas Musgrave in Support of the First Day Motions, filed concurrently herewith (the "First Day Declaration") as Exhibit B.

15. Additional information regarding the Debtors' businesses, capital structure and the circumstances leading to the filing of these chapter 11 cases are contained in the First Day Declaration which is incorporated herein by reference.

16. As set forth in the First Day Declaration, the Debtors are party to the following prepetition credit facilities:

### The Prepetition First Lien Credit Facilities

i. **Prepetition First Lien Credit Agreement**. J.L. French Automotive Castings, Inc., as borrower (the "Prepetition Borrower"), certain subsidiaries of Prepetition Borrower, as guarantors, certain lenders (the "Prepetition First Lien Lenders"), Wilmington Trust FSB (as successor to Goldman Sachs Credit Partners L.P.), as term loan administrative agent (in such capacity, the "Prepetition First Lien Term Loan Administrative Agent"), arranger, syndication agent and sole bookrunner, and CapitalSource Finance LLC, as revolving loan administrative agent (in such capacity, the "Prepetition First Lien Revolving Loan Administrative Agent," and together with the Prepetition First Lien Term Loan Administrative Agent, the "Prepetition First Lien Administrative Agents") and as collateral agent (in such

capacity, the "Prepetition First Lien Collateral Agent," and together with the Prepetition First Lien Administrative Agents, the "Prepetition First Lien Agents") are party to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of May 14, 2007, and amended and restated as of July 12, 2009 (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition First Lien Credit Agreement," and together with the attendant pledge, mortgage, security and guaranty and other related agreements, documents and instruments, the "Prepetition First Lien Credit Facilities").

        ii.      **Prepetition First Lien Credit Parties**.  The Prepetition Borrower is liable as a primary obligor for repayment of the Loan (as defined in the Prepetition First Lien Credit Agreement, and as used herein, the "Prepetition First Lien Loan").  Certain subsidiaries of J.L. French (the "Prepetition First Lien Guarantors," and together with the Prepetition Borrower, the "Prepetition First Lien Credit Parties") guarantee the Prepetition First Lien Obligations (as defined below) owed by the Prepetition Borrower.

        iii.     **Prepetition First Lien Collateral**.  Each Prepetition First Lien Credit Party has pledged to Prepetition First Lien Collateral Agent, for the Secured Parties (as defined in the Prepetition First Lien Credit Agreement, and as used herein, the "Prepetition First Lien Secured Parties") substantially all of its assets and property (the "Prepetition First Lien Collateral") as security for repayment of the Prepetition First Lien Obligations pursuant to, among other things, (I) that certain Pledge and Security Agreement, dated as of May 14, 2007, as amended and restated as of July 12, 2009 and (II) certain Mortgages (each as defined in the Prepetition First Lien Credit Agreement and collectively, the "Prepetition First Lien Security Documents").

iv. **Prepetition First Lien Secured Parties' Consent to Subordination of Liens**. Pursuant to the Prepetition First Lien Credit Agreement, the Requisite Lenders (as defined therein), on behalf of all Prepetition First Lien Secured Parties, have consented to the subordination of all liens securing the Prepetition First Lien Obligations and all Adequate Protection Superpriority Claims granted with respect to the Prepetition First Lien Obligations to the DIP Liens and the DIP Superpriority Claims

### The Prepetition Second Lien Credit Facility.

i. **Prepetition Second Lien Credit Agreement**. Prepetition Borrower, certain subsidiaries of Prepetition Borrower, as guarantors, certain lenders (the "Prepetition Second Lien Lenders"), the Bank of New York (as successor to Goldman Sachs Credit Partners L.P.), as administrative agent (in such capacity, the "Prepetition Second Lien Administrative Agent," and together with the Prepetition First Lien Administrative Agents, the "Prepetition Administrative Agents") and collateral agent (in such capacity, the "Prepetition Second Lien Collateral Agent," and together with (i) the Prepetition First Lien Collateral Agent, the "Prepetition Collateral Agents" and (ii) the Prepetition Second Lien Administrative Agent, the "Prepetition Second Lien Agents;" as used herein, "Prepetition Agents" means the Prepetition First Lien Agents and the Prepetition Second Lien Agents) are party to that certain Amended and Restated Second Lien Credit and Guaranty Agreement, dated as of May 14, 2007, and amended and restated as of July 12, 2009, 2009 (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Second Lien Credit Agreement," and together with the attendant pledge, mortgage, security and guaranty and other related agreements, documents and instruments, the "Prepetition Second Lien Credit Facility."

ii.     **Prepetition Second Lien Credit Parties**.  The Prepetition Borrower is liable as a primary obligor for repayment of the Loan (as defined in the Prepetition Second Lien Credit Agreement, and as used herein, the "Prepetition Second Lien Loan").  Certain subsidiaries of J.L. French (the "Prepetition Second Lien Guarantors," and together with the Prepetition Borrower, the "Prepetition Second Lien Credit Parties") have guaranteed the Prepetition Second Lien Obligations (as defined below) owed by the Prepetition Borrower.

iii.     **Prepetition Second Lien Collateral**.  Each Prepetition Second Lien Credit Party has pledged to Prepetition Second Lien Collateral Agent, for the Secured Parties (as defined in the Prepetition Second Lien Credit Agreement, the "Prepetition Second Lien Secured Parties,") substantially all of its assets and property (the "Prepetition Second Lien Collateral") as security for repayment of the Prepetition Second Lien Obligations pursuant to, among other things, (I) that certain Pledge and Security Agreement, dated as of May 14, 2007, and as amended and restated as of July 12, 2009, and (II) certain Mortgages (each as defined in the Prepetition Second Lien Credit Agreement and collectively, the "Prepetition Second Lien Security Documents").

iv.     **Prepetition Second Lien Secured Parties' Consent to Subordination of Liens**.  Pursuant to the Prepetition Second Lien Credit Agreement, the Requisite Lenders (as defined therein), on behalf of all Prepetition Second Lien Secured Parties, have consented to the subordination of all liens securing the Prepetition Second Lien Obligations and all Adequate Protection Superpriority Claims granted with respect to the Prepetition Second Lien Obligations to the DIP Liens and the DIP Superpriority Claims.

17.     The Prepetition First Lien Credit Facility and the Prepetition Second Lien Credit Facility are referred to collectively as the "Prepetition Credit Facilities."  The Prepetition

First Lien Collateral and the Prepetition Second Lien Collateral are referred to collectively as the "Prepetition Collateral." The Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties are referred to collectively as the "Prepetition Lender Secured Parties." The Prepetition Lender Secured Parties, together with the holder of the Prepetition Interest Rate Swap Claim, but solely to the extent, if any, that the Prepetition Interest Rate Swap Claims are secured by existing, valid, perfected, enforceable and non-avoidable liens any DIP Collateral, are referred to herein as the "Prepetition Secured Parties."

18.     As of the Petition Date, the Debtors owed approximately $204 million of borrowings under the Prepetition First Lien Credit Facilities, approximately $60 million of borrowings under the Prepetition Second Lien Credit Facility, approximately $15 million under an unsecured interest rate swap with Morgan Stanley Capital Services Inc. ("MSCS") (the "Prepetition Interest Rate Swap Claims") which MSCS asserts is a secured claim.

### Summary of Terms of DIP Facilities

19.     A summary of certain key terms of the proposed DIP Facilities is set forth below (the "Rule 4001 Summary"). In addition, attached hereto as Exhibit C is the "Discussion Term Sheet for Debtor in Possession Financing ("DIP Financing")" (the "DIP Term Sheet") that the Debtors and DIP Lenders ultimately agreed on, and upon which the DIP Financing Documents are based. The DIP Term Sheet is a more extensive summary of the terms of the DIP Financing Documents than the Rule 4001 summary below. The Rule 4001 Summary and the DIP Term Sheet are both qualified in their entirety by reference to the provisions of the DIP Financing Documents, and the DIP Financing Documents will control in the event of any inconsistency between this Motion, the Rule 4001 Summary, the Term Sheet and the DIP Financing Documents.

| | |
|---|---|
| **Borrower:** | J.L. French Automotive Castings, Inc. |
| **Guarantors:** | Nelson Metal Products LLC; Allotech International LLC; J.L. French Automotive, LLC; French Holdings LLC; J.L. French LLC; Central Die, LLC |
| **Syndication Agent:** | DDJ Capital Management, LLC. |
| **Administrative Agent/Collateral Agent:** | Wilmington Trust FSB as administrative agent and collateral agent for the Lenders. |
| **Lenders:** | Some or all of the Lenders under the Prepetition First Lien Credit Facility and the Prepetition Second Lien Credit Facility. |
| **Amount of Facilities:** | Up to $15.0 million of senior secured bank financing (exclusive of any capitalized interest or expenses) to include: up to $10.0 million senior secured Tranche A term loan, and up to $5.0 million senior secured Tranche B term loan. |
| **Purpose/Use of Proceeds:** | The proceeds of the DIP Facilities shall be applied to fund expenses in accordance with a budget prepared by the Borrower and approved by the Lenders. |
| **Closing Date:** | The date on which the Interim Order is entered by the Court and the other conditions precedent to the DIP Facilities are satisfied or waived, as determined by the Lenders in their sole discretion. |
| **Maturity/Term:** | The earlier of (a) 120 days after (and including) the Closing Date and (b) the effective date of the plan of reorganization, the terms and conditions of which shall be substantially the same as described in the Restructuring Lock-Up Agreement (such plan of reorganization, the "Plan"); provided that the DIP Facilities may be rolled into an exit facility on terms and conditions acceptable to the Requisite Lenders and the Borrower in their respective sole discretion. |
| **Interest Rate:** | All amounts outstanding under the Facilities will bear interest, at the Borrower's option, as follows: |
| | (i) at the Base Rate (which in no event shall be less than 4.00%) and plus 4.00% *per annum*; or |
| | (ii) at the reserve Adjusted Eurodollar Rate (which in no event shall be less than 3.00%) plus 5.00% *per annum*. |
| **Interest Payments** | Monthly for loans bearing interest with reference to the Base Rate; on the last day of the applicable interest period (which |

shall be one month) for loans bearing interest with reference to the reserve adjusted Eurodollar Rate; and upon prepayment, in each case payable in arrears and computed on the basis of a 360-day year (365/366 day year with respect to loans bearing interest with reference to the Base Rate).

**Fees:**

The Borrower has agreed to the following:

- <u>Syndication Agent, Arranger and Administrative Agent Fees</u>: Fees in an amount equal to (a) $75,000 per annum, payable to DDJ Capital Management, LLC, in its capacity as the Syndication Agent, and (b) (i) for the period from the Closing Date through and until August 31, 2009, $48,000, and (ii) for each three-month period occurring after August 31, 2009, $9,000, payable to Wilmington Trust FSB in its capacity as Administrative Agent.

- <u>Upfront Commitment Fees</u>: Commitment fees ratably to the Lenders party to the DIP Financing Documents on the Closing Date in an amount equal to 3.00% of the maximum amount of the Facilities, payable to such Lenders on the Closing Date.

- <u>On-Going Commitment Fees</u>: Commitment fees equal to 1.00% *per annum* times the daily average undrawn portion of the Tranche A Term Facility or the Tranche B Term Facility, as the case may be, will accrue from the Closing Date and will be payable monthly in arrears.

- <u>Closing fees</u> to each Lender party to the DIP Financing Documents on the Closing Date or the Initial Tranche B Funding Date, as the case may be, in each case, in an amount equal to 3.00% of the stated principal amount of such Lender's loans and unfunded commitment under the applicable Tranche A or B Facility and payable to such Lender out of the proceeds of the initial loan made to the Borrower under the applicable Tranche A or B Facility.

- <u>Backstop Fees</u>: Backstop fees to each of the Backstop Lenders in an amount equal to 2.00% of the portion of Facilities that is backstopped or otherwise committed by such Backstop Lender. The Backstop Fees are in addition to all other fees set forth herein to which a Backstop Lender would be entitled in its capacity as a Lender.

- Funding Fees:

    (i) <u>Tranche A Term Facility</u>: Funding fees to each Lender on date of the initial draw under the Tranche A Term Facility in an amount equal to 2.50% of the stated principal amount of such Lender's loans and unfunded commitment under the Tranche A Term Facility.

    (ii) <u>Tranche B Term Facility</u>: Funding fees to each Lender on date of the initial draw under the Tranche B Term Facility in an amount equal to 5.00% of the stated principal amount of such Lender's loans and unfunded commitment under the Tranche B Term Facility.

**Security:**   The DIP Facilities will be secured by valid, enforceable and automatically perfected first priority security interests, (including without limitation, with priority over the security interests securing the Prepetition First Lien Credit Facilities pursuant to Section 364(d) of the Bankruptcy Code, but subject to permitted liens to be agreed by DIP Lenders, in (i) all assets, including, without limitation, all personal (tangible and intangible), real and mixed property of the Borrower and the Guarantors, (ii) 100% of the capital stock of the Borrower and each direct or indirect domestic subsidiary of the Borrower, (iii) 100% of the non-voting stock of any foreign subsidiaries, (iv) 65% of the capital stock of each first tier foreign subsidiary of the Borrower or any Guarantor, (v) all intercompany debt, and (vi) subject to the entry of the Final DIP Order, all avoidance and other bankruptcy-related actions of the Borrower and Guarantors.

The DIP Lenders' security interests will be granted in the Interim DIP Order and the Final DIP Order and, will have the priority set forth in Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. In addition, the Secured Parties will be granted in the Interim DIP Order and the Final DIP Order a super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Facilities with priority above all other administrative claims; provided that the DIP Lenders' liens and super-priority claim, as well as the pre-petition claims and liens and adequate protection claims and liens of the agents and lenders under the Prepetition First Lien and Second Lien Credit Facilities, shall be subject to the Carve-Out.

**Carve-Out:**   The term "Carve-Out" means upon the Carve-Out Date (as defined below), an amount which may be used subject to the

terms of the Interim DIP Order and the Final DIP Order to pay (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (ii) all allowed but unpaid fees and expenses incurred by professionals (collectively, the "Professionals") of the Debtors and any statutory committee appointed in the Cases (each, a "Committee") up to the Carve-Out Cap (as defined below), in each case, whether incurred or allowed prior to, on or after the Carve-Out Date, but unpaid on or after the Carve-Out Date (whether or not allowed prior to, on or after such date), which fees and expenses remain unpaid on or after the Carve-Out Date after application of all unencumbered funds remaining in the Debtors' estates, and are in respect of (A) allowances of compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy Court to the Professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by the Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members).

As used herein, the term "Carve-Out Cap" means the sum of (x) up to $2.0 million for all unpaid and allowed fees and expenses of the Professionals otherwise covered by the Carve-Out other than the Houlihan Success Fee (as defined below)) plus (y) up to $2.1 million for any unpaid portion of the "Bankruptcy Transaction Fee" (as defined in that certain engagement letter between the Borrower and Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), dated as of November 25, 2008, and hereinafter the "Houlihan Success Fee") that has become due and payable in accordance with the terms of such engagement letter, but only to the extent, and at such time that, either the Plan or any other plan of reorganization accepted by the class of First Lien Lenders under the Prepetition First Lien Credit Agreement has been confirmed and become effective. Notwithstanding the foregoing, (x) the Carve-Out Cap shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid prior to the occurrence of the Carve-Out Date in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to any agent or lender (or any of their respective attorneys or agents under the Prepetition First Lien and Second Lien Credit Facilities), (y) following the Carve-Out Date, any amounts paid to Professionals by any means will reduce the Carve-Out Cap on a dollar-for-dollar basis, and (z) nothing herein shall be construed to impair the

ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (A) and (B) in the proviso in the immediately preceding paragraph.

As used herein "Carve-Out Date" means the date that is the earlier of (x) the Debtors' receipt of a written notice from the Administrative Agent (with a copy to be sent to counsel for the Committee and the U.S. Trustee) that an Event of Default or Termination Event (as defined in the Restructuring Lock-Up Agreement) has occurred and that the Administrative Agent has triggered the Carve-Out or (y) the maturity date.

Notwithstanding the foregoing, so long as the Carve-Out Date has not occurred, the Borrower shall be permitted to pay, as the same may become due and payable, fees and expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code, and the same shall not reduce the Carve-Out Cap.

**Use of Cash Collateral; Adequate Protection:**

Pursuant to the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, the requisite lenders under each such credit agreement, on behalf of all agents and lenders thereunder, shall consent to (i) the DIP Facilities and the entry of the Interim DIP Order and the Final DIP Order, (ii) the subordination of their respective liens and priority claims to the liens and priority claims securing the DIP Facilities, and (iii) the Debtors' use of their cash collateral. As adequate protection for the use of such cash collateral, for the priming of their security interests, and for any diminution in the value of their collateral, the agents and lenders under the Prepetition First and Second Lien Credit Facilities shall receive adequate protection consisting of (i) replacement liens subordinate to the liens granted to the DIP Lenders in respect of the DIP Facilities, (ii) super-priority administrative claims subordinate to the super-priority administrative claims granted to the DIP Lenders, (iii) in the case of the revolving lender under the Prepetition First Lien Credit Agreement, letter of credit fees and interest in respect of that lender's revolving loans at the non-default rate specified in the Prepetition First Lien Credit Agreement, and (iv) in the case of the agents under the Prepetition First Lien Credit Agreement, their respective fees and expenses (including reasonable attorneys' fees and expenses, other than attorneys' fees and expenses incurred to contest the DIP Financing Facilities, the entry of the proposed Interim DIP Order or the Final DIP Order, the confirmation of the Plan or approval of the related disclosure statement or any other actions supported by the requisite lenders under the Prepetition First Lien Credit Agreement); *provided,*

*however*, that in the case of the counsel and the financial advisors to the agents under the Second Lien Credit Agreement, such fees and expenses are subject to a cap of $225,000, (v) monitoring of the businesses of the Debtors and the value of the pre-petition collateral and copies of related written reports, (vi) financial and other reporting in compliance with the Prepetition First Lien Credit Agreement, (vii) in the case of the requisite lenders under each of the Prepetition Credit Facilities, the ability to replace any pre-petition agent; *provided*, *however*, that the revolving loan administrative agent cannot be replaced without the prior written consent of the revolving lender under the Prepetition First Lien Credit Agreement, and (viii) issuance of replacement letters of credit and renewal of pre-petition letters or credit, entitled to the same lien priority and superadministrative priority status accorded to the pre-petition letters of credit. The agents and lenders under the Prepetition First Lien and Second Lien Credit Facilities shall receive no other adequate protection without the consent of the Requisite Lenders.

**Covenants:** The DIP Credit Agreement contains such financial, affirmative and negative covenants by each of the DIP Borrowers and DIP Guarantors as are usual and customary for financings of this kind.

**Events of Default:** The DIP Financing Documents contain events of default as are usual and customary for financings of this kind.

### Relief Requested

20.     The Debtors seek entry of the DIP Orders granting the following relief,

without limitation:

a.      authorizing the Debtors to obtain secured postpetition loans, advances and other financial accommodations pursuant to the DIP Credit Agreement in the amount of up to $15 million;

b.      authorizing the Debtors to enter into and comply in all respects with the DIP Credit Agreement and all other credit documents related thereto and approval of all terms and conditions of the DIP Credit Agreement and all other credit documents related thereto;

c.      the granting in favor of the DIP Lenders of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the Borrower's and Guarantors' obligations under the DIP Financing Documents subject only to the Carve-Out;

d.  as security for the Debtors' obligations under the DIP Financing Documents, the granting in favor of the DIP Agent for the benefit of the DIP Lenders of perfected, valid, and enforceable first-priority liens upon and security interests in all of the assets of the Debtors as summarized above and more specifically set forth in the DIP Financing Documents;

e.  authorizing the Debtors to use cash collateral pursuant to section 361 and 363 of the Bankruptcy Code;

f.  approving the form of adequate protection provided to the agents and lenders under the Prepetition Credit Facilities pursuant to sections 361, 363 and 364 of the Bankruptcy Code;

g.  the scheduling of the final hearing on the Motion to consider entry of the Final Order authorizing and granting the relief requested in the Motion; and

h.  granting related relief and such other and further relief as this Court deems just and proper.

### Basis for Relief

A.  **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

21.  As described in the First Day Declaration, the Debtors' ability to maximize the value of the Debtors' estates through the reorganization process depends, in part, on the Debtors being able to immediately access postpetition financing. Prior to the Petition Date, the Debtors solicited postpetition financing proposals from third party lenders and from the Debtors' current secured lenders. However, the Debtors' ability to obtain financing from third parties was constrained by the unwillingness of the Prepetition First Lien Lenders to allow any third party lenders to prime their liens on the Prepetition Collateral (which comprises substantially all of the Debtors assets). Given the amount of first priority secured debt owed to the Prepetition First Lien Lenders, in excess of $200 million, and the fact that reasonable estimates of current going concern value of the Debtors is less than that number, the Debtors did not believe they could provide sufficient adequate protection to the Prepetition First Lien

Lenders to support an order priming their liens over their objection. As a result the Debtors entered into negotiations with the Prepetition First Lien Lenders on the terms of the debtor in possession financing that is the subject of this Motion.

22.     Before determining to enter into the DIP Facilities upon the terms of the DIP Financing Documents, the Debtors, the Prepetition First Lien Lenders and the proposed DIP Lenders conducted vigorous and lengthy, arms-length negotiations. The Debtors ultimately determined that the proposal for debtor-in-possession financing provided by the DIP Lenders was the best available under the circumstances, and, most importantly, adequately addressed the Debtors' reasonably foreseeable liquidity needs. The terms of the DIP Facilities are described above and in the attached DIP Term Sheet. The DIP Lenders will receive first priority liens on unencumbered assets, junior liens on encumbered assets, and will prime only the liens of the Prepetition First Lien and Second Lien Secured Parties because those parties are consenting the priming on the terms contained in the DIP Financing Documents, including the proposed Interim Order.

**1.     The DIP Facilities Are Necessary To Preserve the Assets of the Debtors' Estates During the Pendency of these Chapter 11 Cases**

23.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). The Debtors require immediate access to working capital and the DIP Facilities, if approved, will provide this working capital, allowing the Debtors to continue funding their day-to-day operations during the pendency of these chapter 11 cases, make payments necessary to maintain their vendor base and honor their customers' orders, and pay for the costs of the chapter 11 process.

24.     The Debtors' major constituencies understand that the Debtors over-leveraged balance sheet and resulting covenant defaults under its Prepetition First Lien and Second Lien Credit Facilities, together with the effects of current market conditions impacting the automobile parts manufacturing industry, have all but exhausted the Debtors' access to working capital. Additionally, to rebut the any skepticism regarding the Debtors' ability to operate as a going-concern that will almost inevitably arise in response to the filing of these chapter 11 cases, the Debtors must minimize any disruption arising from filing for chapter 11 and stabilize its business operations. Any inability to access financing to support the Debtors business operations at this critical juncture could impair the Debtors' reorganization efforts. Approval and implementation of the DIP Facilities is a key component of the Debtors' plan to operate in and exit from bankruptcy in 90 to 120 days, thereby preserving the going-concern value of the Debtors' estates for the benefit of all parties.

**2.     The Terms of the DIP Credit Agreement
        Are the Best Available Given the Circumstances**

25.     As discussed above, certain of the Prepetition First Lien Lenders are willing to provide the DIP Facilities. The material terms of the DIP Facilities are not unlike those commonly approved by the bankruptcy courts in the District of Delaware, and the fees and interest rates are not unlike those seen in other DIP financing agreements approved during the current credit crisis. No lender other than the current DIP Lenders could deliver the consent of the Prepetition Secured Loan Parties to the priming of their claims and security interests. There is no doubt that the terms of the DIP Facilities are the best available, given the circumstances.

**3.     The Debtors Have Exercised their Reasonable Business
        Judgment in Entering Into the DIP Credit Agreement.**

26.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious. See In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr, D. Utah 1981) (court generally will not second-guess debtor's business decisions involving a business judgment made in good faith and upon a reasonable basis); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor). As described above, the Debtors require the benefit of chapter 11 to convert a substantial amount of their debt to equity and reorganize, require access to additional funds to pay for the costs of the chapter 11 cases and certain working capital needs, and therefore have exercised their best business judgment in negotiating a reasonable DIP Facilities with their prepetition lenders.

27.     In light of the current economic state of the automobile parts manufacturing industry, the availability of working capital under the DIP Facilities will assist the Debtors in retaining the confidence of vendors and customers and ensure the continued supply of goods and services needed to sustain the Debtors' operations. Accordingly, pursuant to section 364(c) and (d)(l), the Debtors respectfully submit that they should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured and administrative superpriority basis described herein.

**Provisions to be Highlighted Pursuant to Local Rule 4001-2**

28.     Local Rule 4001-2 requires the Debtors to highlight certain provisions included in the DIP Credit Agreement and the DIP Orders and provide justification for the inclusion of such highlighted provision(s). The Debtors believes that the only such provisions under Rule 4001-2 of the Local Bankruptcy Rules included in the DIP Orders and DIP Credit Agreement are as follows:

a. provisions or findings of fact that bind the Debtors (but not other parties in interest) with respect to the validity, perfection or amount of the Prepetition Lenders' liens, as set forth in paragraph 6 of the Interim Order;

b. upon entry of the Final Order, the waiver of the estates rights under section 506(c), as set forth in paragraph 9 of the Interim Order; and

c. upon entry of the Final Order, the granting to the Prepetition Secured Parties of a lien on any recoveries by the Debtors' estates from avoidance actions, as set forth in paragraph 4(a) of the Interim Order.

29. These provisions are typically found in debtor in possession financing agreements of this nature, and the DIP Lenders have asserted that they would not provide financing to the Debtors absent such provisions.

30. Local Rule 4001-2(a)(i)(B) requires a movant to identify provisions containing findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties time to investigate such matters. See Del. Bankr. L.R. 4001-2(a)(i)(B). The Interim Order provides in relevant part:

> Nothing in this Interim Order or the DIP Financing Documents shall prejudice whatever rights any Committee or any other party in interest (other than the Debtors and their non-Debtor subsidiaries) may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the Prepetition Liens on the Prepetition Collateral, or (ii) the validity, allowability, priority, status or amount of the Prepetition Obligations, or (b) to bring suit against any of the Prepetition Lender Secured Parties in connection with or related to the Prepetition Obligations, or the actions or inactions of any of the Prepetition Lender Secured Parties arising out of or related to the Prepetition Obligations or otherwise; provided that unless any Committee or any other party in interest obtains the requisite standing to commence, and commences, a contested proceeding or an adversary proceeding raising such objection or challenge, including without limitation any claim against the Prepetition Lender Secured Parties in the nature of a "lender liability" cause of

action, setoff, counterclaim or defense to the Prepetition Obligations (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Lender Secured Parties), by the date that is (a) 60 days following the appointment of the first Committee of unsecured creditors, or (b) if no Committee of unsecured creditors is appointed, 75 days following the Petition Date (collectively, (a) and (b) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is validly raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date"; the Challenge Period in respect of the Prepetition Credit Facilities may be extended by written agreement of the applicable Prepetition Administrative Agents and the DIP Agent), upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any Committee, any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest) shall be deemed to be forever waived and barred, and the Prepetition Obligations shall be deemed to be an allowed claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Cases and the findings herein, including in paragraph G, in respect to the Prepetition Liens, the Prepetition Collateral and the Prepetition Obligations shall be binding on all creditors, interest holders and parties in interest. Notwithstanding the foregoing, to the extent any such objection or complaint is filed, such findings herein shall nonetheless remain binding and preclusive on any Committee and on any other person or entity, except to the extent that such assertions were expressly challenged in such objection or complaint. For avoidance of doubt, nothing in this paragraph imposes any limitation on the ability of the Debtors, the Committee or any other party in interest to assert any objections to the Prepetition Interest Rate Swap Claims or otherwise taking any of the actions described in the first sentence of this paragraph with respect to the Prepetition Interest Rate Swap Claims or the Prepetition Interest Rate Swap Counterparty.

See Interim Order ¶ 6. As the Debtors plan to ask the Court to schedule a confirmation hearing within 90 days of the Petition Date, paragraph 6 of the Interim Order provides parties in interests all of the time between the Petition Date and the expected hearing on confirmation of a chapter 11 plan to investigate and bring claims against the Prepetition Lender Secured Parties.

      31.    Pursuant to Local Rule 4001-2(a)(i)(C), a movant must describe provisions of the DIP order that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The Interim Order provides that:

Subject to entry of the Final Order, as a further condition of the DIP Facilities and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Financing Documents, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Agent, the DIP Secured Parties, the DIP Liens, the Prepetition Agents, the Prepetition Secured Parties and the Prepetition Liens. Nothing contained in this Interim Order or in the Final Order shall be deemed a consent by the Prepetition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

See Interim Order ¶ 9. This provision does not immediately waive the estate's rights under section 506(c) but instead conditions such waiver upon the entry of the Final Order. Therefore, parties in interest, including any official committee, will have notice and opportunity to address such waiver at or prior to the Final Hearing. Accordingly, the Debtors respectfully submit that this provision complies with the Local Rules.

32.     Pursuant to Local Rule 4001-2(a)(i)(D), a movant must describe provisions of a DIP Agreement or DIP order that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549. The Interim Order provides that the Adequate Protection Liens granted to the Prepetition Secured Parties, upon entry of the Final Order, shall also extend to the Avoidance Actions. See Interim Order ¶ 4(a). As this provision does not immediately grant the Prepetition Secured Parties liens on the Avoidance Actions, but instead conditions such liens on the entry of the Final Order, the Debtors respectfully submit that it complies with the Local Rules.

### Use of Cash Collateral and the Proposed Adequate Protection

33.     In addition to the need for DIP financing, the Debtors' other pressing concern is the need for immediate use of the "cash collateral" (as such term is defined in Section 363 of the Bankruptcy Code) in which any of the Prepetition Secured Parties have an interest

(the "Cash Collateral") pending a final hearing on this Motion. The Debtors require use of Cash Collateral to be able to pay operating expenses, including payroll, and to pay vendors to ensure a continued supply of materials essential to the Debtors' manufacturing processes and continued viability. As set forth above and in the First Day Declaration, the Debtors are in the midst of a liquidity crisis and require the use of the Cash Collateral—together with the proceeds of the DIP Facilities—to sustain their operations and meet current cash requirements. The alternative to the use of Cash Collateral and access to the DIP Facilities is the cessation of the Debtors' business operations.

34.     Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section. 11 U.S.C. 3636(c)(2). Furthermore, Section 363(e) of the Bankruptcy Code provides, that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use "as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

35.     Here, the "Requisite Lenders" under each of the Prepetition Credit Facilities have consented to the Debtors' use of Cash Collateral on the terms and conditions set forth in the Interim Order. Even in the absence of the "Requisite Lenders'" consent, however, the Debtors should be authorized to use the Cash Collateral because the Prepetition Lenders' interests are adequately protected to the extent necessary.

36.     Adequate protection is a flexible concept and what constitutes sufficient adequate protection is decided on a fact-specific, case-by-case basis. See In re Columbia Gas Sys., Inc., No. 91 803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also Martin v.

United States (In re Martin), 761 F.2d 472, 478 (8th Cir. 1985); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Sw. Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992). By adequate protection, the Bankruptcy Code seeks to maintain the status quo for the period of time between the commencement date and confirmation of a plan of reorganization by shielding a secured creditor from any *diminution* in the value of its interest in collateral during the period of use. See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

37.     Pursuant to the Interim DIP Order, the Debtors are providing the Prepetition Secured Parties with four primary forms of adequate protection. First, subject to the grant of the liens to the DIP Agent and the DIP Lenders, the Debtors propose to provide the Prepetition Secured Parties with replacement liens on all of the DIP Collateral. Second, subject to the superpriority administrative claims granted to the DIP Lenders, the Debtors propose to grant the Prepetition Secured Parties a superpriority administrative claim to the extent of any diminution in the value of the Prepetition Secured Parties' interest in their prepetition collateral (the "Adequate Protection Superpriority Claims"). Third, the Debtors will pay the Prepetition Agents their respective fees and expenses (including reasonable attorney's fees and expenses), all as more fully described above and in the Interim Order (collectively, the "Adequate Protection Payments"). Fourth, the Debtors will pay the revolving lender under the Prepetition First Lien Credit Agreement interest in respect of that lender's revolving loans at the non-default rate specified in the Prepetition First Lien Credit Agreement.

38.     The adequate protection proposed herein and in the DIP Orders is fair and reasonable and more than sufficient to satisfy the requirements of sections 363(c)(2) and (e) of

the Bankruptcy Code, as well as the requirements of section 364(d)(1) of the Bankruptcy Code. The proposed adequate protection is aimed at ensuring the Prepetition Secured Parties do not suffer a diminution in the value of their interest in the Cash Collateral as a result of the Debtors' use of same. Here, the use of the credit available under the DIP Facilities and the use of Cash Collateral will enable the Debtors to get to confirmation of a chapter 11 plan and the substantial deleveraging proposed by such plan, which the Debtors project will preserve the value of the Prepetition Secured Parties' interests in the Debtors' property. See e.g., In re Stein, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (a secured creditor was adequately protected where the creditor's secured position is enhanced by the continued operation of the debtor's business). The adequate protection package proposed, including the adequate protection liens and superpriority administrative claims and the Adequate Protection Payments, offer the Prepetition Secured Parties the opportunity to benefit from improved operating results by providing the Debtors with sufficient working capital to move forward with their planned operational and financial restructuring initiatives.

39.     The proposed adequate protection package is more than what "is necessary to provide adequate protection" to the Prepetition Secured Parties for use of the Cash Collateral, and the Debtors' use of the Cash Collateral should be approved. Courts in this district have granted similar relief in other recent chapter 11 cases. See, e.g., In re Propex, Inc., Case No. 08-10249 (JCC) (Bankr. E.D. Tenn. Feb. 13, 2008); In re Radnor Holdings Corp., Case No, 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006); see In re Tropicana Entm't. LLC, No. 08-10856 (KJC) (Bankr. D. Del, May 30, 2008); In re Linens Holding Co., No. 08-10832 (CSS); (Bankr. D. Del. May 28, 2008); In re Leiner Health Prods., Inc. No. 08-10446 (KJC) (Bankr. D. Del. Apr. 10, 2008); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Mar. 7,

2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr, D. Del. Feb. 22, 2008);

In re Pope & Talbot, Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007); In re

HomeBanc Mortgage Corp., Case No. 07-11079 (KJC) (Bankr. D. Del. Sept 13, 2007).

## Modification of the Automatic Stay is Warranted

40.     The proposed Interim Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of

Default or Termination Event, certain rights and remedies provided for in the Interim Order, the

DIP Financing Documents and the Consent Agreement, and to take various actions without

further order of or application to the Court. However, the DIP Secured Parties must provide the

Debtors and various other parties, including any official committee and the office of the United

States Trustee, with five (5) business days' written notice prior to exercising certain enforcement

rights or remedies in respect of the DIP Collateral. Moreover, the Debtors and any other parties

in interest may seek within the five (5) business day notice period an emergency hearing before

this Court solely for the purpose of considering whether, in fact, an Event of Default or

Termination has occurred and is continuing.

41.     Stay modification provisions of this sort are ordinary and usual features of

DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present

circumstances. Accordingly, the Court should modify the automatic stay to the extent

contemplated by the DIP Credit Agreement and the proposed DIP Orders.

## Interim Approval Should be Granted

42.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion

to use cash collateral or to obtain credit may not be commenced earlier than fifteen (15) days

after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a Debtors' estate pending a final hearing.

43.     Pursuant to Bankruptcy Rules 4001(b) and(c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to enter into the DIP Credit Agreement and use Cash Collateral on an interim basis, pending entry of a final order in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a hearing to consider entry of the Final Order.

44.     As discussed above, the Debtors have an urgent and immediate need for cash to continue to operate. Absent being permitted to borrow under the DIP Facilities and to use the Cash Collateral, the Debtors will not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain financing under the DIP Facilities or to use the Cash Collateral, as requested, on an interim basis pending a final hearing on the motion, the Debtors will be immediately and irreparably harmed. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating its reorganization efforts.

45.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

46.     To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

## Request for Final Hearing

47.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than thirty (30) days following the entry of the Interim Order, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

## Notice

48.     Notice of the Interim Hearing and the emergency relief requested in the Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) the United States Securities and Exchange Commission, (iii) the Office of the United States Attorney for the District of Delaware, (iv) the Internal Revenue Service, (v) the Debtors' forty (40) largest unsecured creditors on a consolidated basis, (vi) counsel to the Prepetition Agents, (vii) all other parties with liens of record on assets of the Debtors as of the Petition Date, (viii) all parties who have requested notice in the Cases pursuant to Bankruptcy Rule 2002, and (ix) counsel to the DIP Agent (the "Notice Parties"), by telecopy, email, overnight courier and/or hand delivery. As the Motion is seeking "first day' relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-2(d). The Debtors submit that, in light of the nature of the relief requested, no further notice need be given.

## No Prior Request

49.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request (i) the entry of an order substantially in the form of the proposed Interim Order; (ii) after the Final Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and (iii) granting such other and further relief as the Court deems appropriate.

Dated:   July 13, 2009                   MILBANK, TWEED, HADLEY & MCCLOY LLP
                                         Gregory A. Bray (CA Bar No. 115367)
                                         Fred Neufeld (CA Bar No. 150759)
                                         Haig M. Maghakian (CA Bar No. 221954)
                                         601 South Figueroa Street, 30th Floor
                                         Los Angeles, CA  90017-5735
                                         Telephone:  213-892-4000
                                         Facsimile:  213-629-5063
                                         Email: gbray@milbank.com
                                                 fneufeld@milbank.com
                                                 hmaghakian@milbank.com

                                         and

                                         PACHULSKI STANG ZIEHL & JONES LLP

                                         Laura Davis Jones (DE Bar No. 2436)
                                         James E. O'Neill (DE Bar No. 4042)
                                         Curtis A. Hehn (DE Bar No. 4264)
                                         Mark M. Billion (DE Bar No. 5263)
                                         919 North Market Street, 17th Floor
                                         P.O. Box 8705
                                         (Courier Route 19801)
                                         Wilmington, DE  19898
                                         Telephone:  302-652-4100
                                         Facsimile:  302-652-4400
                                         E-mail:ljones@pszjlaw.com
                                                 joneill@pszjlaw.com
                                                 chehn@pszjlaw.com
                                                 mbillion@pszjlaw.com

                                         [Proposed] Counsel for Debtors and Debtors in Possession