**Exhibit B**

*DIP Credit Agreement*

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT

dated as of July [__], 2009,

among

J.L. FRENCH AUTOMOTIVE CASTINGS, INC.,
as debtor and debtor-in-possession,

CERTAIN SUBSIDIARIES OF J.L. FRENCH AUTOMOTIVE CASTINGS, INC.,
as Guarantors,

VARIOUS LENDERS,

DDJ CAPITAL MANAGEMENT, LLC,
Syndication Agent,

and

WILMINGTON TRUST FSB,
as Administrative Agent and Collateral Agent

---

**$15,000,000 Senior Secured Super-Priority Debtor-in-Possession Credit Facilities**

---

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS AND INTERPRETATION..........................................................................2
    1.1. Definitions...................................................................................................................2
    1.2. Accounting Terms......................................................................................................26
    1.3. Interpretation, Etc......................................................................................................26

SECTION 2. LOANS.........................................................................................................................27
    2.1. Term Loans ..............................................................................................................27
    2.2. Pro Rata Shares; Availability of Funds ....................................................................28
    2.3. Use of Proceeds.........................................................................................................28
    2.4. Evidence of Debt; Register; Lenders' Books and Records; Notes...........................29
    2.5. Interest on Loans .......................................................................................................30
    2.6. Conversion/Continuation ..........................................................................................31
    2.7. Default Interest..........................................................................................................31
    2.8. Fees ...........................................................................................................................31
    2.9. Scheduled Payments .................................................................................................33
    2.10. Voluntary Prepayments/Commitment Reductions...................................................33
    2.11. Mandatory Prepayments/Commitment Reductions .................................................34
    2.12. Application of Prepayments/Reductions..................................................................35
    2.13. General Provisions Regarding Payments .................................................................35
    2.14. Ratable Sharing .......................................................................................................36
    2.15. Making or Maintaining Eurodollar Rate Loans ......................................................37
    2.16. Increased Costs; Capital Adequacy..........................................................................38
    2.17. Taxes; Withholding, Etc...........................................................................................39
    2.18. Obligation to Mitigate .............................................................................................42
    2.19. Defaulting Lenders...................................................................................................42
    2.20. Removal or Replacement of a Lender.......................................................................43
    2.21. Super Priority Nature of Obligations and Lenders' Liens........................................44
    2.22. Payment of Obligations............................................................................................44
    2.23. No Discharge; Survival of Claims ...........................................................................44
    2.24. Waiver of any Priming Rights..................................................................................44

SECTION 3. CONDITIONS PRECEDENT .......................................................................................45
    3.1. Closing Date..............................................................................................................45
    3.2. Conditions to Each Credit Extension ........................................................................48
    3.3. Exit Facility Option...................................................................................................49

SECTION 4. REPRESENTATIONS AND WARRANTIES .................................................................50
    4.1. Organization; Requisite Power and Authority; Qualification. ..................................50
    4.2. Equity Interests and Ownership ................................................................................50
    4.3. Due Authorization.....................................................................................................50
    4.4. No Conflict................................................................................................................50
    4.5. Governmental Consents ............................................................................................50
    4.6. Binding Obligation....................................................................................................51
    4.7. Historical Financial Statements.................................................................................51
    4.8. Projections.................................................................................................................51
    4.9. No Material Adverse Change.....................................................................................51
    4.10. No Restricted Junior Payments ...............................................................................51
    4.11. Adverse Proceedings, Etc.........................................................................................51

4.12. Payment of Taxes..................................................................................................51
4.13. Properties ...........................................................................................................52
4.14. Environmental Matters.......................................................................................52
4.15. No Defaults ........................................................................................................53
4.16. Material Contracts..............................................................................................53
4.17. Governmental Regulation ..................................................................................53
4.18. Margin Stock......................................................................................................53
4.19. Employee Matters ..............................................................................................53
4.20. Employee Benefit Plans .....................................................................................53
4.21. Certain Fees........................................................................................................54
4.22. Related Agreements ...........................................................................................54
4.23. Compliance with Statutes, Etc. .........................................................................55
4.24. Disclosure...........................................................................................................55
4.25. PATRIOT Act.....................................................................................................55
4.26. Secured, Super-Priority Obligations .................................................................55

SECTION 5. AFFIRMATIVE COVENANTS.............................................................................57
5.1. Financial Statements and Other Reports ...........................................................57
5.2. Existence.............................................................................................................60
5.3. Payment of Taxes and Claims............................................................................60
5.4. Maintenance of Properties..................................................................................61
5.5. Insurance.............................................................................................................61
5.6. Books and Records; Inspections ........................................................................61
5.7. Lenders Meetings ...............................................................................................61
5.8. Compliance with Laws.......................................................................................62
5.9. Environmental.....................................................................................................62
5.10. Subsidiaries ........................................................................................................63
5.11. Additional Real Estate Assets ...........................................................................64
5.12. Further Assurances.............................................................................................64
5.13. Cases ..................................................................................................................64
5.14. Cash Management Systems.................................................................................64

SECTION 6. NEGATIVE COVENANTS....................................................................................65
6.1. Indebtedness........................................................................................................65
6.2. Liens....................................................................................................................67
6.3. No Further Negative Pledges .............................................................................68
6.4. Restricted Junior Payments ................................................................................68
6.5. Restrictions on Subsidiary Distributions...........................................................69
6.6. Investments.........................................................................................................69
6.7. Financial Covenants............................................................................................70
6.8. Fundamental Changes; Disposition of Assets....................................................70
6.9. Disposal of Subsidiary Interests.........................................................................71
6.10. Sales and Lease-Backs.......................................................................................71
6.11. Transactions with Shareholders and Affiliates..................................................71
6.12. Conduct of Business...........................................................................................72
6.13. Amendments or Waivers of Organizational Documents and Certain Related
        Agreements .......................................................................................................72
6.14. Chapter 11 Claims; Adequate Protection...........................................................72
6.15. The Orders...........................................................................................................72
6.16. Limitation on Prepayments of Pre-Petition Obligations ...................................72
6.17. Fiscal Year ..........................................................................................................72

NY\1516604.2345383-001\DOCS_DE:150593.1

      6.18. Customer Agreements ............................................................................................73

SECTION 7. GUARANTY ...................................................................................................73
      7.1. Guaranty of the Obligations .................................................................................73
      7.2. Contribution by Guarantors ..................................................................................73
      7.3. Payment by Guarantors ........................................................................................74
      7.4. Liability of Guarantors Absolute ..........................................................................74
      7.5. Waivers by Guarantors .........................................................................................75
      7.6. Guarantors' Rights of Subrogation, Contribution, Etc. ........................................76
      7.7. Subordination of Other Obligations .....................................................................77
      7.8. Continuing Guaranty .............................................................................................77
      7.9. Authority of Guarantors or Borrower ...................................................................77
      7.10. Financial Condition of Borrower ........................................................................77
      7.11. Bankruptcy, Etc. .................................................................................................77
      7.12. Discharge of Guaranty Upon Sale of Guarantor .................................................78

SECTION 8. EVENTS OF DEFAULT .................................................................................78
      8.1. Events of Default ..................................................................................................78
      8.2. Carve-Out Events ..................................................................................................83

SECTION 9. AGENTS ..........................................................................................................83
      9.1. Appointment of Agents. ........................................................................................83
      9.2. Powers and Duties. ...............................................................................................83
      9.3. General Immunity .................................................................................................83
      9.4. Agents Entitled to Act as Lender ..........................................................................85
      9.5. Lenders' Representations, Warranties and Acknowledgment ...............................85
      9.6. Right to Indemnity ...............................................................................................85
      9.7. Successor Administrative Agent and Collateral Agent. ........................................86
      9.8. Collateral Documents and Guaranty .....................................................................87
      9.9. Withholding Taxes ................................................................................................88

SECTION 10. MISCELLANEOUS ......................................................................................88
      10.1. Notices ................................................................................................................88
      10.2. Expenses. .............................................................................................................89
      10.3. Indemnity ............................................................................................................90
      10.4. Set-Off. ...............................................................................................................90
      10.5. Amendments and Waivers ..................................................................................91
      10.6. Successors and Assigns; Participations. ..............................................................92
      10.7. Independence of Covenants .................................................................................95
      10.8. Survival of Representations, Warranties and Agreements ...................................95
      10.9. No Waiver; Remedies Cumulative ......................................................................95
      10.10. Marshalling; Payments Set Aside .....................................................................95
      10.11. Severability .......................................................................................................95
      10.12. Obligations Several; Independent Nature of Lenders' Rights ............................96
      10.13. Headings. ...........................................................................................................96
      10.14. APPLICABLE LAW ........................................................................................96
      10.15. CONSENT TO JURISDICTION ......................................................................96
      10.16. WAIVER OF JURY TRIAL ..............................................................................97
      10.17. Confidentiality ..................................................................................................97
      10.18. Usury Savings Clause ........................................................................................98
      10.19. Counterparts ......................................................................................................98

1

10.20. Effectiveness; Entire Agreement.......................................................................................98
10.21. PATRIOT Act.......................................................................................................................99
10.22. Electronic Execution of Assignments ...............................................................................99
10.23. No Fiduciary Duty .............................................................................................................99
10.24. Release ...............................................................................................................................99

NY\1516604.2345383-001\DOCS_DE:150593.1

**APPENDICES:**    A-1    Tranche A Term Loan Commitments
A-2    Tranche B Term Loan Commitments
B    Notice Addresses

**SCHEDULES:**    1.1(a)    Equity Holders
4.1    Jurisdictions of Organization and Qualification
4.2    Equity Interests and Ownership
4.13    Real Estate Assets
4.16    Material Contracts
6.1    Certain Indebtedness
6.2    Certain Liens
6.6    Certain Investments

**EXHIBITS:**    A-1    Funding Notice
A-2    Conversion/Continuation Notice
B-1    Tranche A Term Loan Note
B-2    Tranche B Term Loan Note
C    Compliance Certificate
D    Assignment Agreement
E    Certificate re Non-Bank Status
F    Closing Date Certificate
G    Counterpart Agreement
H    Pledge and Security Agreement
I    Intercompany Note
J    Interim Order
K    Initial Budget

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND GUARANTY AGREEMENT

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of July [__], 2009, is entered into by and among **J.L. FRENCH AUTOMOTIVE CASTINGS, INC.**, a Delaware corporation (**"Borrower"**), as a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, **CERTAIN SUBSIDIARIES OF BORROWER**, as Guarantors and the Domestic Guarantors as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party hereto from time to time, **DDJ CAPITAL MANAGEMENT, LLC ("DDJ Capital")**, as Syndication Agent (in such capacity, **"Syndication Agent"**), and **WILMINGTON TRUST FSB ("Wilmington")**, as Administrative Agent (together with its permitted successors in such capacity, **"Administrative Agent"**) and as Collateral Agent (together with its permitted successors in such capacity, **"Collateral Agent"**).

### RECITALS:

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS,** on July 13, 2009 (the **"Petition Date"**), Borrower and all of Borrower's existing domestic subsidiaries (each a **"Debtor"**, and collectively, the **"Debtors"**) each filed a voluntary petition for relief (collectively, the **"Cases"**) under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**);

**WHEREAS,** within nine days of the Petition Date, the Debtors will file the Plan of Reorganization and accompanying disclosure statement and will schedule a hearing for confirmation of the Plan of Reorganization on or before October 6, 2009;

**WHEREAS,** from and after the Petition Date, the Debtors continue to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS,** prior to the Petition Date, Borrower received financing pursuant to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of May 14, 2007 and amended and restated as of July 12, 2009, by and among Borrower, certain subsidiaries of the Borrower party thereto, as guarantors, the lenders party thereto, Goldman Sachs Credit Partners L.P. ("GSCP"), as arranger, syndication agent, and sole bookrunner, Wilmington (as successor-in-interest to GSCP), as term loan administrative agent, Wilmington (as successor-in-interest to CapitalSource Finance LLC), as collateral agent, and CapitalSource Bank (as successor-in-interest to CapitalSource Finance LLC), as revolving loan administrative agent (as amended, restated, supplemented or otherwise modified through the Petition Date, the **"Pre-Petition First Lien Credit Agreement"**);

**WHEREAS,** Borrower has requested and Lenders have agreed to provide a senior secured super-priority debtor-in-possession term loan credit facility to Borrower, in an aggregate principal amount not to exceed $15,000,000, consisting of up to $10,000,000 aggregate principal amount of Tranche A Term Loans and up to $5,000,000 aggregate principal amount of Tranche B Term Loans, the proceeds of which will be used to fund certain expenses of the Debtors during the pendency of the Cases in accordance with the Budget;

**WHEREAS,** Borrower has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its assets, including a pledge

of all of the Equity Interests of each of its Domestic Subsidiaries, all non-voting Equity Interests of any Foreign Subsidiaries and 65% of all the Equity Interests of each of its first-tier Foreign Subsidiaries; and

**WHEREAS,** Guarantors have agreed to guarantee the obligations of Borrower hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their respective assets, including a pledge of all of the Equity Interests of each of their respective Domestic Subsidiaries (excluding any Securitization Subsidiary) and 65% of all the Equity Interests of each of their respective first-tier Foreign Subsidiaries (excluding any Securitization Subsidiary); and

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

### 1.1. Definitions.

The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Additional Customer Agreement**" as defined in Section 6.18.

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/100 of 1%) (i) (a) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being LIBOR01 page) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by Administrative Agent for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement; provided, however, that notwithstanding the foregoing, the Adjusted Eurodollar Rate shall at no time be less than 3.00% per annum.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not

2

purportedly on behalf of Borrower or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Borrower or any of its Subsidiaries, threatened in writing against or affecting Borrower or any of its Subsidiaries or any property of Borrower or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.15(b).

"**Affected Loans**" as defined in Section 2.15(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agent**" means each of Administrative Agent, Syndication Agent, and Collateral Agent.

"**Agent Affiliates**" as defined in Section 10.1(b).

"**Aggregate Amounts Due**" as defined in Section 2.14.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Senior Secured Super-Priority Debtor-in-Possession Credit and Guaranty Agreement, dated as of July [____], 2009, as it may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means (i) in the case of any Loan that is a Base Rate Loan, a rate equal to 4.00% per annum or (ii) in the case of any Loan that is a Eurodollar Rate Loan, a rate equal to 5.00%.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant

to any Credit Document or the transactions contemplated therein which is distributed to Agents or to Lenders by means of electronic communications pursuant to Section 10.1(b).

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (other than Borrower or any Guarantor), in one transaction or a series of transactions, of all or any part of Borrower's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of Borrower's Subsidiaries, other than (i) inventory (or other assets) sold, leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued), (ii) sales, leases or licenses out of other assets for aggregate consideration of less than $50,000 with respect to any transaction or series of related transactions and less than $250,000 in the aggregate since the Closing Date and (iii) sales, conveyances, assignments, grants of interest in, or other transfers of Securitization Assets to one or more Securitization Subsidiaries in connection with a Permitted Securitization.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

"**Assignment Effective Date**" as defined in Section 10.6(b).

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Cases, now and hereafter in effect, or any applicable successor statute.

"**Bankruptcy Court**" as defined in the recitals to this Agreement; provided, however, that "Bankruptcy Court" shall also mean any other court having competent jurisdiction over the Cases.

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively; provided, however, that notwithstanding the foregoing, the Base Rate shall at no time be less than 4.00% per annum. On any day that Base Rate Loans are outstanding, in no event shall the Base Rate be less than the sum of (i) the Adjusted Eurodollar Rate (after giving effect to any Adjusted Eurodollar Rate "floor") that would be payable on such day for a Eurodollar Rate Loan with a one-month interest period plus (ii) the difference between the Applicable Margin for Eurodollar Rate Loans and the Applicable Margin for Base Rate Loans.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent and Lender.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

4

**"Borrower"** as defined in the preamble hereto.

**"Budget"** means the Initial Budget, as modified pursuant to the definition thereof, and as the same may be further amended, supplemented, restated or otherwise modified from time to time with the written consent of the Requisite Lenders in their sole discretion, including, without limitation, any such amendment, supplement, restatement or other modification that extends the Budget to cover additional time periods beyond the initial thirteen week period covered by the Initial Budget; provided, however that the Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the applicable Order.

**"Business Day"** means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term **"Business Day"** means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

**"Capital Lease"** means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

**"Carve-Out"** shall have the meaning given to such term in the Orders.

**"Carve-Out Cap"** shall have the meaning given to such term in the Interim Order.

**"Carve-Out Event"** as defined in Section 8.2.

**"Carve-Out Event Notice"** as defined in Section 8.2.

**"Cases"** means the jointly administered cases of the Debtors under Chapter 11 of the Bankruptcy Code.

**"Cash"** means money, currency or a credit balance in any demand or Deposit Account.

**"Cash Collateral"** has the meaning specified in Section 363 of the Bankruptcy Code.

**"Cash Equivalents"** means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

5

**"Certificate re Non-Bank Status"** means a certificate substantially in the form of Exhibit E.

**"Change of Control"** means, (i) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than the Equity Holders (a) shall have acquired beneficial ownership or control of 35% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of Borrower or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Borrower or (ii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Borrower cease to be occupied by Persons who either (a) were members of the board of directors of Borrower on the Closing Date or (b) were nominated for election by the board of directors of Borrower, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors, in each case, other than any Change of Control resulting from a plan of reorganization upon consummation of which all obligations are paid in full in cash.

**"Chrysler Agreement"** means (i) that certain Agreement Amending and Restating Purchase Orders dated as of February 9, 2006 among DaimlerChrysler Motors Company, LLC, DaimlerChrysler Canada Inc. and Borrower and (ii) the purchase orders submitted by DaimlerChrysler Motors Company, LLC and DaimlerChrysler Canada Inc. to Borrower on or before the date of this Agreement.

**"Claim"** has the meaning specified in Section 101(5) of the Bankruptcy Code.

**"Class"** means (i) with respect to Lenders, each of the following classes of Lenders: (a) Lenders having Tranche A Term Loan Exposure and (b) Lenders having Tranche B Term Loan Exposure, and (ii) with respect to Loans, each of the following classes of Loans: (a) Tranche A Term Loans and (b) Tranche B Term Loans.

**"Closing Date"** means the date on which the Interim Order is entered into by the Bankruptcy Court and the other conditions precedent set forth in Section 3.1 are satisfied or waived, as determined by the Initial Lenders in their sole discretion.

**"Closing Date Certificate"** means a Closing Date Certificate substantially in the form of Exhibit F.

**"Collateral"** means, collectively, all of the real, personal (tangible and intangible) and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

**"Collateral Agent"** as defined in the preamble hereto.

**"Collateral Documents"** means the Pledge and Security Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

**"Collateral Questionnaire"** means a certificate in form satisfactory to Collateral Agent that provides information with respect to the personal or mixed property of each Credit Party.

**"Commitment"** means the Tranche A Term Loan Commitment or the Tranche B Term Loan Commitment of a Lender, and **"Commitments"** means such commitments of all Lenders.

**"Committee"** means the official committee of unsecured creditors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

**"Compliance Certificate"** means a Compliance Certificate substantially in the form of Exhibit C.

**"Consent Agreement"** means that certain Restructuring Lock-Up Agreement dated as of July 12, 2009, by and among Borrower, certain of its subsidiaries, certain Pre-Petition First Lien Term Lenders and certain Pre-Petition Second Lien Lenders.

**"Contractual Obligation"** means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

**"Contributing Guarantors"** as defined in Section 7.2.

**"Control Agreement"** means, with respect to any Deposit Account, including the Reinvestment Account, any Securities Account (as defined in the Pledge and Security Agreement), and any Commodities Account (as defined in the Pledge and Security Agreement) an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among the Collateral Agent, the financial institution at which such Deposit Account is maintained or with which such entitlement or contract is carried and each applicable Credit Party effective to grant "control" (as defined under the UCC) of such Deposit Account, Securities Account or Commodities Account to the Collateral Agent.

**"Conversion/Continuation Date"** means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

**"Conversion/Continuation Notice"** means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

**"Counterpart Agreement"** means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.10.

**"Credit Date"** means the date of a Credit Extension.

**"Credit Document"** means any of this Agreement, the Notes, if any, the Collateral Documents and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent or any Lender in connection herewith on or after the date hereof.

**"Credit Extension"** means the making of a Loan.

**"Credit Party"** means each Person (other than any Agent or any Lender or any other representative thereof) from time to time party to a Credit Document.

**"Currency Agreement"** means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Borrower's and its Subsidiaries' operations and not for speculative purposes.

7

"**Customer Agreement**" means (i) that certain letter agreement dated as of May 26, 2009 between Borrower and Magna Powertrain USA, Inc., Re: J.L. French Automotive Castings, Inc. Restructuring Amendment to Purchase Orders with Magna Powertrain USA, Inc.; (ii) that certain Master Agreement, dated as of June 19, 2009, by and between Ford Motor Company and Borrower; and (iii) any Additional Customer Agreement, in each case in form and substance satisfactory to the Initial Lenders.

"**DDJ Capital**" has the meaning specified in the preamble to this Agreement.

"**DDJ Lenders**" means certain funds and/or accounts managed or advised by DDJ Capital as identified on the signature pages attached hereto or that become Lenders hereunder from time to time.

"**Debtor**" has the meaning specified in the recitals to this Agreement.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default; provided, that if the notice provided for in Section 8.1(c)(ii) with respect to a Default under Section 6.7 shall not have been delivered by the Administrative Agent or any Lender by the date specified in Section 8.1(c)(ii) (the "Notice Date") then such Default shall be deemed to not have arisen under Section 8.1(c)(ii) as of such Notice Date for purposes of this Agreement and each other Credit Document.

"**Default Excess**" means, with respect to any Funds Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Funds Defaulting Lenders (including such Funds Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Funds Defaulting Lender.

"**Default Period**" means, (x) with respect to any Funds Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.10 or Section 2.11 or by a combination thereof) and (b) such Defaulting Lender shall have delivered to Borrower and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments, and (iii) the date on which Borrower, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing; and (y) with respect to any Insolvency Defaulting Lender, the period commencing on the date of the applicable Lender Insolvency Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable and (ii) the date that such Defaulting Lender ceases to hold any portion of the Loans or Commitments.

"**Defaulted Loan**" as defined in Section 2.19.

"**Defaulting Lender**" as defined in Section 2.19.

"**Deposit Account**" means a demand, time, savings, passbook, lockbox or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

8

**"Disclosure Statement"** means the Disclosure Statement for the Debtor's Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code.

**"Disqualified Equity Interests"** means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date, except, in the case of clauses (i) and (ii), if as a result of a change of control or asset sale resulting from a plan or reorganization, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event resulting from a plan of reorganization are subject to the prior payment in full of all Obligations and the termination of the Commitments).

**"Dollars"** and the sign **"$"** mean the lawful money of the United States of America.

**"Domestic Guarantor"** means, on the date of this Agreement, each Domestic Subsidiary listed on the signature pages of this Agreement and thereafter each Domestic Subsidiary that executes a Counterpart Agreement or such other accession agreement to this Agreement as a Domestic Guarantor accepted and agreed by, and in form and substance reasonably satisfactory to, the Administrative Agent; provided that "Domestic Guarantor" shall not include any Securitization Subsidiary.

**"Domestic Subsidiary"** means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

**"Eligible Assignee"** means any Person other than a natural Person that is (i) a Lender, an Affiliate of any Lender or a Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor"(as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; provided, neither any Credit Party nor any Affiliate thereof shall be an Eligible Assignee. A Person who is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) shall not be treated as an Eligible Assignee unless such Person is entitled to an exemption from United States withholding tax and such Person complies with the requirements of Section 2.17(c), and a Person that is a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) shall not be treated as an Eligible Assignee unless such Person complies with the requirements of 2.17(c).

**"Employee Benefit Plan"** means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates.

**"Environmental Claim"** means any investigation, written notice, written notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

9

**"Environmental Laws"** means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; or (ii) the generation, use, storage, transportation or disposal of Hazardous Materials, in any manner applicable to Borrower or any of its Subsidiaries or any Facility.

**"Equity Holders"** means the holders of Equity Interests of Borrower as of the Closing Date identified on Schedule 1.1(a) attached hereto.

**"Equity Interests"** means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

**"ERISA Affiliate"** means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Borrower or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Borrower or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Borrower or such Subsidiary and with respect to liabilities arising with respect to such ERISA Affiliate after such period for which Borrower or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

**"ERISA Event"** means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Borrower, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer

10

Plan if there is any potential liability therefore, or the receipt by Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Exit Facility**" means the Loans made pursuant to the Exit Facility Agreement on or after the Exit Facility Conversion Date.

"**Exit Facility Agreement**" means an amendment, amendment and restatement, or other modification to this Agreement entered into in connection with the exercise of the Exit Facility Option by and among the Agents, the Lenders party thereto from time to time and the Credit Parties, such amendment, amendment and restatement or other modification to be in form and substance satisfactory to the Requisite Lenders.

"**Exit Facility Conversion Date**" means the first date on which a Plan of Reorganization becomes effective, the Exit Facility Option has been exercised and the conditions to the effectiveness of the Exit Facility as set forth in the Exit Facility Documents are satisfied or waived in accordance with the terms thereof.

"**Exit Facility Documents**" means the Exit Facility Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to the Exit Facility Agreement (including, without limitation, any amendment, amendment and restatement or other modification to the Pledge and Security Agreement or any other Credit Document) for the benefit of any Agent or any Lender in connection therewith on or after the date Exit Facility Conversion Date, which instruments, documents and agreements shall be in form and substance satisfactory to the Requisite Lenders.

"**Exit Facility Option**" as defined in Section 3.3.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Borrower or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Fair Share**" as defined in Section 7.2.

11

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"**Final Order**" means an order (in substantially the form of the Interim Order with only such modifications as are satisfactory in form and substance to the Requisite Lenders (in their sole discretion) and Borrower) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Credit Documents, including the granting of the super-priority claims and First Priority Lien status, the waiver of rights under Section 506(c) of the Bankruptcy Code and the payment of all fees constituting Obligations hereunder and modifying the automatic stay to permit the Credit Parties to perform their obligations hereunder and the Lenders, the Administrative Agent and the Collateral Agent to exercise their rights and remedies in accordance with Section 8.1 of this Agreement, authorizing the incurrence by the Credit Parties of permanent post-petition secured and super-priority Indebtedness in accordance with this Agreement and each other Credit Document, as to which no stay has been entered and which has not been reversed, vacated or overturned, and which has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of the Requisite Lenders and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Requisite Lenders waive such requirement in writing.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer, vice president of finance or treasurer of Borrower that such financial statements fairly present, in all material respects, the financial condition of Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure.

"**Financial Plan**" as defined in Section 5.1(j).

"**First Day Orders**" means all orders entered by the Bankruptcy Court in the Cases pursuant to motions and applications filed by the Debtors on the Petition Date or within five Business Days of the Petition Date, in each case, in form and substance reasonably satisfactory to the Initial Lenders.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower and its Subsidiaries ending on December 31 of each calendar year.

**"Flood Hazard Property"** means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

**"Foreign Guarantor"** means, on the date of this Agreement, each Foreign Subsidiary listed on the signature pages of this Agreement and thereafter each Foreign Subsidiary that executes a Counterpart Agreement or such other accession agreement to this Agreement as a Foreign Guarantor accepted and agreed by, and in form and substance satisfactory to, the Administrative Agent; provided that (a) no Foreign Subsidiary shall be a "Foreign Guarantor" to the extent any adverse tax consequences (other than de minimis taxes or other immaterial taxes as determined in the reasonable discretion of the Administrative Agent in consultation with Borrower) would result therefrom (provided that if the guarantee by such Foreign Subsidiary produces or could produce an income inclusion under § 956 of the Internal Revenue Code, the possibility of such income inclusion shall conclusively be deemed to be an adverse tax consequence regardless of whether any Tax results immediately therefrom), and (b) "Foreign Guarantor" shall not include (i) any Foreign Subsidiary organized under the laws of the United Kingdom, Spain, China, Slovakia, or Mexico, and (ii) to the extent constituting a Subsidiary of Borrower, any Joint Venture created under the laws of China and (iii) any Securitization Subsidiary.

**"Foreign Subsidiary"** means any Subsidiary that is not a Domestic Subsidiary.

**"Funding Default"** as defined in Section 2.19.

**"Funding Guarantors"** as defined in Section 7.2.

**"Funds Defaulting Lender"** as defined in Section 2.19.

**"Funding Notice"** means a notice substantially in the form of Exhibit A-1.

**"GAAP"** means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

**"GM Agreement"** means (i) that certain Limited Release Agreement dated as of September 18, 2008 between General Motors Corporation and Borrower and (ii) the purchase orders submitted by General Motors Corporation to Borrower on or before the date of this Agreement.

**"Governmental Authority"** means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

**"Governmental Authorization"** means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

**"Grantor"** as defined in the Pledge and Security Agreement.

**"Guaranteed Obligations"** as defined in Section 7.1.

**"Guarantor"** means each Domestic Guarantor and each Foreign Guarantor.

13

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority because of its hazardous, dangerous or deleterious properties.

"**Hazardous Materials Activity**" means any activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the unaudited consolidated and consolidating balance sheets of Borrower and its Subsidiaries as at the end of each Fiscal Month for the period beginning on January 31, 2009 and ending on March 31, 2009 and the related unaudited consolidated statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries, for such month(s) and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in each case in comparative form the corresponding figures from the Financial Plan for the current Fiscal Year, to the extent prepared on a monthly basis, all in reasonable detail, together with a Financial Officer Certification and (ii) the unaudited consolidated and consolidating balance sheets of Borrower and its Subsidiaries as at the Fiscal Quarter ending March 31, 2009 and the related unaudited consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries for such Fiscal Quarter and for the period beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto.

"**Increased-Cost Lenders**" as defined in Section 2.20.

"**Indebtedness**" means, as applied to any Person, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services, including any earn-out obligations (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letters of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) Disqualified Equity Interests, (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another;

14

(ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; and (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and any Currency Agreement, in each case, whether entered into for hedging or speculative purposes.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the reasonable costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), reasonable documented out-of-pocket expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions, the syndication of the credit facilities provided for herein or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements and agreements contained in any commitment letter delivered by any Agent or any Lender to Borrower with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Borrower or any of its Subsidiaries.

"**Indemnitee**" as defined in Section 10.3.

"**Initial Budget**" means the thirteen week cash flow forecast for the thirteen week period beginning on the Petition Date substantially in the form of Exhibit K attached hereto, which budget shall be deemed modified to provide for the Permitted Adequate Protection Payments specified in the Interim Order; provided, however that the Initial Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the applicable Order.

"**Initial Lenders**" means (i) on the Closing Date and at all times prior to the date on which Monarch becomes a Lender hereunder, the DDJ Lenders and (ii) at all times on and after the date on which Monarch becomes a Lender hereunder, the DDJ Lenders and Monarch.

"**Initial Tranche A Funding Date**" means the first day on which Tranche A Term Loans are made hereunder.

"**Initial Tranche B Funding Date**" means the first day on which Tranche B Term Loans are made hereunder.

"**Insolvency Defaulting Lender**" as defined in Section 2.19.

"**Intellectual Property**" as defined in the Pledge and Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit I evidencing Indebtedness owed among Credit Parties and their Subsidiaries.

"**Interest Payment Date**" means with respect to (i) any Loan that is a Base Rate Loan, the last day of each calendar month of each year, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; and (ii) any Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one -month, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of any Class of Loans shall extend beyond such Class's Maturity Date;

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Borrower' and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Order** has the meaning assigned to such term in Section 3.1.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Borrower from any Person (other than Borrower or any Guarantor), of any Equity Interests of such Person; (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Borrower or any of its Subsidiaries to any other Person (other than Borrower or any Guarantor), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business and (iv) all investments consisting of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and Currency Agreement, whether entered

16

into for hedging or speculative purposes. The amount of any Investment of the type described in clauses (i), (ii) and (iii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means (i) each financial institution listed on the signature pages hereto as a Lender and (ii) any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Lender Insolvency Default**" as defined in Section 2.19.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Tranche A Term Loan and a Tranche B Term Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets, condition (financial or otherwise) or prospects of Borrower and its Subsidiaries taken as a whole (other than any change of the type that customarily occurs as a result of the commencement of a proceeding under Chapter 11 of the Bankruptcy Code); (ii) the ability of any Credit Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means any contract or other arrangement to which Borrower or any of its Subsidiaries is a party (other than the Credit Documents, the Chrysler Agreement, the GM Agreement and any Additional Customer Agreement) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect or have a negative effect on the value of the Collateral taken as a whole.

"**Maturity Date**" means the earlier of (i) November 10, 2009 and (ii) the effective date of the Plan of Reorganization; provided that if that the Loans are converted into the Exit Facility in accordance with Section 3.3, the Maturity Date shall be extended on the Exit Facility Conversion Date to the new Maturity Date set forth in the Exit Facility Agreement.

"**Monarch**" means Monarch Master Funding Ltd.

**"Moody's"** means Moody's Investor Services, Inc.

**"Multiemployer Plan"** means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

**"NAIC"** means The National Association of Insurance Commissioners, and any successor thereto.

**"Narrative Report"** means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Borrower and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

**"Net Asset Sale Proceeds"** means, with respect to any Asset Sale, an amount equal to: (i) Cash payments received by Borrower or any of its Subsidiaries from such Asset Sale, <u>minus</u> (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale solely to the extent such taxes are senior in priority to the Obligations and (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien that (x) is expressly permitted hereunder on the stock or assets in question, (y) is senior to the First Priority Lien securing the Obligations with respect to the applicable assets or stock and (z) is required to be repaid under the terms thereof as a result of such Asset Sale.

**"Net Insurance/Condemnation Proceeds"** means an amount equal to: (i) any Cash payments or proceeds received by Borrower or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Borrower or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (ii) (a) any actual and reasonable costs incurred by Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Borrower or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith (it being understood that Net Insurance/Condemnation Proceeds as defined herein does not include business interruption insurance proceeds with respect to an ongoing business unit, the operations of which shall have survived such casualty, power of eminent domain, condemnation or other event resulting in the taking of any assets).

**"Net Mark-to-Market Exposure"** of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Indebtedness of the type described in clause (xi) of the definition thereof. As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Indebtedness as of the date of determination (assuming such Indebtedness was to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Indebtedness as of the date of determination (assuming such Indebtedness was to be terminated as of that date).

**"New Wisconsin Equipment"** as defined in Section 6.1(q).

**"Non-Public Information"** means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

18

"**Non-US Lender**" as defined in Section 2.17(c).

"**Note**" means a Tranche A Term Note or a Tranche B Term Note.

"**Notice**" means a Funding Notice or a Conversion/ Continuation Notice.

"**Obligations**" means all obligations of every nature of each Credit Party, including obligations from time to time owed to Agents (including former Agents under this Agreement solely to the extent that any obligations owed to such former Agent expressly survive the resignation or replacement of such former Agent or the termination of this Agreement), Lenders or any of them, under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the Cases or such related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Orders**" means, collectively, the Interim Order and the Final Order.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**PATRIOT Act**" as defined in Section 3.1(p).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Adequate Protection Payments**" means the adequate protection payments to the secured parties under the Pre-Petition Credit Agreements pursuant to the terms of the Orders.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Securitization**" means (a) that certain Account Purchase Agreement, dated January 1, 2005, as amended, among Wells Fargo Business Credit, Inc. and JLFR, Inc., so long as such agreement adheres to the following requirements specified in clause (b)(ii) of this definition, or (b) a Securitization or the arrangement described in clause (a) that (i) replaces or continues the accounts receivable programs maintained by the Borrower and certain Subsidiaries with Ford Motor Company, Magna International, Daimler-Chrysler and Wells Fargo National Bank, National Association (formerly known as Wells Fargo Business Credit, Inc.) and (ii) complies with the following criteria: (A) on terms providing comparable liquidity as the accounts receivable discount programs maintained by the Borrower and certain Subsidiaries with Ford Motor Company, Magna International, Daimler-Chrysler and Wells Fargo National Bank, National Association (formerly known as Wells Fargo Business Credit, Inc.) as in

effect on the Closing Date, (B) the amount to be advanced to the Borrower or any of its Subsidiaries does not exceed $95,000,000 in the aggregate outstanding (with respect to all such Securitizations) at any time after the Closing Date, and (C) the Seller's Retained Interest and all proceeds thereof shall constitute Collateral and all necessary steps to perfect a security interest in such Seller's Retained Interest for the benefit of the Secured Parties are taken by the Borrower and its Subsidiaries. There may be only two Permitted Securitizations outstanding at any time. A Permitted Securitization may utilize accounts owing from such existing and future customers of the Borrower as the Borrower may select (including, without limitation, Ford Motor Company, Magna International, Daimler-Chrysler and General Motors Corporation), and may be done through Wells Fargo National Bank, National Association or through another purchaser or lender selected by the Borrower.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" has the meaning specified in the recitals to this Agreement.

"**Plan of Reorganization**" means a Chapter 11 plan of reorganization in the Cases, the terms and conditions of which shall be substantially the same as described in the Consent Agreement unless otherwise consented to in writing by the Requisite Lenders in their sole discretion.

"**Platform**" as defined in Section 5.1(p).

"**Pledge and Security Agreement**" means the Pledge and Security Agreement to be executed by Borrower and each Guarantor substantially in the form of Exhibit H, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Post-Petition**" means the time period beginning immediately upon filing the Cases.

"**Pre-Petition**" means the time period ending immediately prior to the Petition Date.

"**Pre-Petition Agents**" means, collectively, the Pre-Petition First Lien Agents and the Pre-Petition Second Lien Agents.

"**Pre-Petition Control Agreement**" as defined in Section 5.14(b).

"**Pre-Petition Credit Agreements**" means, collectively, the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement.

"**Pre-Petition First Lien Agents**" means the agents under the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition First Lien Collateral Agent**" means the "Collateral Agent", as such term is defined in the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning specified in the recitals to this Agreement.

"**Pre-Petition First Lien Credit Documents**" means the "Credit Documents", as such term is defined in the Pre-Petition First Lien Credit Agreement.

20

**"Pre-Petition First Lien Lenders"** means the lenders under the Pre-Petition First Lien Credit Agreement.

**"Pre-Petition First Lien Term Lenders"** means the lenders of term loans under the Pre-Petition First Lien Credit Agreement.

**"Pre-Petition Indebtedness"** means any or all Indebtedness of the Borrower and it Subsidiaries incurred prior to the Petition Date and outstanding on the Petition Date.

**"Pre-Petition Lenders"** means, collectively, the Pre-Petition First Lien Lenders and the Pre-Petition Second Lien Lenders.

**"Pre-Petition Obligations"** means any or all obligations of every nature of each Credit Party incurred prior to the Petition Date and outstanding on the Petition Date.

**"Pre-Petition Second Lien Agents"** means the agents under the Pre-Petition Second Lien Credit Agreement.

**"Pre-Petition Second Lien Credit Agreement"** means that certain Second Lien Credit and Guaranty Agreement dated as of May 14, 2007, as amended, restated, supplemented or otherwise modified from time to time, by and among the Borrower, the guarantors party thereto, the lending institutions party thereto from time to time, The Bank of New York, as administrative agent and Goldman Sachs Credit Partners L.P., as collateral agent.

**"Pre-Petition Second Lien Credit Documents"** means the "Credit Documents", as such term is the defined in the Pre-Petition Second Lien Credit Agreement.

**"Pre-Petition Second Lien Lenders"** means the lenders under the Pre-Petition Second Lien Credit Agreement.

**"Pre-Petition Senior Liens"** has the meaning ascribed to it in the Orders.

**"Prime Rate"** means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

**"Primed Liens"** has the meaning ascribed to it in the Orders.

**"Principal Office"** means, for Administrative Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

**"Professionals"** means the Credit Parties' professionals (excluding the Credit Parties' ordinary course professionals but including, without limitation, the Credit Parties' attorneys and financial advisors) and the professionals of the Committee retained by the Committee prior to the Exit Facility Conversion Date.

**"Projections"** as defined in Section 4.8.

**"Pro Rata Share"** means (i) with respect to all payments, computations and other matters relating to the Tranche A Term Loan of any Lender, the percentage obtained by dividing (a) the Tranche A Term Loan Exposure of that Lender by (b) the aggregate Tranche A Term Loan Exposure of all Lenders; (ii) with respect to all payments, computations and other matters relating to the Tranche B Term Loan of any Lender, the percentage obtained by dividing (a) the Tranche B Term Loan Exposure of that Lender by (b) the aggregate Tranche B Term Loan Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Tranche A Term Loan Exposure and the Tranche B Term Loan Exposure of that Lender by (B) an amount equal to the sum of the aggregate Tranche A Term Loan Exposure and the aggregate Tranche B Term Loan Exposure of all Lenders.

**"Real Estate Asset"** means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

**"Register"** as defined in Section 2.4(b).

**"Regulation D"** means Regulation D of the Board of Governors, as in effect from time to time.

**"Regulation FD"** means Regulation FD as promulgated by the U.S. Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

**"Reinvestment Account"** means a Deposit Account maintained by the Borrower with a financial institution approved by the Administrative Agent, which Deposit Account is subject to a Control Agreement and which Deposit Account shall have no amounts on deposit therein other than with respect to (i) any Net Asset Sale Proceeds required to be deposited therein pursuant to Section 2.11(a) and (ii) any Net Insurance/Condemnation Proceeds required to be deposited therein pursuant to Section 2.11(b); provided that, without the prior written consent of the Administrative Agent, the Borrower shall not be permitted to withdraw or transfer any amounts on deposit in such Reinvestment Account other than in accordance with Section 2.11(a) and Section 2.11(b), as the case may be.

**"Related Agreements"** means, collectively, (a) the Consent Agreement, (b) the Customer Agreements, (c) the Orders, (d) the First Day Orders, (e) the Plan of Reorganization, and (f) each agreement entered into by any Credit Party in connection therewith.

**"Related Fund"** means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

**"Release"** means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

**"Released Parties"** as defined in Section 10.24.

**"Releasing Parties"** as defined in Section 10.24.

**"Replacement Lender"** as defined in Section 2.20.

**"Requisite Class Lenders"** means, at any time of determination, (i) for the Class of Lenders have Tranche A Term Loan Exposure, Lenders holding more than 50% of the aggregate Tranche A Term Loan Exposure of all Lenders and (ii) for the Class of Lenders having Tranche B Term Loan Exposure, Lenders holding more than 50% of the aggregate of Tranche B Term Loan Exposure of all Lenders.

**"Requisite Lenders"** means (i) if any Initial Lender then holds more than 10% of the aggregate Term Loan Exposure, such Initial Lender and such other Lenders that, together with such Initial Lender, hold more than 50% of the aggregate Term Loan Exposure of all Lenders and (ii) in the event that the DDJ Lenders or Monarch no longer hold more than 10% of the Loans and unfunded Commitments under the Loans, Monarch (in the circumstance where the DDJ Lenders no longer hold more than 10% of the Loans and unfunded Commitments under the Loan) or the DDJ Lenders (in the circumstance where Monarch no longer holds more than 10% of the Loans and unfunded Commitments under the Loan) and such other Lenders that together with such Lenders, hold more than 50% of the aggregate Term Loan Exposure of all Lenders.

**"Restricted Junior Payment"** means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Borrower or any of its Subsidiaries (or any direct or indirect parent of Borrower) now or hereafter outstanding, except a dividend payable solely in shares of Equity Interests to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Borrower or any of their respective Subsidiaries (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Borrower or any of its Subsidiaries (or any direct or indirect parent of Borrower) now or hereafter outstanding; and (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Subordinated Indebtedness.

**"S&P"** means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

**"Secured Parties"** has the meaning assigned to that term in the Pledge and Security Agreement.

**"Securities"** means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

**"Securities Act"** means the Securities Act of 1933, as amended from time to time, and any successor statute.

**"Securitization Assets"** means any accounts receivable owed to the Borrower or any of its Subsidiaries (whether now existing or arising or acquired in the future) arising in the ordinary course of business from the sale of goods or services, all collateral securing such accounts receivable, all contracts and contract rights and all guarantees or other obligations in respect of such accounts receivable, all proceeds of such accounts receivable and other assets (including contract rights) which are of the type

23

customarily transferred or in respect of which security interests are customarily granted in connection with securitizations of accounts receivable and which are sold, transferred or otherwise conveyed by the Borrower or any of its Subsidiaries to a Securitization Subsidiary.

"**Securitization Subsidiary**" means a Person in which the Borrower or any of its Subsidiaries (including any Securitization Subsidiary) makes an Investment and to which the Borrower or any of its Subsidiaries (including any Securitization Subsidiary) sells, conveys, transfers or grants a security interest in Securitization Assets, which Person is formed for the limited purpose of effecting one or more Securitizations involving the Securitization Assets and related activities.

"**Spanish Subsidiaries**" means, collectively, J.L. French Ansola, S.R.L. and J.L. French Services, S.R.L.

"**Standard Securitization Undertakings**" mean representations, warranties, covenants, obligations and indemnities entered into by the Borrower or any of its Subsidiaries (including any Securitization Subsidiary) which are customary for a seller or servicer of assets transferred in connection with a Securitization.

"**State of Wisconsin**" as defined in Section 6.1(r).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Syndication Agent**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, and any levy, impost, duty, assessment, charge, fee, deduction or withholding that is in the nature of a tax and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business (other than solely as a result of such Person's having executed, delivered or performed its obligations or received payments under, or enforced, this Agreement or any other Credit Document) on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"**Term Loan Exposure**" means, as of any date of determination, the aggregate amount of the Tranche A Term Loan Exposure and Tranche B Term Loan Exposure.

"**Terminated Lender**" as defined in Section 2.20.

"**Test Period**" as defined in Section 6.7(a).

24

"**Total Utilization of Tranche A Term Loan Commitments**" means, at any date of determination, the sum of the aggregate principal amount of all outstanding Tranche A Term Loans.

"**Total Utilization of Tranche B Term Loan Commitments**" means, at any date of determination, the sum of the aggregate principal amount of all outstanding Tranche B Term Loans.

"**Tranche A Term Lender**" means a Lender with a Tranche A Term Loan Commitment or an outstanding Tranche A Term Loan.

"**Tranche A Term Loan**" means a Tranche A Term Loan made by a Tranche A Term Lender to Borrower pursuant to Section 2.1(a)(i).

"**Tranche A Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Tranche A Term Loan and "**Tranche A Term Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Tranche A Term Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof (including, without limitation, Section 2.11(d)). The aggregate amount of the Tranche A Term Loan Commitments as of the Closing Date is $10,000,000.

"**Tranche A Term Loan Commitment Period**" means the period from the Closing Date to but excluding the Tranche A Term Loan Commitment Termination Date.

"**Tranche A Term Loan Commitment Termination Date**" means the earliest to occur of (i) the Maturity Date, (ii) the date of the Tranche A Term Loan Commitments are permanently reduced to zero pursuant to Section 2.10(b) or 2.11 and (iii) the date of the termination of the Tranche A Term Loan Commitments pursuant to Section 8.1.

"**Tranche A Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, (i) prior to the termination of the Tranche A Term Loan Commitments, the Lender's Tranche A Term Loan Commitment and (ii) after the termination of the Tranche A Term Loan Commitments, the aggregate outstanding principal amount of the Tranche A Term Loans of such Lender.

"**Tranche A Term Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Tranche B Term Lender**" means a Lender with a Tranche B Term Loan Commitment or an outstanding Tranche B Term Loan.

"**Tranche B Term Loan**" means a Tranche B Term Loan made by a Lender to Borrower pursuant to Section 2.1(a)(ii).

"**Tranche B Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Tranche B Term Loan and "**Tranche B Term Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Tranche B Term Loan Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof (including, without limitation, Section 2.11(d)). The aggregate amount of the Tranche B Term Loan Commitments as of the Closing Date is $5,000,000.

25

"**Tranche B Term Loan Commitment Period**" means the period from the Closing Date to but excluding the Tranche B Term Loan Commitment Termination Date.

"**Tranche B Term Loan Commitment Termination Date**" means the earliest to occur of (i) the Maturity Date, (ii) the date of the Tranche B Term Loan Commitments are permanently reduced to zero pursuant to Section 2.10(b) or 2.11 and (iii) the date of the termination of the Tranche B Term Loan Commitments pursuant to Section 8.1.

"**Tranche B Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, (i) prior to the termination of the Tranche B Term Loan Commitments, the Lender's Tranche B Term Loan Commitment and (ii) after the termination of the Tranche B Term Loan Commitments, the aggregate outstanding principal amount of the Tranche B Term Loans of such Lender.

"**Tranche B Term Loan Note**" means a promissory note in the form of Exhibit B-2, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Type of Loan**" means a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unrestricted Cash**" means as of any date of determination, Cash (located in the United States of America) of the Borrower and its Subsidiaries that would be reflected as unrestricted cash on a balance sheet of the Borrower as of such date on a consolidated basis in accordance with GAAP.

"**U.S. Lender**" as defined in Section 2.17(c).

"**Wilmington**" as defined in the preamble hereto.

**1.2. Accounting Terms.** Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Borrower to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(f), if applicable). Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

**1.3. Interpretation, Etc.** Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The terms lease and license shall include sub-lease and sub-license, as applicable.

## SECTION 2.  LOANS

### 2.1.  Term Loans.

    (a)  <u>Tranche A Term Loan Commitments</u>.

        (i)  During the Tranche A Term Loan Commitment Period, subject to the terms and conditions hereof, each Lender severally agrees to make Tranche A Term Loans to Borrower on any Credit Date in an amount up to but not exceeding the amount of such Lender's Tranche A Term Loan Commitment in effect on such date.  Amounts borrowed pursuant to this Section 2.1(a) may not be repaid and reborrowed during the Tranche A Term Loan Commitment Period. Each Lender's Tranche A Term Loan Commitment shall expire on the Tranche A Term Loan Commitment Termination Date and all Tranche A Term Loans and all other amounts owed hereunder with respect to the Tranche A Term Loans and the Tranche A Term Loan Commitments shall be paid in full no later than such date; and

        (ii)  Notwithstanding anything to the contrary contained herein, in no event shall any Tranche A Lender be obligated to make any Tranche A Term Loan in an amount exceeding that permitted at the time by the applicable Order.

    (b)  <u>Tranche B Term Loan Commitments</u>.

        (i)  During the Tranche B Term Loan Commitment Period, subject to terms and conditions hereof and the consent of the Requisite Lenders (which may be withheld or delayed in their sole discretion), each Lender severally agrees to make Tranche B Term Loans to Borrower on any Credit Date in an amount up to but not exceeding the amount of such Lender's Tranche B Term Loan Commitment in effect on such date.  Amounts borrowed pursuant to this Section 2.1(b) may not be repaid and reborrowed during the Tranche B Term Loan Commitment Period. Each Lender's Tranche B Term Loan Commitment shall expire on the Tranche B Term Loan Commitment Termination Date and all Tranche B Term Loans and all other amounts owed hereunder with respect to the Tranche B Term Loans and the Tranche B Term Loan Commitments shall be paid in full no later than such date; and

        (ii)  Notwithstanding anything to the contrary contained herein, in no event shall any Tranche B Lender be obligated to make any Tranche B Term Loan in an amount exceeding that permitted at the time by the applicable Order.

    (c)  <u>Borrowing Mechanics for Loans</u>.

        (i)  Loans shall be made no more than one time in any one week period and in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

        (ii)  Whenever Borrower desires that Lenders make Loans, Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 10:00 a.m. (New York City time) at least two Business Days in advance of the proposed Credit Date; provided, that for purposes of the initial Credit Extension hereunder, the Funding Notice shall be delivered to Administrative Agent at least five Business Days in advance of the proposed Credit Date. Except as otherwise provided herein, a Funding Notice for a Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to make a borrowing in accordance therewith.

(iii)   Notice of receipt of each Funding Notice in respect of Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 10:00 a.m. (New York City time)) not later than 3:00 p.m. (New York City time) on the same date as Administrative Agent's receipt of such Funding Notice from Borrower.

(iv)   Each Lender shall make the amount of its Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Loans available to Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Borrower as designated in writing to Administrative Agent by Borrower.

**2.2.  Pro Rata Shares; Availability of Funds.**

(a)  <u>Pro Rata Shares</u>.  All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)  <u>Availability of Funds</u>.  Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date. Nothing in this Section 2.2(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

**2.3.  Use of Proceeds.**  The proceeds of the Loans shall be applied in accordance with the Budget. No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act. Nothing herein shall in any way prejudice or prevent any Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Agents' and Lenders' right to review and object to any such requests, motions or applications). The Borrower and its Subsidiaries shall not use the proceeds of the Loans (i) for any purpose that is prohibited under the Bankruptcy Code, (ii) for the payment of fees, expenses, interest or principal with respect to secured Indebtedness arising under the Pre-Petition Credit Agreements or in any way relating to the Pre-Petition First Lien Credit Documents or the Pre-Petition Second Lien Credit Documents other than Permitted Adequate Protection Payments, (iii) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the Administrative Agent, the Lenders, the Pre-Petition Agents party to this Agreement or the Consent Agreement, and the Pre-Petition Lenders party to this Agreement or the Consent Agreement or their respective rights and remedies under this Agreement, the other Credit

28

Documents, the Orders, the Pre-Petition First Lien Credit Documents and the Pre-Petition Second Lien Credit Documents, as the case may be, including, without limitation, to commence or prosecute or join in any action against any or all of the Administrative Agent, the Lenders, the Pre-Petition Lenders party to this Agreement or the Consent Agreement, and the Pre-Petition Lenders party to this Agreement or the Consent Agreement seeking (x) to avoid, subordinate or recharacterize the Obligations or any of the Collateral Agent's or any Pre-Petition Agent's party to this Agreement or the Consent Agreement Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the Administrative Agent, the Lenders, the Pre-Petition Agents party to this Agreement or the Consent Agreement, and the Pre-Petition Lenders party to this Agreement or the Consent Agreement or their Collateral or Collateral (as defined in any of the Pre-Petition First Lien Credit Documents or Pre-Petition Second Lien Documents) in connection with the Credit Documents, the Pre-Petition First Lien Credit Document or the Pre-Petition Second Lien Credit Documents or (z) to prevent or restrict the exercise by any or all of the Administrative Agent, the Lenders, the Pre-Petition Agents party to this Agreement or the Consent Agreement, and the Pre-Petition Lenders party to this Agreement or the Consent Agreement of any of their respective rights or remedies under the Credit Documents, the Pre-Petition First Lien Credit Documents or the Pre-Petition Second Lien Credit Documents, (iv) to make any distribution under a plan of reorganization in the Cases, (v) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent acting at the direction of the Requisite Lenders, or (vi) for any other purpose prohibited by or in the Orders.

### 2.4. Evidence of Debt; Register; Lenders' Books and Records; Notes.

(a) <u>Lenders' Evidence of Debt</u>. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any applicable Loans; and <u>provided further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b) <u>Register</u>. Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the **"Register"**). The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Commitments and the Loans in accordance with the provisions of Section 10.6, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any Loan. Borrower hereby designates Wilmington to serve as Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.4, and Borrower hereby agrees that, to the extent Wilmington serves in such capacity, Wilmington and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees."

(c) <u>Notes</u>. If so requested by any Lender by written notice to Borrower (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Tranche A Term Loan or Tranche B Term Loan.

29

**2.5. Interest on Loans.**

(a) Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i) if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(ii) if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin.

(b) The basis for determining the rate of interest with respect to any Loan, shall be selected by Borrower and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c) In connection with Eurodollar Rate Loans there shall be no more than five (5) Interest Periods outstanding at any time. In the event Borrower fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower and each Lender.

(d) Interest payable pursuant to Section 2.5(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Loan, the last Interest Payment Date with respect to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e) Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being

30

prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans.

**2.6. Conversion/Continuation.**

(a) Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, Borrower shall have the option:

(i) to convert at any time all or any part of any Loan or equal to $1,000,000 and integral multiples of $1,000,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Borrower shall pay all amounts due under Section 2.15 in connection with any such conversion; or

(ii) upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $1,000,000 in excess of that amount as a Eurodollar Rate Loan.

(b) Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to effect a conversion or continuation in accordance therewith.

**2.7. Default Interest.** Upon the occurrence and during the continuance of an Event of Default under Section 8.1(a) or (c) and, at the request of Requisite Lenders, any other Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans; provided, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.8. Fees.**

(a) Borrower agrees to pay to Lenders:

(i) up front commitment fees in an amount equal to 3.00% of the aggregate amount of the Commitments, due and payable in full on the Closing Date;

(ii) ongoing commitment fees in an amount equal to 1.00% per annum times the average of the daily difference between (1) the sum of the Tranche A Term Loan Commitments

31

and the Tranche B Term Loan Commitments and (2) the aggregate principal amount of all Tranche A Term Loans and Tranche B Term Loans, respectively, which will accrue from the Closing Date and be payable monthly in arrears;

(iii) closing fees in an amount equal to 3.00% of the aggregate amount of the Commitments as fee compensation for the funding of each such Lender's Loan, due and payable in full (a) in the case of Tranche A Term Loan Commitments, to each Tranche A Term Lender on the Initial Funding Tranche A Funding Date out of the proceeds of the Tranche A Term Loans made on the Initial Tranche A Funding Date and (b) in the case of Tranche B Term Loan Commitments, to each Tranche B Term Lender out of the proceeds of the Tranche B Term Loans made on the Initial Tranche B Funding Date.

(iv) funding fees due and payable in full to (a) each Tranche A Term Lender on the Initial Tranche A Funding Date, in an amount equal to 2.50% of such Tranche A Term Lender's Tranche A Term Loan Commitment and (b) each Tranche B Term Loan Lender on the Initial Tranche B Funding Date, in an amount equal to 5.00% of such Tranche B Term Lender's Tranche B Term Loan Commitment.

All fees referred to in this Section 2.8(a) shall be paid to Administrative Agent at its Principal Office, shall be fully earned on the date of payment thereof, shall be non-refundable and non-creditable, and upon receipt, Administrative Agent shall promptly distribute to each Tranche A Term Lender and Tranche B Term Lender, as the case may be, its Pro Rata Share thereof.

(b) In addition to the fees to which each Initial Lender would be entitled as a Lender, as consideration for their agreement to backstop the Commitments, each Initial Lender shall be entitled to its Pro Rata Share of a fee in an amount equal to 2.00% of the aggregate amount of the Commitments on the Closing Date, which shall be due and payable in full on the Closing Date, shall be paid to the Administrative Agent at its Principal Office, shall be fully earned on the Closing Date, shall be non-refundable and non-creditable, and upon receipt, Administrative Agent shall promptly distribute such fee to each Initial Lender.

(c) All fees referred to in Section 2.8(a)(ii) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable on the last day of each calendar month of each year during the Tranche A Term Loan Commitment Period and the Tranche B Term Loan Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Tranche A Term Loan Commitment Termination Date and the Tranche B Term Loan Commitment Termination Date, respectively.

(d) Borrower agrees to pay to Wilmington at its Principal Office, in its capacity as Administrative Agent and Collateral Agent, solely for its own account, a non-refundable agency fee in an amount equal to, (i) for the period from the Closing Date through and until August 31, 2009, $48,000, such fee to be due and payable in full in advance on the Closing Date, and (ii) for each three-month period occurring after August 31, 2009, $9,000, such fee to due and payable in full in advance on the first day of each such three-month period for as long as any Commitments or Loans are outstanding.

(e) Borrower agrees to pay to DDJ Capital at its Principal Office, in its capacity as Syndication Agent, a non-refundable syndication fee in an amount equal to $75,000 per annum, such fee to be due and payable in advance on the Closing Date and each anniversary thereof for as long as any Commitments or Loans are outstanding.

(f) In addition to any of the foregoing fees, Borrower agrees to pay to Agents such other fees in the amounts and at the times separately agreed upon.

**2.9. Scheduled Payments.** The principal amounts of the Loans shall be repaid in full on the Maturity Date.

**2.10. Voluntary Prepayments/Commitment Reductions.**

(a) <u>Voluntary Prepayments</u>.

(i) Any time and from time to time:

(1) with respect to Base Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount; and

(2) with respect to Eurodollar Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount;

(ii) All such prepayments shall be made:

(1) upon not less than one Business Day's prior written notice in the case of Base Rate Loans; and

(2) upon not less than three Business Days' prior written notice in the case of Eurodollar Rate Loans;

in each case given to Administrative Agent by 12:00 p.m. (New York City time) on the date required (and Administrative Agent will promptly transmit such original notice for Loans, by telefacsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.12(a).

(b) <u>Voluntary Commitment Reductions</u>.

(i) Borrower may, upon not less than three Business Days' prior irrevocable written notice confirmed in writing to Administrative Agent (which original written notice Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, (1) the Tranche A Term Loan Commitments in an amount up to the amount by which the Tranche A Term Loan Commitments exceed the Total Utilization of Tranche A Term Loan Commitments at the time of such proposed termination or reduction or (2) the Tranche B Term Loan Commitments in an amount up to the amount by which the Tranche B Term Loan Commitments exceed the Total Utilization of Tranche B Term Loan Commitments at the time of such proposed termination or reduction; <u>provided</u>, any such partial reduction of the Tranche A Term Loan Commitments or the Tranche B Term Loan Commitments, as the case may

33

be, shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(ii) Borrower's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Tranche A Term Loan Commitments or the Tranche B Term Loan Commitments, as the case may be, shall be effective on the date specified in the Borrower's notice and shall reduce the Tranche A Term Loan Commitments or the Tranche B term Loan Commitments, as the case may be, of each Lender proportionately to its Pro Rata Share thereof.

## 2.11. Mandatory Prepayments/Commitment Reductions.

(a) <u>Asset Sales</u>. Promptly on the date of completion of any Asset Sale by Borrower or any of its Subsidiaries, Borrower shall cause any Net Asset Sale Proceeds therefrom to be credited to the account of Administrative Agent by wire transfer to prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to such Net Asset Sale Proceeds; <u>provided,</u> (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $250,000, Borrower shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds within twelve (12) months of receipt thereof in long-term productive assets of the general type used in the business of Borrower and its Subsidiaries; <u>provided further,</u> pending any such reinvestment, all such Net Asset Sale Proceeds shall be held in the Reinvestment Account and, on the Maturity Date, if the Exit Facility Conversion Date shall not have occurred prior to such date pursuant to the Exit Facility Option, all such Net Asset Sale Proceeds that have not been reinvested shall be used to repay the Loans.

(b) <u>Insurance/Condemnation Proceeds</u>. No later than the second Business Day following the date of receipt by Borrower or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; <u>provided,</u> (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $250,000, Borrower shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds within twelve (12) months of receipt thereof in long term productive assets of the general type used in the business of Borrower and its Subsidiaries, which investment may include the repair, restoration or replacement of the applicable assets thereof; <u>provided, further,</u> pending any such reinvestment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be held in the Reinvestment Account and, on the Maturity Date, if the Exit Facility Conversion Date shall not have occurred prior to such date pursuant to the Exit Facility Option, all such Net Insurance/Condemnation Proceeds that have not been so reinvested shall be used to repay the Loans.

(c) <u>Prepayment Certificate</u>. Concurrently with any prepayment of the Loans pursuant to Sections 2.11(a) and (b), Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds, as the case may be. In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

NY\1516604.2345383-001\DOCS_DE:150593.1