## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J.L. FRENCH AUTOMOTIVE CASTINGS, INC.[1] | ) | Case No. 09-12445 (KG) |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

### DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED
### JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### IMPORTANT DATES

- Voting Deadline by which Ballots and must be received: _____ __, 2009, at _____ (E.D.T.)

- Deadline by which to file and serve objections
  to Confirmation of the Plan: _____ __, 2009, at _____ (E.D.T.)

- Hearing on Confirmation of the Plan: _____ __, 2009, at ____ (E.D.T.)

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Gregory Bray (Ca. Bar No. 115367)
Fred Neufeld (Ca. Bar No. 150759)
Haig Maghakian (Ca. Bar. No. 221954)
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
[Proposed] Co-Counsel for the Debtors and Debtors-in-Possession

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705
[Proposed] Co-Counsel for the Debtors and Debtors-in-Possession

Dated: July 26, 2009.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS _____ __, 2009, UNLESS THE DEBTORS EXTEND THE DEADLINE PRIOR TO THE VOTING DEADLINE.  TO BE COUNTED, THE VOTING AGENT MUST <u>RECEIVE</u> YOUR BALLOT OR MASTER BALLOT BEFORE THE VOTING DEADLINE.

---

[1]   The Debtors in these cases along with the last four digits of each of the Debtors' federal tax identification numbers are:  J.L. French Automotive Castings, Inc., (3670); French Holdings LLC, (0518); Nelson Metal Products LLC (4939); Allotech International LLC (5832); J.L. French LLC (8901); J.L. French Automotive, LLC (7075); Central Die, LLC (7793).  The Debtors' headquarters and mailing address is:  3101 South Taylor Drive, Sheboygan, WI 53082.

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................................... 1

    A.    OVERVIEW OF CHAPTER 11 .............................................................................. 3

    B.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ......................................... 4

    C.    PARTIES ENTITLED TO VOTE ON THE PLAN ................................................. 4

    D.    SOLICITATION PACKAGE .................................................................................. 5

    E.    VOTING INSTRUCTIONS ................................................................................... 5

    F.    THE CONFIRMATION HEARING ....................................................................... 6

II. BACKGROUND ................................................................................................................... 7

    A.    OVERVIEW OF J.L. FRENCH'S BUSINESS ..................................................... 7

    B.    THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE ........................ 8

        1.    The February 2006 Bankruptcy ................................................................ 8

        2.    The Debtors' Current Corporate and Capital Structure ........................... 8

III. EVENTS LEADING TO THE CHAPTER 11 CASES ..................................................... 10

    A.    OVERVIEW -- THE CURRENT STATE OF THE AUTOMOTIVE SUPPLY INDUSTRY ........................................................................................... 10

    B.    SOURCES OF LIQUIDITY CONSTRAINTS AND DECLINES IN EBITDA ............................ 10

    C.    IMPACT OF LIQUIDITY CONSTRAINTS ...................................................... 12

    D.    DEBTORS' PREPETITION RESTRUCTURING EFFORTS ............................. 12

    E.    FORBEARANCE AGREEMENTS; CONSENT AGREEMENT ....................... 12

    F.    OPERATING IN THE ORDINARY COURSE OF BUSINESS ....................... 13

IV. CHAPTER 11 CASES ..................................................................................................... 13

    A.    ADMINISTRATION OF THE CHAPTER 11 CASES ..................................... 13

        1.    Administrative Motions ........................................................................... 13

        2.    Operations ............................................................................................... 13

        3.    Financing ................................................................................................. 15

|   |   |   |   |
|---|---|---|---|
| | 4. | Employment and Compensation of Professionals | 15 |
| | 5. | Preference Analysis | 16 |
| | 6. | Other Potential Avoidance Actions | 16 |
| B. | | THE COMMITTEE | 16 |
| C. | | SUBSTANTIVE CONSOLIDATION | 16 |
| D. | | PENSION PLANS | 17 |

**V. SUMMARY OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION** ... 17

| | | | |
|---|---|---|---|
| A. | | PURPOSE AND PREDICATES TO THE PLAN | 17 |
| B. | | ADMINISTRATIVE AND PRIORITY TAX CLAIMS | 17 |
| | 1. | Administrative Claims | 17 |
| | 2. | DIP Facility Claims | 18 |
| | 3. | Priority Tax Claims | 18 |

**VI. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS** ... 19

| | | | |
|---|---|---|---|
| A. | | SUMMARY | 19 |
| B. | | Classification and Treatment of Claims and Equity Interests | 19 |
| | 1. | Class 1—Other Priority Claims. | 19 |
| | 2. | Class 2—Other Secured Claims. | 20 |
| | 3. | Class 3—First Lien Claims. | 20 |
| | 4. | Class 4—Second Lien Claims | 21 |
| | 5. | Class 5—General Unsecured Claims | 22 |
| | 6. | Class 6—Preferred Equity Interests | 23 |
| | 7. | Class 7— Common Equity Interests. | 23 |
| C. | | Intercompany Claims and Equity Interests | 23 |
| D. | | Special Provision Governing Unimpaired Claims | 23 |

**VII. ACCEPTANCE OR REJECTION OF THE PLAN** ... 24

| | | |
|---|---|---|
| A. | Voting Classes | 24 |
| B. | Acceptance by Voting Classes | 24 |

| | | | |
|---|---|---|---|
| C. | | Presumed Acceptance of Plan | 24 |
| D. | | Presumed Rejection of Plan | 24 |
| E. | | Elimination of Vacant Classes | 24 |
| F. | | Non-Consensual Confirmation; Cramdown | 24 |

**VIII. MEANS FOR IMPLEMENTATION OF THE PLAN** ......................................... **24**

| | | | |
|---|---|---|---|
| A. | | Consolidation of the Debtors for Voting and Distribution | 24 |
| B. | | Vesting of Assets in the Reorganized Debtors | 25 |
| C. | | Cancellation of Equity Interests | 25 |
| D. | | Issuance of New Securities; Execution of Related Documents | 25 |
| E. | | Effectuating Documents; Further Transactions | 25 |
| F. | | Creation of Retained Professional Escrow Account | 25 |
| G. | | Corporate Governance, Directors and Officers, and Corporate Action | 25 |
| | 1. | Reorganized J.L. French Automotive Castings, Inc. Certificate of Incorporation and By-Laws | 25 |
| | 2. | Effectiveness of Stockholders' Agreement | 26 |
| | 3. | Directors and Officers of the Reorganized Debtors | 26 |
| | 4. | Management Incentive Program | 26 |
| | 5. | D&O Tail Coverage Policies | 26 |
| | 6. | Corporate Action | 26 |
| H. | | Sources of Cash for Plan Distribution | 26 |
| I. | | Exit Financing | 27 |

**IX. TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND PENSION PLAN** ....................................... **27**

| | | | |
|---|---|---|---|
| A. | | Assumption and Rejection of Executory Contracts and Unexpired Leases | 27 |
| B. | | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 27 |
| C. | | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan | 27 |
| D. | | Indemnification of Directors, Officers and Employees | 28 |
| E. | | Assumption of D&O Insurance Policies | 28 |

F.     Compensation and Benefit Programs ........................................................ 28

G.    Workers' Compensation Programs .......................................................... 29

**X. PROVISIONS GOVERNING DISTRIBUTIONS ............................................... 29**

A.    Distribution Record Date ....................................................................... 29

B.    Disbursing Agent ................................................................................... 29

C.    Rights and Powers of the Disbursing Agent .......................................... 29

D.    Distributions for Claims Allowed as of the Effective Date ..................... 29

E.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ................................... 30

      1.    Delivery of Distributions in General ............................................ 30

      2.    Undeliverable Distributions ......................................................... 30

      3.    Compliance with Tax Requirements/Allocations ......................... 31

F.    Timing and Calculation of Amounts to be Distributed ........................... 31

G.    Minimum Distribution ........................................................................... 31

H.    Setoffs; Subordination .......................................................................... 31

**XI. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS ....................................... 32**

A.    Resolution of Disputed Claims .............................................................. 32

      1.    Prosecution of Claims Objections ............................................... 32

      2.    Claims Estimation ...................................................................... 32

      3.    Payments and Distributions on Disputed Claims ......................... 32

B.    Claims Allowance ................................................................................. 32

C.    Controversy Concerning Impairment ..................................................... 33

D.    Allowed Claims .................................................................................... 33

**XII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................................................... 33**

A.    Conditions Precedent to Confirmation ................................................... 33

B.    Conditions Precedent to Consummation ................................................ 33

C.    Waiver of Conditions ............................................................................ 34

|   |   |   |   |
|---|---|---|---|
| | D. | Effect of Non-Occurrence of Conditions to Consummation | 35 |
| **XIII. RELEASE, INJUNCTIVE AND RELATED PROVISIONS** | | | **35** |
| | A. | Compromise and Settlement | 35 |
| | B. | Releases by the Debtors | 35 |
| | C. | Third Party Release | 36 |
| | D. | Exculpation | 36 |
| | E. | Indemnification | 37 |
| | F. | Deemed Consent | 37 |
| | G. | No Waiver | 37 |
| | H. | Preservation of Rights of Action; Reservation of Rights | 37 |
| | | 1. Maintenance of Causes of Action | 37 |
| | | 2. Preservation of All Causes of Action Not Expressly Settled or Released | 38 |
| | I. | Discharge of Claims and Termination of Equity Interests | 39 |
| | J. | Injunction | 39 |
| **XIV. RETENTION OF JURISDICTION** | | | **39** |
| **XV. MISCELLANEOUS PROVISIONS** | | | **41** |
| | A. | Definition of "Adverse or Disproportionate Effect or Modification" | 41 |
| | B. | Effectuating Documents, Further Transactions and Corporate Action | 42 |
| | C. | Payment of Statutory Fees | 42 |
| | D. | Professional Fee Claims | 42 |
| | E. | Modification of Plan | 42 |
| | F. | Corrective Action | 42 |
| | G. | Revocation of Plan | 43 |
| | H. | Substantial Consummation | 43 |
| | I. | Successors and Assigns | 43 |
| | J. | Reservation of Rights | 43 |
| | K. | Section 1145 Exemption | 43 |

L.  Section 1146 Exemption ................................................................................ 43

M.  Further Assurances ....................................................................................... 44

**XVI. SUMMARY OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN** ....................... 44

1.  New Common Stock ............................................................................ 44

2.  Warrants ............................................................................................. 45

**XVII. VOTING PROCEDURES** ............................................................................................ 45

A.  THE SOLICITATION PACKAGE .................................................................. 45

B.  VOTING INSTRUCTIONS ........................................................................... 46

C.  VOTING TABULATION .............................................................................. 48

**XVIII. FINANCIAL PROJECTIONS** ...................................................................................... 50

**XIX. CONFIRMATION PROCEDURES** ................................................................................. 53

A.  THE CONFIRMATION HEARING .............................................................. 53

B.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ............... 53

C.  RISK FACTORS ........................................................................................... 56

D.  IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION ................ 56

E.  DISCLAIMER .............................................................................................. 56

**XX. CERTAIN RISK FACTORS AFFECTING THE DEBTORS** ............................................... 57

A.  CERTAIN BANKRUPTCY LAW CONSIDERATIONS ................................... 57

B.  FINANCIAL INFORMATION; DISCLAIMER ............................................... 59

C.  FACTORS AFFECTING THE VALUE OF THE SECURITIES TO BE ISSUED
    UNDER THE PLAN ..................................................................................... 60

D.  RISK FACTORS ASSOCIATED WITH THE BUSINESS ................................. 61

E.  FACTORS AFFECTING THE REORGANIZED DEBTORS ............................... 62

1.  General Factors .................................................................................. 62

2.  Litigation Risks ................................................................................. 62

3.  Environmental Liability Factors ....................................................... 63

**XXI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .............. 66

A.  LIQUIDATION UNDER CHAPTER 7 .......................................................... 66

B.     ALTERNATIVE PLAN OF REORGANIZATION .................................................. 66

**XXII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** .................................................. 66

A.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS ................ 67

B.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF
       CLASS 3 CLAIMS .................................................................................................. 68

       1.     First Lien Revolving Lender ............................................................ 68

       2.     First Lien Term Lender .................................................................... 69

C.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF
       CLASS 4 CLAIMS .................................................................................................. 70

D.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF
       CLASS 6 CLAIMS .................................................................................................. 70

E.     DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST ................................. 71

F.     GAIN ATTRIBUTABLE TO MARKET DISCOUNT ............................................... 71

G.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF
       CAPITALSOURCE EXIT SECURED NOTES ......................................................... 72

       1.     Stated Interest and Original Issue Discount .................................... 72

       2.     Sale, Exchange or Other Disposition of the CapitalSource Exit Secured Notes .............. 72

H.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF
       NEW COMMON STOCK .......................................................................................... 72

I.     EXERCISE OF WARRANTS .................................................................................... 73

J.     INFORMATION REPORTING AND BACKUP WITHHOLDING ............................. 73

**XXIII. CONCLUSION AND RECOMMENDATION** ............................................................. 74

**EXHIBITS: EXHIBITS B, C, AND D TO THIS DISCLOSURE STATEMENT ARE INCLUDED IN THE PLAN SUPPLEMENT.**

**Exhibit A**   -   The Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code

**Exhibit B**   -   Financial Projections

**Exhibit C**   -   Liquidation Analysis

**Exhibit D**   -   Going Concern Valuation of Debtors

THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT IT HAS NOT YET BEEN APPROVED. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN"). ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

## I.

## INTRODUCTION

J.L. French Automotive Castings, Inc. ("J.L. French") and certain of J.L. French's direct-and-indirect subsidiaries identified on the title page above (collectively, the "Debtors"), as debtors and debtors-in-possession, submit this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to Holders[2] of Claims and Equity Interests in connection with: (i) the solicitation of votes to accept or reject the *Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code*, dated July 20, 2009, as the same may be amended from time to time (the "Plan"), which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on July 20, 2009, and (ii) the Confirmation Hearing, which is scheduled for _____ __, 2009, commencing at 2:00 p.m., E.D.T. A copy of the Plan is attached hereto as Exhibit A. As set forth in this Disclosure Statement, only those Holders of Claims in Classes 3, 4 and 5 who are entitled to vote on the Plan will receive this Disclosure Statement. All other Holders of Claims and Equity Interests will receive a notice of the Disclosure Statement, which will provide details on how to procure copies of this Disclosure Statement.

THE BOARD OF DIRECTORS OF J.L. FRENCH AUTOMOTIVE CASTINGS, INC., (THE "BOARD") RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE SUBMIT A TIMELY BALLOT VOTING TO ACCEPT THE PLAN. THE BOARD AND THE RESPECTIVE MANAGERS OF THE DEBTORS HAVE UNANIMOUSLY APPROVED THE FILING AND SOLICITATION OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN. THE BOARD BELIEVES THAT THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DISCUSSED IN THIS DISCLOSURE STATEMENT BECAUSE: (A) THE PLAN PROVIDES FOR A LARGER DISTRIBUTION TO HOLDERS OF ALLOWED CLAIMS THAN WOULD OTHERWISE RESULT FROM A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE; AND (B) THE PLAN PROVIDES FOR A GREATER DISTRIBUTION TO ALL HOLDERS OF CLAIMS JUNIOR TO THE FIRST LIEN LENDERS THAN WOULD OTHERWISE BE AVAILABLE IF THE BANKRUPTCY CODE'S "ABSOLUTE PRIORITY" RULE WERE STRICTLY ENFORCED. THE "ABSOLUTE PRIORITY" RULE PROVIDES, IN PERTINENT PART, THAT SENIOR CLASSES OF CLAIMS MUST BE SATISFIED BEFORE JUNIOR CLASSES RECEIVE ANY DISTRIBUTION. IN ADDITION, ANY ALTERNATIVE OTHER THAN CONFIRMATION OF THE PLAN COULD RESULT IN EXTENSIVE DELAYS AND INCREASED ADMINISTRATIVE EXPENSES RESULTING IN SMALLER DISTRIBUTIONS TO THE HOLDERS OF ALLOWED CLAIMS. INCLUDED WITH THIS DISCLOSURE STATEMENT IS A LETTER FROM THE DEBTORS RECOMMENDING THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE ON THE PLAN, TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.

---

[2]    Unless otherwise defined in this Disclosure Statement, all capitalized terms used but not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

THE DEBTORS ARE MAKING THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE THIS DISCLOSURE STATEMENT WAS FILED WITH THE BANKRUPTCY COURT. UNLESS OTHERWISE SPECIFIED, HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO, AND MAY NOT BE DEEMED AS PROVIDING, ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ISSUES IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

*SEE* ARTICLE XX OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS AFFECTING THE DEBTORS" FOR A DISCUSSION OF VARIOUS FACTORS TO BE CONSIDERED IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS OR OTHER INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN. NOTWITHSTANDING THE FOREGOING, PARTIES TO THE CONSENT AGREEMENT MAY RELY ON THE REPRESENTATIONS AND INDUCEMENTS SET FORTH THEREIN AND ANY ANCILLARY AGREEMENTS RELATED THERETO.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. WHILE THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME

ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ADDITIONALLY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS AND CERTAIN FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE; HOWEVER, YOU SHOULD READ THE PLAN IN ITS ENTIRETY. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION TO BE INCORPORATED HEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.

THE EXHIBITS CONTAINED IN THE PLAN SUPPLEMENT AND THE EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN CONSTITUTES A MOTION SEEKING ENTRY OF AN ORDER SUBSTANTIVELY CONSOLIDATING THE CHAPTER 11 CASES SOLELY FOR THE LIMITED PURPOSES OF ACTIONS ASSOCIATED WITH THE CONFIRMATION AND CONSOLIDATION OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, VOTING, CONFIRMATION AND DISTRIBUTION.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (COLLECTIVELY, THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW. THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") HAS NOT APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

ALTHOUGH THE PLAN INTENDS THAT SECTION 1145 OF THE BANKRUPTCY CODE AND OTHER APPLICABLE LAW EXEMPT CERTAIN NEW COMMON STOCK FROM REGISTRATION, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

A.      OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 reorganization case. The Bankruptcy Court's confirmation of a plan of reorganization binds the debtor, any issuer of securities under the plan

of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose prior to the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

**B.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

The following chart summarizes distributions to Holders of Allowed Claims and Equity Interests under the Plan.[3]  The recoveries set forth below are projected recoveries and may change based upon changes in Allowed Claims and proceeds available.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Aggregated Amount of Allowed Claims or Equity Interests (as of Petition Date) | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | $2,953,435 | 100% |
| Class 2 | Other Secured Claims | Unimpaired | $3,332,329 | 100% |
| Class 3 | First Lien Claims[4] | Impaired | $210,179,534 | 56% |
| Class 4 | Second Lien Claims | Impaired | $64,052,559 | 10% |
| Class 5 | General Unsecured Claims[5] | Impaired | $1,436,880 | 5% |
| Class 6 | Preferred Equity Interests | Impaired | 1,999,997 shares | 0% |
| Class 7 | Common Equity Interests | Impaired | 8,122,667 shares | 0% |

**C.    PARTIES ENTITLED TO VOTE ON THE PLAN**

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan.  Holders of Claims or Equity Interests not impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Equity

---

[3]    This chart is only a summary of the classification and treatment of Allowed Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.

[4]    In Class 3, the Claim of the Revolving Lender is approximately $49.7 million, and the Claim of the Term Loan Lenders is approximately $160.5 million.  The estimated recovery of the Revolving Lender is 100%, and that of the Term Loan Lenders 42%.

[5]    This estimate of the amount of Class 5 Claims does not include Morgan Stanley, which will not share in the Class 5 Recovery.

Interests impaired by the Plan and receiving no Distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

- The Debtors are **NOT** seeking votes from the Holders of Claims in Classes 1 and 2 because these Classes, and each Holder of a Claim in these Classes, are not Impaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, these Classes are conclusively presumed to have accepted the Plan.

- The Debtors are **NOT** seeking votes from the Holders of Class 6 Preferred Equity Interests and Class 7 Common Equity Interests because these Classes are Impaired under the Plan, and the Holders of Equity Interests in those Classes will not receive any Distributions under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, each of these Classes is deemed to have rejected the Plan.

- The Debtors **ARE** soliciting votes to accept or reject the Plan from those Holders of Claims in Classes 3, 4 and 5 because Claims in those Classes are Impaired under the Plan and the Holders of those Claims will receive Distributions under the Plan. As such, the Holders of Class 3, 4 and 5 Claims have the right to vote to accept or reject the Plan.

For a detailed description of the Classes of Claims and the Classes of Equity Interests, as well as their respective treatment under the Plan, *see* Section VI of this Disclosure Statement.

**D.    SOLICITATION PACKAGE**

Accompanying this Disclosure Statement are copies of:

- letters to the Holders in each of the Voting Classes urging them to vote to accept the Plan;

- the Plan;

- notice of the Confirmation Hearing ("Confirmation Hearing Notice"); and

- one (1) or more Ballots and a return envelope, which are provided only to the Holders of Claims in Classes 3, 4 and 5, together with voting instructions.

The above, together with the Plan Supplement which is available on the Debtors' website, are collectively referred to as the solicitation package (the "Solicitation Package").

The Solicitation Package is being distributed to the Holders of Allowed Class 3, 4 and 5 Claims as of the Voting Record Date. The Solicitation Package materials may also be obtained by accessing the Debtors' website at www.bmcgroup.com/jlfrenchautomotivecastings or by requesting a copy from the Debtors' Voting Agent by writing to J.L. French Automotive Castings, Inc., c/o BMC Group, Inc., 444 N. Nash St., El Segundo, CA 90245 or calling (888)-909-0100.

**E.    VOTING INSTRUCTIONS**

Only the Holders of Allowed Class 3, 4 and 5 Claims as of July 27, 2009 (the "Voting Record Date") are entitled to vote to accept or reject the Plan, and Holders of Allowed Class 3, 4 and 5 Claims may do so by completing the Ballot and returning it in the envelope provided to the Voting Agent so that it is received by the Voting Agent by the Voting Deadline of _____ __, 2009 at 4:00 p.m. E.D.T. Voting Instructions are attached to each Ballot.

The Debtors, with the approval of the Bankruptcy Court, have engaged BMC Group, Inc., ("BMC"), 444 N. Nash St., El Segundo, CA 90245, www.bmcgroup.com, as the claims and noticing agent and as the voting agent (the "Voting Agent") to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject

the Plan and the Debtors will File a voting report (the "Voting Report") no later than two (2) Business Days before the Confirmation Hearing.

The deadline for the Voting Agent to receive any Ballot is 4:00 p.m. E.D.T., _____ __, 2009 (the "Voting Deadline").

| BALLOTS |
|---|
| Ballots (or the Master Ballot of your Nominee Holder) must be actually received by the Voting Agent by the Voting Deadline at one of the following addresses: |

| | |
|---|---|
| J.L. FRENCH AUTOMOTIVE CASTINGS, INC. c/o BMC Group Inc. PO Box 3020 Chanhassen, MN 53317-3020 | If by first class mail |
| J.L. FRENCH AUTOMOTIVE CASTINGS, INC. c/o BMC Group Inc. 18750 Lake Drive East Chanhassen, MN 55317 | If by overnight courier or personal delivery |

If you have any questions on the procedures for voting on the Plan, please call the Voting Agent at the following telephone number:

(888) 989-0100

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.

EACH HOLDER OF A CLAIM MAY CAST ONLY ONE BALLOT PER EACH SUCH CLAIM HELD. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 3, 4 AND 5 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

F.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2009, to take place at _____ E.D.T. (the "Confirmation Hearing Date") before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at Marine Midland Building, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on the Debtors, by no later than _____ __, 2009, at 4:00 p.m. E.D.T. (the "Plan Objection Deadline"). **UNLESS OBJECTIONS TO CONFIRMATION OF THE PLAN ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DEADLINES SET FORTH IN THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

The Debtors will publish the Confirmation Hearing Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline, and Confirmation Hearing Date, in the following publications in order to provide notification to those persons who may not receive notice by mail; *The Wall Street Journal (National and International editions),* the *Financial Times (Global Edition),* the *Milwaukee Journal Sentinel and* the *Glasgow Daily Times.*

## II.

## BACKGROUND

### A.    OVERVIEW OF J.L. FRENCH'S BUSINESS

The Debtors are leading global designers and producers of high-pressure aluminum die-castings, specializing in automotive powertrain components. Die-casting is a fast, cost-effective and high quality manufacturing process for production of high volume, tight tolerance metal components. The die-casting process entails the injection of a molten metal alloy under high pressure into a steel mold (or tool), which molten metal solidifies rapidly (from milliseconds to a few seconds) to form a component and is then automatically extracted

Founded in 1968, the Debtors began as a small, family-owned manufacturer of aluminum die-castings from a single facility, the Taylor Facility, in Sheboygan, Wisconsin. In 1994, the Debtors opened an additional manufacturing facility in Sheboygan, Wisconsin, known as the "Gateway Facility." This facility not only provided the Debtors with additional production capacity, but also provided the necessary aluminum smelting infrastructure for its manufacturing processes to allow the Debtors to produce finished automotive parts directly from scrap aluminum. The Debtors believe that this smelting infrastructure, which has subsequently been expanded to other of the Debtors' facilities, provides the Debtors with several operational benefits, including: (i) greater control over the materials utilized in the die-cast process ensuring that finished products are of uniform high quality; (ii) broader access to a wider range of scrap aluminum suitable for production needs, affording the Debtors greater control over their aluminum costs; and (iii) access to an independent revenue source through sales of processed aluminum to third parties.

Since opening the Gateway Facility, the Debtors have expanded the scope of their die-cast aluminum product line. In 1997, Ford Motor Company ("Ford") awarded the Debtors a contract to supply transmission cases for light trucks and sport utility vehicles. To support these newly awarded contracts, the Debtors expanded the Gateway Facility to install 3,500-ton die-cast machines, which allowed them to produce much larger die-cast products. In 2004, the Debtors successfully won their first contract to produce high pressure aluminum die-cast engine blocks and have subsequently won two (2) additional engine block contracts. To support the increased aluminum requirements of the engine block programs and the need for additional large tonnage die cast machines, the Debtors invested substantial sums in expanding their facilities and acquiring aluminum shredding and smelting equipment and two (2) additional 3,500-ton die-cast machines. In 1999, the Debtors acquired a manufacturing facility located in Glasgow, Kentucky.

*The Debtors' Current Domestic Customers and Products*

The Debtors currently produce a broad range of aluminum die-cast components and assemblies, including engine blocks, oil pans, transmission cases, engine covers, bedplates, ladderframes, cam covers, and front end accessory drive brackets. The Debtors are one of only a select group of aluminum product suppliers equipped to provide original equipment manufacturers ("OEMs") and first-tier automotive parts suppliers, on a global basis, with broad technical design, rapid prototyping, engineering and program management capabilities for manufacturing high-pressure die-cast aluminum engine and powertrain parts.

The Debtors depend upon a select group of OEMs and first-tier automotive part suppliers for a majority of their sales. During 2008, approximately 95% of the Debtors' sales revenue was attributable to just four customers— Ford, General Motors Corporation ("General Motors"), Magna International, Inc. ("Magna"), and Chrysler, LLC ("Chrysler").

*The Debtors' Supply Contracts*

The Debtors generally manufacture highly specialized parts designed for a particular vehicle model or platform, and thus generally enter into long-term supply contracts with both the OEM for such model or platform and first-tier automotive supplier customers. While the Debtors typically enter into long-term supply contracts, their customers do not provide any guarantees of future volumes. Customers typically enlist the Debtors well in advance of the start of production, in some cases as many as several years before the anticipated start of production. Major new business launches may require the Debtors to acquire new production space, and often require the Debtors to make substantial investments in new machinery equipment, die-cast machines and tooling necessary to produce component parts. Thus, it is critical that the Debtors have adequate free cash flow available to make the necessary capital expenditures, often years before they realize any revenues from the product launch.

*The Debtors' Aluminum Smelting Operations*

Debtor Allotech International LLC, a Wisconsin limited liability company ("Allotech") operates one of the largest aluminum smelting operations in the United States and supplies the other Debtors with high quality aluminum ready for die-casting. Allotech uses on-site furnaces to heat scrap aluminum to over 1,400 degrees Fahrenheit, combining the liquid aluminum with the alloys and additives necessary to create the processed aluminum necessary for die-cast manufacturing. As a result of the anticipated aluminum requirements to support new programs, Allotech invested in a state of the art aluminum shredder and separator that has enabled it to increase its capacity and access cheaper and more abundant sources of scrap to be utilized in the smelting process. In addition to supplying other Debtors, Allotech produces processed aluminum for sale to third parties. In 2008, these sales accounted for a significant portion of the Debtors' revenues. During the past several months, however, liquidity constraints and the precipitous decline in aluminum prices have forced Allotech to significantly curtail this business, which has further eroded the Debtors' revenues and profitability.

## B.    THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### 1.    The February 2006 Bankruptcy

The Debtors previously filed for chapter 11 relief on February 10, 2006, in this Court (Case No. 06-10119, jointly administered, the "2006 Bankruptcy Cases"). The Debtors emerged from the 2006 Bankruptcy Cases on June 30, 2006, pursuant to an order confirming a plan of reorganization (the "2006 Plan"), made all distributions required under the 2006 Plan. The Debtors emerged from bankruptcy under the 2006 Plan with $205 million of secured term loans and a revolving secured loan of up to $50 million. The Bankruptcy Court entered a final decree closing the 2006 Bankruptcy Cases on April 17, 2009, and the 2006 Bankruptcy Cases were closed on April 23, 2009.

### 2.    The Debtors' Current Corporate and Capital Structure

The Debtors' current corporate structure is illustrated in a diagram included in the Plan Supplement. J.L. French, owns all of the equity interests in Nelson Metal Products LLC, a Delaware limited liability company ("NMP"), and French Holdings LLC, a Delaware limited liability company. NMP owns 94.05% of the equity interests in J.L. French Automotive, LLC, a Michigan limited liability company ("JLFA"). French Holdings LLC owns all of the equity interests in Allotech and J.L. French LLC, both Wisconsin limited liability companies. J.L. French LLC owns all of the equity interests in Central Die, LLC, a Wisconsin limited liability company, and 5.95% of the equity interests in JLFA. Each of the entities named in this paragraph is a Debtor in these Chapter 11 Cases.

The Debtors also own a number of subsidiaries related to production of auto parts outside of the U.S. J.L. French Ansola, S.R.L. is a wholly-owned subsidiary of J.L. French located in Spain, and manufactures auto parts. Servicios J.L. French, S.R.L. is a wholly-owned subsidiary of J.L. French located in Spain, and is a management service company. J.L. French Automotive Castings China Holdings, LLC is a wholly-owned subsidiary of J.L.

French, and a majority owner of a automotive component manufacturing joint venture located in the Peoples Republic of China. The Debtors also hold direct or indirect ownership interests in J.L. French Servicios, S. de R.L. de C.V., a Mexican company, and J.L. French s.r.o., a Slovakian company. None of the foreign companies named in this paragraph are Debtors in these Chapter 11 Cases, and the Debtors do not anticipate that any non-U.S. insolvency proceeding or wind-down will materially affect these Chapter 11 Cases or the Debtors' financial restructuring.

Debtor J.L. French owns 100% of the capital stock of JLFR, Inc ("JLFR"). JLFR is a single-purpose entity that at one time purchased customer receivables from JLFA and then sold them to Wells Fargo Business Bank, National Association ("WFBB") pursuant to an Accounts Purchase Agreement, dated January 1, 2005, between JLFR and WFBB, as a means of obtaining a steady, predictable source of working capital for the Debtors' operations. JLFR is not a debtor in these Chapter 11 Cases. Several months prior to the Petition Date WFBB terminated the Accounts Purchase Agreement. The Debtors believe that, as of the Petition Date, no amounts were owing to WFBB under the Accounts Purchase Agreement.

(a)     The First Lien Credit Facility

The Debtors are parties to a First Lien Credit and Guaranty Agreement, dated as of May 14, 2007 (as amended, modified, supplemented or restated from time to time, the "First Lien Credit and Guaranty Agreement"). The Debtors' obligations under the First Lien Credit and Guaranty Agreement are secured (subject to limited exceptions) by a first priority pledge of, lien on and/or security interest in: (a) all of the membership interests in J.L. French's direct and indirect domestic restricted subsidiaries; (b) 65% of the voting power of capital stock of J.L. French's first-tier, wholly-owned foreign subsidiaries and 100% of the non-voting stock in certain of such first-tier, wholly-owned foreign subsidiaries; (c) substantially all of the Debtors' present and future property and assets, real and personal, tangible and intangible; and (d) the proceeds of such property and assets.

Under the First Lien Credit and Guaranty Agreement, CapitalSource Finance LLC ("CapitalSource") is the revolving loan administrative agent (the "First Lien Revolving Agent"), Wilmington Trust FSB (as successor to Goldman Sachs Credit Partners L.P.) is the term loan administrative agent (the "First Lien Term Agent") for the lenders (collectively, the "First Lien Lenders"), and Wilmington Trust FSB is the collateral agent for the First Lien Lenders. The current outstanding principal balance of the term loans is approximately $154 million; and the current outstanding principal balance of the revolving loan is approximately $50 million (inclusive of reimbursement obligations in respect of approximately $5 million of issued letters of credit).

(b)     The Second Lien Credit Facility

On May 14, 2007, the Debtors also entered into the Second Lien Credit and Guaranty Agreement (as amended, modified, supplemented or restated from time to time, the "Second Lien Credit and Guaranty Agreement"). The Bank of New York (as successor to Goldman Sachs Credit Partners L.P.) is the term loan administrative and collateral agent (the "Second Lien Agent") for the lenders (collectively, the "Second Lien Lenders"). The current principal amount outstanding under the Second Lien Term Loan is approximately $60 million. The Debtors' obligations under the Second Lien Credit and Guaranty Agreement are secured by substantially the same collateral as secures the First Lien Credit and Guaranty Agreement.

(i)     Prepetition Defaults Under the Credit Facilities

Prior to the Petition Date, the Debtors triggered a number of financial covenant defaults related to interest coverage and leverage ratios under the First Lien and Second Lien Credit and Guaranty Agreements. In addition, on December 31, 2008, March 31, 2009 and June 30, 2009 the Debtors failed to make term loan principal payments under the First Lien Credit and Guaranty Agreement; on February 10, 2009, March 31, 2009 and June 30, 2009, the Debtors failed to make interest payments on the First Lien Credit and Guaranty Agreement; and on February 13, 2009, March 31, 2009 and June 30, 2009, the Debtors failed to make interest payments on the Second Lien Credit and Guaranty Agreement.

(c)    Swap Transactions

Debtor J.L. French entered into interest rate swap transactions ("Swaps") with Morgan Stanley Capital Services Inc. ("MSCS"), pursuant to three swap confirmations, each dated July 19, 2006, and the ISDA 2002 Master Agreement dated July 13, 2006.  Morgan Stanley guaranteed MSCS's payment obligations under the Swaps, pursuant to a letter, dated May 1, 2007, from Morgan Stanley to J.L. French. On April 30, 2009, MSCS commenced an action in the state courts of New York to enforce its rights under the Swaps.  The Debtors estimate that the claim of Morgan Stanley is approximately $15 million.  Soon after the commencement of these Chapter 11 Cases, the Debtors and Morgan Stanley reached a settlement of the litigation and agreement on the treatment of the Interest Rate Swap Claims.  Pursuant to the settlement, on the Effective Date, Morgan Stanley will receive the Morgan Stanley Exit Swap, in full and final satisfaction of its Allowed Class 5 Claims.  The documents evidencing the Morgan Stanley Exit Swap are contained in the Plan Supplement.  The initial mark-to-market value of the Morgan Stanley Exit Note as of the Effective Date shall be one million $U.S. dollars ($1,000,000.00) in favor of Morgan Stanley.

## III.

## EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    OVERVIEW -- THE CURRENT STATE OF THE AUTOMOTIVE SUPPLY INDUSTRY

Notwithstanding the 2006 Bankruptcy Cases, the Debtors have continued to encounter significant operational and financial difficulties.  In 2008, nearly all of the Debtors' revenue was directly or indirectly related to light vehicle production of its primary customers Ford, General Motors and Chrysler (collectively, the "Domestic Automakers").  The Domestic Automakers' North American light vehicle production fell to 7.5 million vehicles for 2008 (a 20% decline from the 2007 level of 9.4 million vehicles), and such decline has continued into 2009 with an expectation (based upon a forecast prepared in May 2009 by CSM Worldwide) that the Domestic Automakers' North American light vehicle production will drop to 4.2 million vehicles (44% less than in 2008, and 55% less than in 2007).  The Domestic Automakers' production levels have been in decline for several years due to a number of factors including, among other things, global competition, significant legacy costs and high energy costs, but the precipitous decline that began in mid-2008 (and which is expected to continue through 2009) was triggered by the current global credit crisis and the resulting deterioration of consumer confidence and consumer spending which has devastated the automobile industry (the "Credit Crisis").

The Credit Crisis, coupled with the significant recent deterioration in the Domestic Automakers' market share and vehicle production, has all but eliminated the availability of capital to support the operations of automotive suppliers, as credit providers have become increasingly concerned with the future viability of the Domestic Automakers.  For instance, within the past six (6) months, WFBB, the funding provider under the Debtors' accounts receivable factoring arrangement determined that it would no longer factor receivables owed to the Debtors by any of the Domestic Automakers, resulting in a significant reduction in the Debtors' liquidity.  The recent chapter 11 bankruptcy cases of General Motors and Chrysler has further exacerbated the concerns of the credit and capital markets regarding the viability of auto industry parts suppliers.

### B.    SOURCES OF LIQUIDITY CONSTRAINTS AND DECLINES IN EBITDA

While most of the Debtors' product lines are profitable, the Debtors' financial results have been seriously impaired by the loss of sales volume under many of their existing customer contracts.  Over the past several years, the Debtors invested significant amounts of capital to expand their die-casting and machining capacity in support of specific customer production contracts that in many cases failed to generate the expected level of sales volume.  The precipitous decline in volume under these contracts and related loss of revenue have rendered the Debtors unable to generate sufficient cash flow to service their debt obligations.  The Debtors' financial woes have been exacerbated by the refusal of some of their customers to award certain new business because of the Debtors' over-leveraged balance sheet.

As a result, the Debtors' liquidity has become severely constrained.  As of the Petition Date, the Debtors had no access to working capital borrowing and were unable to stay current on their payment obligations under the

First Lien and Second Lien Credit and Guaranty Agreements. Specifically, the Debtors' liquidity position has been negatively impacted by the following factors:

*Decline in Domestic Automobile Sales*

In accordance with common practice within the automotive supply industry, the Debtors typically supply their customers on a requirements basis and are not guaranteed any minimum volume of business. As a result, when the Debtors' customers experience a downturn or decrease in vehicle production volume, the Debtors experience a commensurate decrease in the orders placed by their customers. In February 2008, the Debtors projected that the Domestic Automakers and their first-tier automotive parts suppliers would collectively purchase over $390.8 million in parts from the Debtors during 2008 and $377.4 million in 2009. However, as a result of the significant sales declines discussed above, such customers collectively purchased only $327.8 million (adjusted for aluminum price fluctuations) from the Debtors in 2008, or 16.1% below the forecast amount. Revenue for 2009 is currently forecast to be approximately $205 million, a sharp drop of more than 45% from the amount previously forecast.

These revenue declines have had a significant negative impact on the Debtors' earnings. In February 2008, the Debtors forecast that their EBITDA would exceed $53 million for 2008 and $57 million for 2009. As a result of the significant sales declines discussed above, however, preliminary actual EBITDA for 2008 was approximately $35.8 million, and based on the current economic conditions and the industry environment for light vehicle production, the Debtors are forecasting that EBITDA will decline further in 2009, to approximately $25 million. Not surprisingly, the steady decrease in sales volume described above, together with the high amount of leverage on the Debtors' balance sheet, has resulted in substantial liquidity constraints for the Debtors.

*Volatility in Commodity Prices*

The Debtors have suffered from extreme volatility in key commodity prices, making it more expensive for the Debtors to manufacture their products. Significantly, the cost of aluminum reached what management believes to be an all-time high in April 2008, an increase of nearly 25% from the beginning of 2008, and 35% from the beginning of 2007. Since the peak in April 2008, the price of aluminum has fallen more than 65%. The cost of natural gas, another commodity key to the Debtors' continuing operations, has increased significantly during the past two (2) years before declining dramatically late in 2008. The Debtors cannot simply pass these costs on to their customers to account for their increased cost of production. Rather, even as commodity prices increase, the Debtors must often decrease their sale prices to customers to abide by the governing supply contracts.

*Inability to Achieve Desired Profit Margins*

The Debtors also have not always been able to achieve their desired profit margins with respect to existing product lines. Typically, when a first-tier automotive supplier awards a supply contract to manufacture a part for a particular new vehicle or vehicle platform, it does so for the life of that particular vehicle platform. The long-term nature of such supply contracts would ordinarily allow the Debtors to earn increased profits over time, as they become more adept at manufacturing the product, and thereby reducing the cost to manufacture and improving the quality of such parts. But many of the Debtors' supply contracts provide for regular price decreases over the life of a contract. As a result of significant volume shortfalls on many of its key programs, the Debtors have been unable to achieve cost savings sufficient to offset these price decreases (especially considering the recent and unexpected increases in commodities prices that the Debtors have experienced).

*Launch of New and Maintenance of Existing Business Lines*

The Debtors have incurred significant costs during the past three (3) years relating to the launch of a significant new contract to produce V6 engine blocks for one of its major customers. During 2006, 2007 and 2008 the Debtors invested more than $5.0 million in dedicated program-specific equipment plus an additional $9.0 million to expand their die-casting and smelting capacity in support of such program. While this would ordinarily be a positive development, unforeseen technical difficulties in managing the launch of the contract, coupled with reductions in anticipated production volume, have negatively impacted the Debtors' gross margins and profitability with respect to such program.

The Debtors have also incurred substantial costs to maintain and repair their existing product lines. In fact, 50% of their annual capital expenditures have typically been incurred to maintain and replace assets for existing product lines. The Debtors spend approximately $20 million each year launching, maintaining and repairing business lines. These capital expenditures have taken a toll on the Debtors' overall operations, compounding the problems presented by the Debtors' depressed sales volumes and high debt leverage.

## C.    IMPACT OF LIQUIDITY CONSTRAINTS

The Debtors' liquidity has been severely constrained in recent months, as a result of the volume declines described above and the loss of their ability to factor receivables from the Domestic Automakers through WFBB. As of the Petition Date, the Debtors had no access to debt financing to fund their working capital needs, and they had insufficient cash to stay current on their payment obligations under their secured debt. These issues present a serious threat to the Debtors' ability to pursue the growth and development initiatives necessary to remain competitive in their industry.

As a result of the factors outlined above, the Debtors have not achieved the sales or profit margins that they anticipated since early 2008, and the Debtors have been rendered unable to service their debt obligations at their current levels. Moreover, absent a restructuring, the Debtors' continued efforts to service such debt will impair their ability to make the necessary capital investments to implement the new product lines necessary to sustain their businesses. The Debtors believe that with a deleveraged capital structure and the opportunity to continue launching new product lines, they will be well-positioned to grow and become more profitable.

## D.    DEBTORS' PREPETITION RESTRUCTURING EFFORTS

Over the course of the past year, the Debtors engaged Milbank, Tweed, Hadley & McCloy LLP as restructuring counsel, Houlihan Lokey Howard & Zukin Capital, Inc. as investment banker and financial advisor, and Conway MacKenzie, Inc. as financial and operational restructuring advisor. In conjunction with its advisors, the Debtors concluded that unless they substantially reduce their debt obligations, they could no longer fund the capital expenditures required to launch new products and reliably supply high-quality and well-engineered parts, and, accordingly, that the lenders under the secured credit facilities would have to convert their debt investments in the Debtors into equity of the reorganized Debtors.

## E.    FORBEARANCE AGREEMENTS; CONSENT AGREEMENT

By early February 2009, the Debtors were in default under several provisions of the First and Second Lien Credit Facilities, partly because of their failure to make the scheduled interest payments due under the Credit Facilities. The Debtors began negotiating with the First Lien Term Agent, First Lien Revolver Agent and the Second Lien Agent.

On February 13, 2009, the Requisite Lenders under, and as defined in, the First Lien Credit and Guaranty Agreement entered into the Forbearance and Standstill Agreement (First Lien) ("First Lien Forbearance Agreement") with the Debtors, pursuant to which the First Lien Lenders agreed to temporarily forbear from the exercise of the remedies available to them under First Lien Credit Documents until February 23, 2009. Pursuant to several letter agreements, the term of the First Lien Forbearance Agreement was extended to July 15, 2009.

Also on February 13, 2009, the Debtors entered into the Forbearance and Standstill Agreement (Second Lien) (the "Second Lien Forbearance Agreement") with Requisite Lenders under, and as defined in, the Second Lien Credit and Guaranty Agreement, pursuant to which the Second Lien Lenders agreed to temporarily forbear until February 23, 2009, from the exercise of the remedies available to them under the Second Lien Credit and Guaranty Agreement and the Second Lien Pledge and Security Agreement. Pursuant to several letter agreements, the term of the Second Lien Forbearance Agreement was extended several times to July 15, 2009.

During the time that the First and Second Lien Forbearance Agreements were in place, the Debtors, First Lien Term Lenders, First Lien Revolving Lenders, Second Lien Lenders and OEMs began discussing the terms of a consensual chapter 11 restructuring pursuant to which all of the First Lien Term Lenders and Second Lien Lenders would convert their debt to equity in the Reorganized Debtors, the Revolving Lender would receive a restructured secured note, and the OEMs would make certain modifications to the OEM Agreements requested by the Debtors.

The terms of the parties' agreement are contained in the Consent Agreement, dated as of July 12, 2009, a copy of which is included in the Plan Supplement.

## F.    OPERATING IN THE ORDINARY COURSE OF BUSINESS

Though the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their assets as debtors-in-possession pursuant to sections 1107 (a) and 1108 of the Bankruptcy Code. The Debtors' customers continue to receive automotive components and related services from the Debtors, and the Debtors' vendors are being paid in full according to applicable payment terms for goods and services delivered during the bankruptcy cases.

### IV.

### CHAPTER 11 CASES

## A.    ADMINISTRATION OF THE CHAPTER 11 CASES

The Debtors do not anticipate that the Chapter 11 Cases will be lengthy. The Debtors anticipate that the Effective Date of the Plan should actually occur shortly after the Confirmation Hearing.

As in many large chapter 11 cases, the Debtors filed a variety of customary motions on the Petition Date which were designed to facilitate their smooth transition into bankruptcy.

*First Day Motions in these Chapter 11 Cases*

### 1.    Administrative Motions

*Motion of the Debtors for Order Directing Joint Administration of Related Chapter 11 Cases*

The Debtors are affiliated entities and filed a motion requesting that their Chapter 11 Cases be jointly administered by the Court, seeking to avoid the cost of maintaining separate Bankruptcy Court dockets for each of the Debtors' chapter 11 cases. On July 14, 2009, the Court entered an order granting the request for joint administration of the Chapter 11 Cases.

*Motion of the Debtors for Entry of an Order Establishing Deadline for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof*

The Debtors filed a motion for an order establishing a bar date (the "Bar Date") and approving the form and manner of notice thereof.

### 2.    Operations

*Motion of the Debtors for Entry of an Order Under 11 U.S.C. §§ 363, 364, 1107 and 1108 (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, (C) Continued Use of Existing Business Forms and (D) Continued Use of Existing Investment Guidelines; (II) Granting Superpriority Administrative Priority Status to Postpetition Intercompany Claims; and (III) Authorizing Continued Performance Under Intercompany Arrangements and Historical Practices*

The Debtors filed a motion for an order authorizing the continued use of nine (9) primary bank accounts at various banks throughout the United States, through which Debtor J.L. French LLC manages cash receipts, transfers and disbursements for the Debtors' entire domestic corporate enterprise. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between such accounts by various methods, including checks, electronic funds transfers and direct deposits. Specifically, the Debtors' Cash Management System consists of: (i) a depository account maintained at Wells Fargo Bank, N.A. "Wells Fargo"), with J.L. French LLC as the account debtor; (ii) numerous disbursement accounts maintained by Wells Fargo and Branch Banking & Trust; and (iii) a "lockbox" account and joint trust account maintained at affiliates of Wells Fargo. The cash management system also includes a revolving credit facility with CapitalSource, as well as two (2) money market accounts, which are

linked to two of the Debtors' main accounts maintained by Wells Fargo.  On July 14, 2009, the Court entered an order granting the relief requested in the motion.

> *Motion of The Debtors for Entry of an Order: (I) Authorizing the Debtors to Pay Prepetition (A) Wages, Salaries, and Other Compensation, (B) Employee Medical and Similar Benefits, and (C) Reimbursable Employee Expenses; And (III) Authorizing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing*

The Debtors filed a motion to authorize the payment of prepetition wages and commissions and benefits to Debtors' employees.  The Debtors provide employees benefits, including, but not limited to (a) health and dental insurance, (b) stop loss coverage, (c) workers' compensation, (d) vacation, (e) sick leave, (f) stock and savings plans, and (g) other miscellaneous benefits.  On July 14, 2009, the Court entered an order granting the relief requested in the motion.

> *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Remit and Pay Prepetition Sales, Use and Franchise Taxes and Certain Other Government Charges and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing*

The Debtors filed a motion for an order authorizing the continued collection and remittance of prepetition taxes, including, but not limited to, sales tax, use and franchise taxes and other taxes necessary to operate Debtors businesses, and certain fees for permits, licenses and other similar assessments.  On July 14, 2009, the Court entered an order granting the relief requested in the motion.

> *Motion of the Debtors for Entry of an Order Under 11 U.S.C. §§105(A), 361, 362, 363 and 364 and Fed. R. Bankr. P. 6004(A) for an Order Authorizing: (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Workers' Compensation, Liability, Property and Other Insurance Programs Including Payment of Policy Premiums and Brokers' Fees; and (II) Continuation of Insurance Premium Financing Programs*

The Debtors filed a motion for an order authorizing (a) the continuation of their insurance programs, including to the extent such insurance programs require payment of prepetition claims, including (i) workers' compensation, (ii) directors' and officers' liability, (iii) employment practices liability, (iv) fiduciary liability, (v) crime, kidnap & ransom, (vi) ocean cargo liability, (vii) foreign coverage, (viii) environmental liability, (ix) umbrella & excess liability and various other liability, property, and automobile insurance programs (collectively, the "Insurance Programs"), (b) the payment of prepetition policy premiums and brokers' fees arising under the Insurance Programs and (c) the continuation of  its insurance premium financing programs and payment of insurance premium financing obligations in connection with the Insurance Programs.  The Insurance Programs include coverage for, among other things, employees' losses related to employment, breach of officers' and directors' duties, personal injury torts, liability arising out of the operation of motor vehicles and various other first party property claims and third party liability claims.  On July 14, 2009, the Court entered an order granting the relief requested in the motion.

> *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Pay in the Ordinary Course of Business Prepetition Claims of Shippers and Other Lien Claimants and (II) Authorizing Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing*

The Debtors filed a motion for an order authorizing payment of prepetition claims of shippers, domestic common carriers, truckers and other similar lien claimants in the ordinary course of business, in order to protect timely delivery or goods to the Debtors and their customers.  On July 14, 2009, the Court entered an order granting the relief requested in the motion.

*Motion of the Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(A) and 366: (I) Prohibiting Utilities from Discontinuing, Altering or Refusing Service; (II) Establishing Procedures for Determining Adequate Assurances of Payment; and (III) Establishing Procedures for the Utilities to Opt Out of the Debtors' Proposed Procedures for Adequate Assurance*

The Debtors filed a motion for an order prohibiting utility providers from discontinuing, altering or refusing service, and providing such utility providers with appropriate forms of adequate protection. On July 14, 2009, the Court entered an interim order granting the relief requested in the motion.

*Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. § 546(c): (I) Establishing Procedures for Resolution of Reclamation Claims; and (II) Prohibiting Sellers of Goods from Reclaiming or Otherwise Interfering with Debtors' Possession of Certain Goods.*

The Debtors filed a motion for an order (a) requiring the Debtors to review all reclamation claims of creditors and to file a report by no later than August 28, 2009 describing the claims and the Debtors' position on the validity and priority of such claims, and (b) prohibiting vendors from reclaiming goods without further order of the Court. On July 14, 2009, the Court entered an order granting the relief requested in the motion

*Motion of the Debtors for Entry of an Order Authorizing, but not Requiring the Debtors to Pay in the Ordinary Course of Business the Prepetition Claims of Essential Trade Creditors.*

The Debtors filed a motion for an order authorizing payment of the prepetition claims of certain essential trade creditors in order to protect the uninterrupted delivery of essential goods and services from the Debtors' vendors On July 14, 2009, the Court entered an order granting the relief requested in the motion.

### 3.    Financing

*DIP Financing Motion*

The Debtors filed a motion seeking an order authorizing the Debtors to enter into a postpetition credit facility with certain lenders in order to access approximately $15 million of postpetition financing during the Chapter 11 Cases. The motion also sought, among other things, the grant of a super-priority priming lien to secure the postpetition lenders' claims, the grant of super-priority administrative expense claim status for the claims based upon the postpetition lending, and certain adequate protection for the First and Second Lien Lenders. On July 14, 2009, the Bankruptcy Court entered an interim order granting the relief requested in the motion.

### 4.    Employment and Compensation of Professionals

The Debtors filed the following applications to employ professionals at the expense of the bankruptcy estates:

*Application for Order Pursuant to 11 U.S.C. §§ 327(A) and 328(A), Fed. R. Bankr. P. 2014(A) and Del. Bankr. L. R.. 2014-1, Authorizing Employment and Retention of Milbank, Tweed, Hadley & McCloy LLP as Attorneys Nunc Pro Tunc to Petition Date*

*Application for Order Pursuant to 11 U.S.C. §§ 327(A) and 328(A) and Fed. R. Bankr. P. 2014(A) Authorizing Employment and Retention of Pachulski, Stang, Ziehl, & Jones P.C. as Attorneys for the Debtors*

*Application to Employ and Retain BMC Group, Inc. as Notice, Claims and Balloting Agent to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date*

*Application to Employ and Retain Varnum LLP Nunc Pro Tunc to the Petition Date as Special Counsel for the Debtors under Sections 327(e) and 328(a) of the Bankruptcy Code*

*Application for Entry of an Order Authorizing the Employment and Retention of Conway Mackenzie, Inc. as Financial Advisor to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date*

*Application for Entry of an Order Authorizing the Employment and Retention of Houlihan Lokey Howard & Zukin Capital, Inc. As Investment Banker to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date*

*Application for Entry of an Order Authorizing the Employment and Retention of Ernst & Young LLP as Tax Service Providers and Tax Consultants to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date*

The Debtors filed the following motion for an order establishing procedures for interim payment of the fees and expenses of professionals employed at the expense of the estate: *Debtors' Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code.*

The Debtors filed the following motion for an order approving the employment and payment of additional non-bankruptcy ordinary course professionals: *Motion of Debtors for Entry of An Order Authorizing the Debtors to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Businesses*

### 5.    Preference Analysis

The Debtors are conducting an ongoing analysis of potential avoidance actions, including potential actions to recover preferential transfers pursuant to section 547 of the Bankruptcy Code. The Debtors do not anticipate filing any preference actions.

### 6.    Other Potential Avoidance Actions

As of the date hereof, the Debtors are not aware of any potential avoidance action under chapter 5 of the Bankruptcy Code that would result in any material recovery to the Debtors' estates.

## B.    THE COMMITTEE

As of the date hereof, no committee has been appointed.

## C.    SUBSTANTIVE CONSOLIDATION

The Plan is premised upon substantively consolidating certain of the Debtors as set forth in Article I.C of the Plan for the limited purposes of confirming and consummating the Plan, including but not limited to voting, confirmation and distribution.

There is no express statutory authority for substantive consolidation; rather, substantive consolidation exists as an equitable remedy. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Bankruptcy Court's ability to order substantive consolidation derives from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that the Bankruptcy Court may issue orders necessary to carry out the provisions of the Bankruptcy Code. *In re DRW Property Co.* 82, 54 B.R. 489, 494 (Bankr. N.D. Tex. 1985). Some courts have also found authority for substantive consolidation in section 1123(a)(5)(C) of the Bankruptcy Code. Section 1123(a)(5)(C) provides in part, "a plan [of reorganization] shall provide adequate means for the plan's implementation, such as merger or consolidation of the debtor with one or more persons." *See, e.g., In re Stone & Webster, Inc.*, 286 B.R. 532, 541 (Bankr. D. Del. 2002) ("Courts have held that [Section 1123(a)(5)(C)] indicates Congress' intent that a chapter 11 debtor may merge or consolidate with other entities, including other debtors, as part of the reorganization process . . . substantive consolidation is expressly authorized by . . . § 1123(a)(5)(C)"). There are however, no statutorily prescribed standards for court approval of substantive consolidation. Instead, courts apply certain judicially-developed standards to determine the appropriateness of substantive consolidation. *See e.g., In re New Century TRS Holding, Inc.*, 390 B.R. 140, 160 (Bankr. D. Del. 2008) (discussing and applying the Third Circuit's *Owens Corning* test).

The Debtors believe that the limited substantive consolidation requested in the Plan is legally justified under section 1123(a)(5) of the Bankruptcy Code and prevailing case law. Moreover, it is in the best interest of the Debtors' estates and will promote a more expeditious and streamlined distribution and recovery process for all creditors. The proposed substantive consolidation will not affect any liens or other security interests held by any prepetition secured creditors.

The Plan shall serve as a motion seeking entry of an order substantively consolidating the Debtors as described in the Plan and for the limited purposes provided for in the Plan. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan as provided therein on or before the Plan Objection Deadline, the Substantive Consolidation Order (which order may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

In the event that the Bankruptcy Court does not substantively consolidate some or all of the Debtors' Estates for voting purposes, the Debtors believe that confirmation and distributions under the Plan will not be affected, except with respect to Class 6. If there were to be no substantive consolidation of the Debtors' Estates, then Class 6 would be divided into several subclasses, one for each Debtor against which Claims have been filed (or which have scheduled Claims).

**D.      PENSION PLANS**

Debtor NMP is a sponsor of a pension plan for UAW Hourly Employees. The Debtors intend to continue to maintain the pension plan subsequent to the Effective Date.

**V.**

**SUMMARY OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION**

**A.      PURPOSE AND PREDICATES TO THE PLAN**

The Plan's primary purpose is to effectuate a restructuring consistent with the terms and conditions of the Consent Agreement. Present debt service requirements do not currently afford the Debtors sufficient flexibility to maximize their present and anticipated future business opportunities. The Restructuring (as defined below) will reduce the amount of the Debtors' outstanding indebtedness by more than $240 million. The Debtors believe that the Restructuring will significantly enhance customer and vendor confidence in their prospects and will enable them to devote additional resources to research and development, capital expenditures and other strategic initiatives.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. '**

**B.      ADMINISTRATIVE AND PRIORITY TAX CLAIMS**

**1.      Administrative Claims**

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date; (b) or if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be, or otherwise upon an order of the Bankruptcy Court; *provided that* Allowed Administrative Claims comprising obligations incurred in the ordinary course of business or otherwise assumed by a Debtor pursuant to the Plan will be assumed on the Effective Date, and thereafter, paid or performed by the respective Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing any such obligations and Professional Fee Claims shall be paid from the Retained Professional Escrow Account in accordance with the applicable order of the Bankruptcy Court after filing a fee application, notice and a hearing pursuant to the procedures set forth in Article XII.D. of the Plan. The treatment of Class 3 Claims (First Lien Lenders) and Class 4 Claims (Second Lien Claims) contained in Article III.B. of the Plan shall be in full satisfaction of all Allowed unsecured, secured and administrative claims of such First Lien Lenders and Second Lien Lenders in respect of the First Lien Credit Facility and Second Lien Credit Facility, respectively.

2.    **DIP Facility Claims**

DIP Facility Claims are Unimpaired and unclassified claims. On the Effective Date, the Reorganized Debtors shall either (i) repay the DIP Facility Claims in full in cash from the proceeds of an exit facility to be consummated pursuant to the terms and conditions of the Third Party Exit Credit Documents, which the Reorganized Debtors shall execute and deliver on the Effective Date, or (ii) with the consent of the Requisite Lenders (as defined in the DIP Facility Credit Agreement), which consent may be withheld or delayed in their sole discretion, the Reorganized Debtors shall jointly and severally assume, as borrower or guarantors, all of the actual or contingent DIP Facility Claims, and the terms and conditions of the DIP Facility Claims (including any unfunded commitments) shall be amended and restated as provided in the DIP Facility Exit Credit Documents, which the Reorganized Debtors shall execute and deliver on the Effective Date. The forms of the principal Third Party Exit Credit Documents or the DIP Facility Exit Credit Documents, as the case may be, shall be filed as part of the Plan Supplement, and may thereafter be altered, amended, modified or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules. Among other things, the indebtedness and other obligations under the Third Party Exit Credit Documents or the DIP Facility Exit Credit Documents, as the case may be, shall be secured by liens upon and security interests in all real and personal property assets of the Reorganized Debtors, such liens and security interests having the same priority as that granted to the Holders of the Allowed DIP Facility Claims under Final DIP Order. On and after the Effective Date, the relative priorities, including without limitation Lien, payment and enforcement priorities, between (a) the indebtedness and other obligations under the Third Party Exit Credit Documents or the DIP Facility Exit Credit Documents, as the case may be, and the Liens securing same, and (b) the indebtedness and other obligations under CapitalSource Exit Credit Documents and the Liens securing same, shall be governed by the terms of the New Intercreditor Agreement.

3.    **Priority Tax Claims**

(a)    Priority Tax Claims are Unimpaired and unclassified claims. Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, on the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; (iii) over a period ending not later than five (5) years after the Petition Date; and (iv) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan (other than payments in Cash made to a Class of Creditors under section 1122(b) of the Bankruptcy Code).

(b)    *Installment Payments*: Any installment payments made pursuant to section 1129(a)(9)(C) of the Bankruptcy Code shall be in equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and subsequently on the first day of each third calendar month thereafter, as necessary. The amount of any Priority Tax Claim that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall: (i) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced; (ii) survive the Effective Date and Consummation of the Plan as if the Chapter 11 Cases had not been commenced; and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. In accordance with section 1124 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Plan shall not alter or otherwise impair the legal, equitable, and contractual rights of any Holder of a Priority Tax Claim that is not otherwise due and payable on or prior to

the Effective Date. Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided in the Plan, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes.

## VI.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.    SUMMARY**

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Other than as specifically set forth in the Plan, the treatment of and consideration to be received by holders of Claims or Equity Interests pursuant to Article III of the Plan shall be in full satisfaction, settlement, release and discharge of such holder's respective Claim or Equity Interest. Except as expressly set forth in the Plan or in the Confirmation Order, such discharge shall not affect the liability of any other Person or Entity on, or the property of any other Person or Entity encumbered to secure payment of, any such Claim or Equity Interest; nor shall it affect the Reorganized Debtors' obligations pursuant to the Plan.

Summary of Classification and Treatment of Classified Claims and Equity Interests.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Preferred Equity Interests | Impaired | Deemed to Reject |
| 7 | Common Equity Interests | Impaired | Deemed to Reject |

**B.    Classification and Treatment of Claims and Equity Interests**

**1.    Class 1—Other Priority Claims.**

(a)    *Classification*: Class 1 consists of the Other Priority Claims against the Debtors.

(b)    *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by the Plan. Unless otherwise agreed to by the Holders of the Allowed Class 1 Claim and the Debtors, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, one of the following treatments, as determined by the Debtors and upon the consent of the Requisite Supporting First Lien Term Loan Lenders and after consultation with the Requisite Supporting Second Lien Lenders:

(i)    the Debtors will pay the Allowed Class 1 Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable; *provided that,*

Allowed Class 1 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Allowed Class 1 Claims become due and owing in the ordinary course of business;

(ii) each such Allowed Class 1 Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or

(iii) the Debtors will treat the Allowed Class 1 Claim in accordance with subsections (i) and (ii) above thereafter when such claim becomes Allowed.

(c) *Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders Class 1 Claims are not entitled to vote to accept or reject the Plan; *provided*, *however*, that all Class 1 Claims shall be subject to Allowance under the provisions of the Plan, including, but not limited to, Article VIII of the Plan.

2. **Class 2—Other Secured Claims.**

(a) *Classification*: Class 2 consists of the Other Secured Claims against the applicable Debtor.

(b) *Treatment*: Each Holder of an Allowed Class 2 Claim will be placed in a separate subclass of Class 2, and each subclass will be treated as a separate class for distribution purposes. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 2 Claim shall receive, in full and final satisfaction of such Allowed Class 2 Claim, one of the following treatments, as determined by the Debtors and upon the consent of the Requisite Supporting First Lien Term Loan Lenders and after consultation with the Requisite Supporting Second Lien Lenders:

(i) the Debtors will pay the Allowed Class 2 Claim in full in Cash;

(ii) the Debtors will reinstate the Allowed Class 2 Claim; or

(iii) the Debtors will treat an Allowed Class 2 Claim in a manner indubitably equivalent to the treatments set forth in subsections (i) and (ii) above.

(c) *Voting*: Class 2 is Unimpaired, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan; *provided*, *however*, that all Class 2 Claims shall be subject to Allowance under the provisions of the Plan, including, but not limited to, Article VIII of the Plan.

3. **Class 3—First Lien Claims**

(a) *Classification*: Class 3 consists of the Holders of First Lien Claims.

(b) *Treatment*: On or as soon as practicable after the Effective Date, a Holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction of each such Allowed Class 3 Claim and all other Allowed unsecured, secured and administrative claims of such Holder of an Allowed Class 3 Claim arising in respect of the First Lien Facility and any grant of adequate protection with respect thereto, the following:

(i) The Holder of an Allowed Class 3 Claim that is a First Lien Revolver Lender shall receive the CapitalSource Exit Secured Note (the form of which is included in the Plan Supplement), which secured grid promissory note shall be in an initial principal amount of such First Lien Revolving Lender's Allowed Class 3 Claim, shall provide for an increase in the principal amount thereof in the event

there is a drawing on any letter of credit entitled to the benefit of the First Lien Facility and outstanding immediately prior to the Petition Date in the amount of such drawing, shall be for a term ending on November 14, 2013, with interest and principal payable on the terms on conditions set forth in the CapitalSource Exit Secured Note. On and after the Effective Date, the relative priorities, including without limitation Lien, payment and enforcement priorities, between, on the one hand, the indebtedness and other obligations under the CapitalSource Exit Credit Documents and the Liens securing same and, on the other hand, the indebtedness and other obligations under the Third Party Exit Credit Documents or the DIP Facility Exit Credit Documents, as the case may be, and the Liens securing same, shall be governed by the terms of the New Intercreditor Agreement;

(ii)     Each Holder of an Allowed Class 3 Claim that is a First Lien Term Lender shall receive its Pro Rata share of 95% of the Distribution Shares. Each Holder of an Allowed Class 3 Claim that is a First Lien Term Lender shall execute and deliver the Stockholders' Agreement prior to receiving its Pro Rata share of the Distribution Shares as set forth above. If any such Holder has not executed and delivered the Stockholders' Agreement by the 60th day after the Effective Date, such Holder shall no longer be eligible to receive any distribution of the New Common Stock, and such Holder's share of the New Common Stock will be distributed Pro Rata, to the remaining Holders of Allowed Class 3 Claims that are First Lien Term Lenders that are parties to the New Stockholders' Agreement;

(iii)    All fees, costs and expenses of the First Lien Agents and their respective predecessors-in-interest (including, without limitation, all First Lien Professional Fees) that are outstanding as of the Effective Date shall be paid in full in Cash on the Effective Date; and

(iv)    The foregoing treatment of the Allowed Class 3 Claims gives full effect to any intercreditor or other provisions in any of the First Lien Documents (including, without limitation, the provisions of Section 2.15(b) of the First Lien Credit Agreement and Section 7.2 of the Pledge and Security Agreement (as defined in the First Lien Credit Agreement)), any Second Lien Documents, Prepetition Intercreditor Agreement or any of the other Prepetition Collateral Documents relating to the application of proceeds or payments in respect of the First Lien Obligations and/or the Second Lien Obligations, and accordingly, no Holder of an Allowed Class 3 Claim or an Allowed Class 4 Claim shall have any claim against any other Holder of an Allowed Class 3 Claim (or any First Lien Agent) or Allowed Class 4 Claim (or any Second Lien Agent) based upon or otherwise arising in respect of any such intercreditor or other provisions of any First Lien Documents, Second Lien Documents, Prepetition Intercreditor Agreement, other Prepetition Collateral Documents or otherwise.

(c)    *Voting*: Class 3 is Impaired, and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.    **Class 4—Second Lien Claims**

(a)    *Classification*: Class 4 consists of the Holders of Second Lien Claims.

(b)    *Treatment*: On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction of its Allowed Class 4 Claim and all other Allowed unsecured, secured and administrative claims of such Holder of an Allowed Class 4 Claim arising in respect of the Second Lien Facility and any grant of adequate protection with respect thereto, its Pro Rata share of the following:

(i)    5% of the Distribution Shares. Each Holder of an Allowed Class 4 Claim shall execute and deliver the Stockholders' Agreement prior to receiving its Pro Rata share of the Distribution Shares as set forth above. If any such Holder has not executed and delivered the Stockholders' Agreement by the 60th day after the Effective Date, such Holder shall no longer be eligible to receive any distribution of the New Common Stock, and such Holder's share of the New Common Stock will be distributed Pro Rata, to the remaining Holders of Allowed Class 4 Claims that are parties to the Stockholders' Agreement; and

(ii)    the Class 4 Warrants. Notwithstanding the foregoing, each Holder of an Allowed Class 4 Claim shall execute and deliver the Stockholders' Agreement prior to receiving its Pro Rata share of the Class 4 Warrants. If any such Holder of Second Lien Claims has not executed and delivered the Stockholders' Agreement by the 60th day after the Effective Date, such Holder shall no longer be eligible to receive any distribution of the Class 4 Warrants, and such Holder's share of the Class 4 Warrants will be distributed Pro Rata, to the remaining Holders of Allowed Class 4 Claim that are parties to the Stockholders' Agreement.

(iii)    All fees, costs and expenses of the Second Lien Agent and its predecessor-in-interest (including, without limitation, all Second Lien Professionals' Fees up to the Second Lien Fee Cap) that are outstanding as of the Effective Date shall be paid in full in Cash on the Effective Date; and

(iv)    The foregoing treatment of the Allowed Class 4 Claims gives full effect to any intercreditor or other provisions in any of the Second Lien Documents (including without limitation, the provisions of Section 2.15(b) of the Second Lien Credit Agreement and Section 7.2 of the Second Lien Pledge and Security Agreement), any First Lien Documents, Prepetition Intercreditor Agreement or any of the other Prepetition Collateral Documents relating to the application of proceeds or payments in respect of the First Lien Obligations and/or Second Lien Obligations, and accordingly, no Holder of an Allowed Class 3 Claim shall have any claim against any Holder of an Allowed Class 4 Claim (or the Second Lien Agent) based upon or otherwise arising in respect of any such intercreditor or other provisions of any First Lien Documents, Second Lien Documents, Prepetition Intercreditor Agreement or other Prepetition Collateral Documents.

(c)    *Voting*: Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5.    **Class 5—General Unsecured Claims**

(a)    *Classification*: Class 5 consists of Holders of General Unsecured Claims, including, without limitation, the Interest Rate Swap Claims and the Claims of OEMs that are not Specified OEMs. Claims of the Specified OEMs are not included in Class 5 and shall not share in the Class 5 Recovery because such Claims are governed by the assumption by the Debtors of the Specified OEMs' contracts and purchase orders pursuant to Article VI.A. of the Plan and the consequent payment in full of such claims in the ordinary course of business pursuant to the terms of the respective OEM Consensually Modified Agreements.

(b)    *Treatment*: Each Holder of an Allowed Class 5 Claim, but not including the holder of the Interest Rate Swap Claims, shall receive his, her or its Pro Rata share of the $75,000 Class 5 Recovery, in full and final satisfaction of each such Allowed Class 5 Claim. The holder of the Interest Rate Swap Claims shall receive the Morgan Stanley Exit Swap in full and final satisfaction of the Interest Rate Swap Claims..

(c)    *Voting*: Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept

or reject the Plan; *provided, however*, that all Class 5 Claims shall be subject to Allowance under the provisions of the Plan, including, but not limited to, Article VIII of the Plan.

6.     **Class 6—Preferred Equity Interests**

   (a)     *Classification*: Class 6 consists of all Preferred Equity Interests in the Debtors.

   (b)     *Treatment*: On the Effective Date, all Class 6 Preferred Equity Interests shall be deemed cancelled, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Preferred Equity Interests.

   (c)     *Voting*: Class 6 is Impaired, and Holders of Class 6 Preferred Equity Interests are conclusively deemed to reject the Plan. Holders of Class 6 Preferred Equity Interests are therefore not entitled to vote to accept or reject the Plan.

7.     **Class 7— Common Equity Interests**

   (a)     *Classification*: Class 7 consists of all Common Equity Interests in the Debtors.

   (b)     *Treatment*: On the Effective Date, all Class 7 Common Equity Interests shall be deemed cancelled, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Common Equity Interests.

   (c)     *Voting*: Class 7 is Impaired, and Holders of Class 7 Common Equity Interests are conclusively deemed to reject the Plan. Holders of Class 7 Common Equity Interests are therefore not entitled to vote to accept or reject the Plan.

**C.     Intercompany Claims and Equity Interests**

Notwithstanding anything described in the Plan to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Reorganized Debtors with the consent of the Requisite Supporting First Lien Lenders and after consultation with the Requisite Supporting Second Lien Lenders, Intercompany Claims, and claims of any Debtor against any other Debtor may be: (i) preserved and reinstated, in full or in part; (ii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (iii) eliminated or waived based on accounting entries in the Debtors' or Reorganized Debtors' books and records and other corporate activities; or (iv) contributed to the capital of the Entity obligated in respect of such Intercompany Claim.

The cancellation of Preferred and Common Equity Interests pursuant to the Plan shall not apply to any equity interests of any Debtor in any other Debtor, which intercompany equity interests shall remain unimpaired and unaltered under the terms of the Plan after the Effective Date.

**D.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or Reorganized Debtors' rights in respect of any Unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

# VII.

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Voting Classes**

Each Holder of an Allowed Claim in Classes 3, 4 and 5 shall be entitled to vote to accept or reject the Plan.

**B.      Acceptance by Voting Classes**

The Voting Classes shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two thirds in amount of the Allowed Claims actually voting in that Class have voted to accept the Plan; and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in that Class have voted to accept the Plan.

**C.      Presumed Acceptance of Plan**

Classes 1 and 2 are Unimpaired under the Plan, and are therefore presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**D.      Presumed Rejection of Plan**

Classes 6 and 7 are Impaired and shall receive no distribution, and are therefore presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**E.      Elimination of Vacant Classes**

Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 (i.e., no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for the purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.      Non-Consensual Confirmation; Cramdown**

The Debtors reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 6 and 7. To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code; and/or (b) modify the Plan in accordance with   Article XII.E. thereof.

# VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      Consolidation of the Debtors for Voting and Distribution**

On and after the Effective Date, except for Class 2 Claims, each and every Claim in the Debtors' Chapter 11 Cases against any of the Debtors shall be deemed filed against the consolidated Debtors, and shall be deemed a single consolidated Claim against and obligation of all of the consolidated Debtors. Such limited consolidation shall not affect (other than for Plan voting and distribution purposes) (i) the legal and corporate structures of the Reorganized Debtors, or (ii) pre- and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with contracts that were entered into during the Debtors' Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code and the Plan, (y) in connection with the terms of the DIP Facility, the DIP Facility Exit Credit Documents or the Third Party Exit Credit Documents, as the case may be, the CapitalSource Exit Credit Documents, the New Common Stock and the Class 4 Warrants, and

(z) pursuant to the terms and conditions contained in the Plan. From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under the Plan.

**B.      Vesting of Assets in the Reorganized Debtors**

Pursuant to section 1141(b) of the Bankruptcy Code, all property of the respective estate of each Debtor, together with any property of each Debtor that is not property of its estate and that is not specifically disposed of pursuant to the Plan, or by order of the Bankruptcy Court, will revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Liens, Claims and Equity Interests except as specifically provided pursuant to the Plan, the Confirmation Order, the DIP Facility Exit Credit Documents or the Third Party Exit Credit Documents, as the case may be, and the CapitalSource Exit Credit Documents.

**C.      Cancellation of Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates, and other documents evidencing the Equity Interests shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, except to the extent otherwise provided therein, any indenture or similar instrument relating to any of the foregoing shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged.

**D.      Issuance of New Securities; Execution of Related Documents**

On or immediately after the Effective Date, the Reorganized Debtors shall issue all securities, notes, stock, instruments, certificates, and other documents required to be issued pursuant to the Plan, including, without limitation, New Common Stock and the New Organizational Documents, each of which shall be distributed as provided therein. The Reorganized Debtors shall execute and deliver all other agreements, documents and instruments that are required to be executed pursuant to the terms thereof.

**E.      Effectuating Documents; Further Transactions**

The chief executive officer, chief financial officer or any other appropriate officer of Debtor J.L. French Automotive Castings, Inc. or Reorganized J.L. French Automotive Castings, Inc., or any other applicable Debtor or Reorganized Debtor, as the case may be, shall be authorized to: (a) execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; and (b) certify or attest to any of the foregoing actions.

**F.      Creation of Retained Professional Escrow Account**

On the Effective Date, the Reorganized Debtors shall establish the Retained Professional Escrow Account and reserve the amounts necessary to ensure the payment of all Allowed Accrued Professional Compensation.

**G.      Corporate Governance, Directors and Officers, and Corporate Action**

      **1.      Reorganized J.L. French Automotive Castings, Inc. Certificate of Incorporation and By-Laws**

On the Effective Date, Reorganized J.L. French Automotive Castings, Inc. shall file the Reorganized J.L. French Automotive Castings, Inc. Certificate of Incorporation with the Secretary of State of the state of Delaware in accordance with Section 103 of the General Corporation Law of the state of Delaware. The Reorganized J.L. French Automotive Castings, Inc. Certificate of Incorporation and the Reorganized J.L. French Automotive Castings, Inc.

By-Laws will, among other things: (a) authorize the issuance of New Common Stock; and (b) prohibit the issuance of non-voting securities pursuant to section 1123(a)(6) of the Bankruptcy Code.

### 2.    Effectiveness of Stockholders' Agreement

The Plan provides that the Stockholders' Agreement, as thereinafter amended or changed on the terms thereof, shall be deemed effective and binding upon all Holders of New Common Stock on the Effective Date and upon all future Holders of New Common Stock (including all holders of warrants issued pursuant to the Warrant Agreements (the "Warrants")).

### 3.    Directors and Officers of the Reorganized Debtors

The New Board's composition shall be disclosed in a notice to be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing. The directors of the remaining Reorganized Debtors shall be appointed by the New Board on the Effective Date in accordance with the terms of the Stockholders' Agreement. The Debtors' current management will continue as the management of the Reorganized Debtors, subject to review of the New Board. The Debtors will disclose, prior to the commencement of the Confirmation Hearing, the nature of any compensation for any member of the New Board who is an "Insider" under the Bankruptcy Code. Each such director, officer and member shall serve from and after the Effective Date pursuant to the terms of the Reorganized J.L. French Automotive Castings, Inc. Certificate of Incorporation, other constituent documents, or the Delaware General Corporation Law.

### 4.    Management Incentive Program

The New Board shall be authorized, but not obligated, to implement the Management Incentive Program as authorized by and pursuant to the New Organizational Documents, *provided that* the terms and conditions of that Management Incentive Program have been agreed to by the New Board. The New Organizational Documents shall explicitly authorize the New Board to issue the Maximum Authorized Management Incentive Program Shares of New Common Stock for the Management Incentive Program.

### 5.    D&O Tail Coverage Policies

Reorganized J.L. French Automotive Castings, Inc. will obtain sufficient tail coverage for a period of six (6) years under a directors' and officers' insurance policy for the current and former officers and directors of the Debtors.

### 6.    Corporate Action

On the Effective Date, the adoption and filing (as necessary) of the New Organizational Documents, the approval of the Reorganized J.L. French Automotive Castings, Inc. By-Laws, the appointment of directors, officers, managers, members and partners for the Reorganized Debtors, the adoption of a Management Incentive Program, and all actions contemplated thereby, shall be authorized and approved in all respects subject to the provisions of the Plan. All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, officers or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate directors and officers of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan and the Plan Documents in the name of and on behalf of the Reorganized Debtors. Entry of the Confirmation Order will constitute approval of the Plan Documents and all such transactions subject to the occurrence of the Effective Date.

## H.    Sources of Cash for Plan Distribution

All Cash necessary for the Debtors, or the Reorganized Debtors, as the case may be, to make payments pursuant to the Plan (including, but not limited to, the Exit Costs) shall be obtained from existing Cash balances as of the Effective Date.

**I.**     **Exit Financing**

The Reorganized Debtors intend to either (1) obtain a $15,000,000 exit financing facility from a third party on market terms or (2) jointly and severally assume, as borrower or guarantors, all of the actual or contingent DIP Facility Claims, and the terms and conditions of the DIP Facility Claims (including any unfunded commitments) shall be amended and restated as provided in the DIP Facility Exit Credit Documents, which the Reorganized Debtors shall execute and deliver on the Effective Date. The principal DIP Facility Exit Credit Documents shall be filed as part of the Plan Supplement and thereafter may be altered, amended, modified or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules.

IX.

**TREATMENT OF EXECUTORY CONTRACTS,**
**UNEXPIRED LEASES AND PENSION PLAN**

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Any executory contracts and unexpired leases that have not expired by their own terms on or prior to the Effective Date, which the Debtors have not assumed or rejected during the pendency of the Chapter 11 Cases and which are not listed in the Plan Supplement as executory contracts or unexpired leases to be rejected, and that are not the subject of a motion pending as of the Effective Date to reject the same, shall be deemed assumed by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Those executory contracts and unexpired leases listed in the Plan Supplement as executory contracts or unexpired leases to be rejected shall be deemed rejected by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any executory contract or unexpired lease is with a Debtor to be merged into another Debtor and is to be assumed or deemed assumed under the Plan, the executory contract or unexpired lease also shall be deemed to be an asset and liability and obligation of the Reorganized Debtor into which that Debtor is to be merged.

On the Effective Date, the Debtors shall be deemed to have assumed the OEM Consensually Modified Agreements, and the OEM Consensually Modified Agreements shall be effective and binding upon the Debtors and the respective Specified OEMs.

**B.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All proofs of Claim arising from the rejection (if any) of executory contracts or unexpired leases must be filed with the Voting Agent within thirty (30) days after the earlier of: (a) the date of entry of an order of the Bankruptcy Court approving any such rejection; and (b) the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely Filed within that time period will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and property unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article X.I. and Article X.J. of the Plan.

**C.**     **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan**

Any monetary amounts by which any executory contract and unexpired lease to be assumed pursuant to the Plan (including pursuant to Article VI.A of the Plan) is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding: (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by

section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption of any executory contracts or unexpired leases. Nevertheless, the Debtors or the Reorganized Debtors in their discretion may file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to any matter pertaining to the assumption. All such objections shall be litigated to Final Order, *provided, however*, that the Debtors may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections. In the event of such a dispute, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made in the ordinary course following the entry of a Final Order resolving the dispute and approving the assumption; provided, however, that based on the Bankruptcy Court's resolution of any such dispute, the applicable Debtor or Reorganized Debtor shall have right, within thirty (30) days of the entry of such Final Order and subject to approval of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, to reject the applicable executory contract or unexpired lease.

**D.    Indemnification of Directors, Officers and Employees**

All indemnification provisions in place on and prior to the Effective Date for current and former directors and officers of the Debtors and their subsidiaries shall survive the Effective Date of the Plan for Claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date. As of the Effective Date, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, board resolutions, contracts or otherwise) for the current and former directors, officers, employees, attorneys, other professionals and agents of the Debtors shall be deemed to have been assumed by the Reorganized Debtors, and shall survive effectiveness of the Plan. All contingent and unliquidated Claims of Debtors' current and former directors, officers and employees for indemnification, defense or reimbursement of any liability shall be deemed expunged and withdrawn as of the Effective Date. The Reorganized Debtors shall be required to indemnify a director or officer in connection with a proceeding (or part thereof) initiated by such director or officer only if such proceeding (or part thereof) was authorized by the board of directors of the Reorganized Debtors.

**E.    Assumption of D&O Insurance Policies**

As of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' directors and officers liability insurance policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the Debtors' directors and officers liability insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the Debtors' directors and officers liability insurance policies, and each such indemnity obligation will be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of claim need be Filed.

**F.    Compensation and Benefit Programs**

Except as otherwise expressly provided in the Plan or in the Plan Supplement, all employment agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees and non-employee directors, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements and plans, incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans, shall be treated as executory contracts under the Plan, and on the Effective Date will be deemed assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; and the Debtors' and Reorganized Debtors' obligations under such programs to such Persons shall survive confirmation of the Plan, except for: (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent that any such rejection does not violate the Bankruptcy Code including, but not limited to, sections 1114 and 1129(a)(13) thereof); (b) all employee equity or equity-based incentive plans; and (c) such executory contracts or employee benefit plans as have previously been rejected, are the subject of pending rejection procedures or a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract; *provided however*, that the Reorganized Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue unless and to the extent that any such retiree benefits have been modified in accordance with section 1114 of the Bankruptcy Code.

G.    **Workers' Compensation Programs**

As of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' workers' compensation insurance policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the Debtors' workers' compensation liability insurance policies. As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claim on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided, however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; provided however, that nothing in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for in the applicable laws.

## X.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    **Distribution Record Date**

As of the close of business on the date the Clerk of the Bankruptcy Court enters the Confirmation Order or such other date as may be designated in the Confirmation Order, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents (other than Classes 3 and 4) will be deemed closed, and there will be no further changes in the record holders of any of the Claims or Equity Interests (other than Classes 3 and 4). The Debtors will have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date (other than Classes 3 and 4). The Debtors or Reorganized Debtors, as applicable, will recognize only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date (other than Classes 3 and 4). The Distribution Record Date is the record date for purposes of making distributions under the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and if so completed will be deemed to have been completed as of the required date

B.    **Disbursing Agent**

Reorganized J.L. French Automotive Castings, Inc., as Disbursing Agent, or such other entity designated by Reorganized J.L. French Automotive Castings, Inc. as a Disbursing Agent, will make all distributions under the Plan when required by the Plan. A Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court

C.    **Rights and Powers of the Disbursing Agent**

The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated thereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

D.    **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, the Disbursing Agent shall make distributions on the Effective Date or as soon as reasonably practicable thereafter on account of all

Allowed Claims that are entitled to receive distributions under the Plan, and shall make further distributions to Holders of Claims that subsequently are determined to be Allowed Claims.

The New Common Stock and Warrants to be issued under the Plan shall be deemed issued as of the Effective Date regardless of the date on which they are actually dated, authenticated or distributed.

**E.      Delivery and Distributions and Undeliverable or Unclaimed Distributions**

**1.      Delivery of Distributions in General**

Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on the records of the Debtors or the Reorganized Debtors, as the case may be, as of the Effective Date. Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder indicated on the Debtors' records on the date of any such distribution; _provided, however,_ that the manner of such distributions shall be determined at the discretion of the Debtors or Reorganized Debtors, as the case may be; and _provided further_ that the Debtors' books and records for the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any proof of Claim filed by that Allowed Claim Holder; and _provided further_ that all distributions to the First Lien Lenders and Second Lien Lenders shall be made directly by the Disbursing Agent on the Effective Date or as soon as practicable after the Effective Date.

**2.      Undeliverable Distributions**

(a)      Holding of Certain Undeliverable Distributions.

If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors are notified in writing of such Holder's then current address. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VII.E.2 of the Plan, until such time as any such distributions become deliverable. Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind. As soon as reasonably practicable, the Reorganized Debtors shall make all distributions that become deliverable.

(b)      Failure to Claim Undeliverable Distributions.

In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, sixty (60) days after the Effective Date, the Reorganized Debtors will file with the Bankruptcy Court a listing of the Holders of undeliverable distributions. This list will be maintained for as long as the Chapter 11 Cases remain open. Any Holder of an Allowed Claim, irrespective of when a Claim became an Allowed Claim, that does not assert a Claim pursuant to the Plan for an undeliverable distribution (regardless of when not deliverable) within the later of (i) one (1) year after the Effective Date, and (ii) sixty (60) days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Reorganized Debtors or their property. In such cases: (i) any Cash held for distribution on account of such Claims shall be property of the Reorganized Debtors, free of any restrictions thereon; and (ii) any New Common Stock or Class 4 Warrants held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c)      Failure to Present Checks.

Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. The Debtors shall periodically File with the Bankruptcy Court a list of Holders of un-negotiated checks. Any Holder of an Allowed Claim holding an un-negotiated check that does not seek reissuance within 240 days after the initial mailing or other delivery of such check shall have its right to a distribution in the amount of the un-negotiated check discharged, and such Holder shall be forever, barred, enjoined and estopped from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment of such Claims shall be property of the Reorganized

Debtors free of any Claims of such Holder for the amount of such un-negotiated check. Nothing contained in the Plan shall require the Debtors to attempt to locate any Holder of an Allowed Claim.

### 3.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. For tax purposes, distributions received by Holders in full or partial satisfaction of Allowed Claims will be allocated first to unpaid interest that accrued on such Claims, with any excess allocated to the principal amount of Allowed Claims.

### F.    Timing and Calculation of Amounts to be Distributed

On the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan.

### G.    Minimum Distribution

Any other provision of the Plan notwithstanding, no fractional shares of New Common Stock or fractional Warrants shall be distributed. Whenever any payment of a fractional share or Warrant under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole share or Warrant (up or down), with half shares or half warrants or less being rounded down. Any other provision of the Plan notwithstanding, the Debtors or the Reorganized Debtors, as the case may be, will not be required to make distributions or payments of less than $50 (whether cash or otherwise), and they will likewise not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### H.    Setoffs; Subordination

Other than with respect to the Claims of the First Lien Term Lenders, the First Lien Revolving Lender, the Second Lien Lenders and the DIP Lenders (as to which all rights of setoff or recoupment are waived pursuant to the Plan by the Debtors and the Reorganized Debtors), the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; *provided that* neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan. All Claims against the Debtors and all rights and Claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Equity Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims under the Plan shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

## XI.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

**A.      Resolution of Disputed Claims**

**1.      Prosecution of Claims Objections**

The Debtors prior to the Effective Date, and thereafter the Reorganized Debtors, shall have the exclusive authority to file objections on or before the Claims Objection Bar Date, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; *provided, however* that the Reorganized Debtors must receive the prior written approval of the Requisite Supporting First Lien Term Loan Lenders and consult with the Requisite Supporting Second Lien Lenders prior to entering into any settlement or compromise of any Disputed Claim if the face amount of the Disputed Claim is in excess of $100,000.00.

**2.      Claims Estimation**

Before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**3.      Payments and Distributions on Disputed Claims**

Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Reorganized Debtors in their discretion, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of any such disputes by settlement or Final Order. On the date or, if such date is not a Business Day, on the next successive Business Day that is twenty (20) calendar days after the end of the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim will receive all payments and distributions to which that Holder is then entitled under the Plan. Notwithstanding the foregoing, any Holder of both an Allowed Claim and a Disputed Claim in the same Class of Claims will not receive payment or distribution in satisfaction of any such Allowed Claim, except as otherwise agreed by the Reorganized Debtors in their discretion or ordered by the Bankruptcy Court, until all such Disputed Claims are resolved by settlement or Final Order. In the event that there are Claims that require adjudication or other resolution, the Debtors and Reorganized Debtors reserve the right to, or shall upon an order of the Bankruptcy Court, establish appropriate reserves for potential payment of any such Claims.

**B.      Claims Allowance**

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors will have and shall retain after the Effective Date any and all rights and defenses that the

Debtors had with respect to any Claim as of the Petition Date. All Claims of any Person or Entity subject to section 502(d) of the Bankruptcy Code shall be deemed disallowed as of the Effective Date unless and until such Person or Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be.

**C.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or any Class of Claims are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine any such controversy before the Confirmation Date.

**D.      Allowed Claims**

Upon entry of the Confirmation Order, the DIP Facility Claims, First Lien Claims, Second Lien Claims and Claims of Specified OEMs shall be deemed Allowed Claims under the Plan.

## XII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.      Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that: (a) all provisions, terms and conditions of the Plan are approved in the Confirmation Order; (b) the Confirmation Order is entered no later than October 6, 2009 or such later date to which the Requisite Supporting First Lien Term Loan Lenders have consented in writing after consultation with the Second Lien Lenders; and (c) the Plan, the proposed Confirmation Order and all of the Plan Documents are in form and substance acceptable to the (1) Debtors; (2) the Requisite Supporting First Lien Term Loan Lenders; and (3) the Requisite Supporting Second Lien Lenders and First Lien Revolving Lender to the extent of any Adverse or Disproportionate Effect or Modification.

**B.      Conditions Precedent to Consummation**

The Consummation of the Plan will not occur unless and until each of the following conditions has occurred or will occur contemporaneously with the Consummation of the Plan, or waived pursuant to the provisions of Article IX.C. of the Plan:

1.      the Confirmation Order shall have been entered, shall have become a Final Order, shall be in full force and effect, and shall be in form and substance acceptable to the: (a) Debtors; (b) Requisite Supporting First Lien Term Loan Lenders; and (c) Requisite Supporting Second Lien Lenders and First Lien Revolving Lender to the extent of any Adverse or Disproportionate Effect or Modification;

2.      the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan;

3.      the provisions of the Confirmation Order are non-severable and mutually dependent;

4.      all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been executed or become effective, in form and substance satisfactory to: (a) the Requisite Supporting First Lien Term Loan Lenders; and (b) the Requisite Supporting Second Lien Lenders and First Lien Revolving Lender to the extent of any Adverse or Disproportionate Effect or Modification;

5.      Reorganized J.L. French Automotive Castings, Inc. is authorized and directed to issue the New Common Stock and the Class 4 Warrants;

6.     the OEM Consensually Modified Agreements shall have been executed and be in full force and effect;

7.     the New Common Stock and Warrants to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding;

8.     any alteration of any term or provision of the Plan by the Bankruptcy Court shall be acceptable to the (i) Debtors; (ii) Requisite Supporting First Lien Term Loan Lenders; and (iii) Requisite Supporting Second Lien Lenders and First Lien Revolving Lender to the extent of any Adverse or Disproportionate Effect or Modification;

9.     the Stockholders' Agreement and the Warrant Agreements shall have been approved by the Requisite Supporting Second Lien Lenders and shall have been executed or become effective;

10.     all fees, costs and expenses required to be paid under the DIP Facility, the First Lien Pledge and Security Agreement or the Plan, including without limitation, those of the DIP Agent incurred under the DIP Facility and the First Lien Term Agent incurred under the First Lien Pledge and Security Agreement, shall have been paid;

11.     all fees, costs and expenses required to be paid under the Second Lien Pledge and Security Agreement, including without limitation, those of the Second Lien Term Agent shall have been paid, *provided that* Second Lien Professional Fees are subject to the Second Lien Fee Cap;

12.     either (a) the Third Party Exit Credit Documents shall have been executed and delivered and all conditions precedent thereto shall have been satisfied or (ii) the DIP Facility Exit Credit Documents in the form approved by the DIP Agent and the requisite threshold of the DIP Lenders (as set forth in the DIP Facility Exit Credit Documents) and the Debtors, shall have been executed and delivered and all conditions precedent thereto shall have been satisfied;

13.     all documents and agreements necessary to implement the Plan shall have been, as applicable to each such document and agreement: (a) tendered for delivery; (b) all conditions precedent thereto shall have been satisfied; and (c) shall have been effected or executed; which documents and agreements shall include, but not be limited to:

     (a)     the New Organizational Documents and all documents provided for therein or contemplated thereby; and

     (b)     the Management Incentive Program, if approved and authorized by the New Board;

14.     The New Board shall have been appointed; and

15.     The articles of incorporation and/or certificates of formation of the Reorganized Debtors shall have been filed with the applicable authority of their respective jurisdiction of incorporation and/or formation in accordance with such jurisdiction's applicable laws.

## C.    Waiver of Conditions

The Debtors may, in their discretion, at any time, waive any of the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided, however*, that the Debtors may not waive any of the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan without the prior written consent of the: (A) Requisite Supporting First Lien Term Loan Lenders; and (B) Requisite Supporting Second Lien Lenders and First Lien Revolving Lender to the extent of any Adverse or Disproportionate Effect or Modification.

**D.      Effect of Non-Occurrence of Conditions to Consummation**

Unless extended by the mutual agreement of the Debtors and the Requisite Supporting First Lien Term Loan Lenders, in the event the conditions specified in Article IX.B. of the Plan have not been satisfied or waived in accordance with Article IX of the Plan by October 23, 2009: (i) the Confirmation Order will be vacated; (ii) no distributions under the Plan will be made; (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all the Debtors' obligations with respect to the Claims and Equity Interests will remain unchanged and nothing contained in the Plan will be deemed to constitute a waiver or release of any Claims or claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other Entity in any proceedings further involving the Debtors.

## XIII.

## RELEASE, INJUNCTIVE AND RELATED PROVISIONS

**A.      Compromise and Settlement**

The allowance, classification and treatment of all Allowed Claims and Equity Interests under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable rights relating thereto.  In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, Claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist:  (a) between the Debtors, on the one hand, and the Releasing Parties, on the other; and (b) as between the Releasing Parties.  As of the Effective Date, any and all such Causes of Action, Claims and counterclaims referenced in (a) and (b) in the immediately preceding sentence are settled, compromised and released pursuant to the Plan.  The Confirmation Order shall approve all such releases of Causes of Action, Claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant to the Plan.  Nothing in Article X.A. of the Plan, however, shall compromise or settle in any way whatsoever any Causes of Action that the Debtors or the Reorganized Debtors may have against the Non-Released Parties.

**B.      Releases by the Debtors**

On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees, including, but not limited to (a) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise and (b) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, and in view of the indemnification pursuant to Article X.E. of the Plan of the Debtors' former officers and directors as Indemnified Parties, each of the Debtors shall provide a full discharge and release to the Debtor Releasees (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors) and each such Debtor Releasee's respective properties from any and all claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors or the Reorganized Debtors would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for or on behalf of any of the Debtors or any of their Estates and further including those in any way related to the Chapter 11 Cases or the Plan; *provided, however,* that the foregoing Debtor Release shall not operate to waive or release any Causes of Action expressly set forth in and preserved by the Plan or Plan Supplement; and *provided, further, however,* that the foregoing Debtor Release shall not operate to waive or release the Debtors or the Reorganized Debtors from their obligations under the Plan or the Confirmation Order.

Notwithstanding anything contained in the Plan to the contrary, the Debtors shall not have released nor be deemed to have released by operation of Article X.B. of the Plan or otherwise any claims or Causes of Action that they or the Reorganized Debtors may have now or in the future against the Non-Released Parties.